Ruth O. SHAW, et al., Plaintiffs,

v.

Governor James B. HUNT, Jr., et al., Defendants.

No. 92–202–CIV–5–BR.

United States District Court, E.D. North Carolina, Raleigh Division.

Aug. 22, 1994.

Robinson O. Everett, Durham, NC, for Ruth O. Shaw, Melvin G. Shimm, Robinson O. Everett, James M. Everett, Dorothy G. Bullock.

R.A. Renfer, Asst. U.S. Atty., Raleigh, NC, for William P. Barr, John Dunne and amicus U.S.

Edwin M. Speas, Jr., Tiare Bowe Smiley, State Attorney General's Office, John R. McArthur, N.C. Dept. of Justice, Raleigh, NC, for James B. Hunt, Dennis A. Wicker, Daniel T. Blue, Jr., Rufus L. Edmisten, North Carolina State Bd. of Elections, Edward J. High, Jean H. Nelson, Larry Leake, Dorothy Presser, June K. Youngblood.

Geraldine Sumter, Anita Sue Hodgkiss, James E. Ferguson, II, Ferguson, Stein, Wallas, Adkins, Gresham & Sumter, P.A., Charlotte, NC, for Ralph Gingles, Virginia Newell, George Simkins, N.A. Smith, Ron Leeper, Alfred Smallwood, Dr. Oscar Blanks, Rev. David Moore, Robert L. Davis, C.R. Ward, Jerry B. Adams, Jan Valder, Bernard Offerman, Jennifer McGovern, Charles Lamberth, Ellen Emerson, Lavonia Allison, George Knight, Leto Copeley, Woody Connette, Roberta Waddle, William M. Hodges.

Thomas A. Farr, Maupin, Taylor, Ellis & Adams, Raleigh, NC, for James Arthur "Art" Pope, Betty S. Justice, Doris Lail, Joyce Lawing, Nat Swanson, Rick Woodruff, J. Ralph Hixon, Audrey McBane, Sim A. Delapp, Jr., Richard S. Sahlie, Jack Hawke.

Before PHILLIPS, Senior Circuit Judge, BRITT, District Judge *, and VOORHEES, Chief District Judge **.

## AMENDED OPINION

PHILLIPS, Senior Circuit Judge:

This action, brought by several white citizens and registered voters of the State of North Carolina against various state and federal officials, challenges the constitutionality of the congressional redistricting[1] plan (the Plan) adopted by the North Carolina General Assembly following the 1990 decennial census.[2] Plaintiffs now claim principally that the General Assembly's redistricting plan violates their rights under the Equal Protection Clause of the Fourteenth Amendment, because it intentionally includes one or more congressional districts constructed along racial lines in order to assure the election of two African–American members of Congress, and is not narrowly tailored to further any compelling governmental interest. We ini-

---

\* of the Eastern District of North Carolina.

\*\* of the Western District of North Carolina.

**1.** Though the terms "reapportionment" and "redistricting" are often used interchangeably, see, e.g., Hays v. Louisiana, 839 F.Supp. 1188, 1190 n. 1 (W.D.La.1993), vacated, — U.S. —, 114 S.Ct. 2731, 129 L.Ed.2d 853 (1994), we believe there is an important technical distinction between them. "Reapportionment" refers to the reallocation of a finite number of seats in a legislative body among a fixed number of political subunits. "Redistricting," by contrast, refers to the process by which the lines dividing those political subunits into separate electoral districts are redrawn in response to a reapportionment. See Carstens v. Lamm, 543 F.Supp. 68, 72 n. 3 (D.Colo.1982). For the sake of precision, we use the term "redistricting" to refer to the specific legislative action under challenge here. See Gingles v. Edmiston, 590 F.Supp. 345, 349 n. 1 (E.D.N.C.1984) (drawing same distinction), aff'd sub nom. Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

**2.** Jurisdiction of this three-judge district court is based on 28 U.S.C. §§ 1331, 1343, and 2284.

tially dismissed that claim under Rule 12(b)(6), *Shaw v. Barr,* 808 F.Supp. 461 (E.D.N.C.1992), but the Supreme Court reversed and remanded, *Shaw v. Reno,* —— U.S. ——, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (*Shaw* ). On remand, we find that the Plan's lines were deliberately drawn to produce one or more districts of a certain racial composition and that it is thus a "racial gerrymander" subject to strict scrutiny under *Shaw.* But we nonetheless conclude that the Plan passes constitutional muster under that standard, because it is narrowly tailored to further the state's compelling interest in complying with the Voting Rights Act. We therefore hold that the Plan does not violate the plaintiffs' Equal Protection rights in the manner alleged, and we give judgment for the defendants accordingly.

## I.

### General Background and Procedural History

As a result of population increases reflected in the 1990 decennial census, North Carolina became entitled to an additional seat in the United States House of Representatives, bringing its total number of seats to twelve. In July of 1991, the North Carolina General Assembly therefore enacted legislation to redistrict the state into twelve congressional districts. 1991 N.C.Sess.Laws Ch. 601. This redistricting plan included one district, the First, in which African–Americans constituted majorities of both the registered voters and the voting age population of the district. This proposed majority-minority district [3] was located in the northeastern part of the state.

Because 40 of North Carolina's 100 counties are covered by the provisions of § 5 of the Voting Rights Act of 1965, 42 U.S.C.

§ 1973c,[4] the state submitted its proposed redistricting plan to the United States Attorney General for preclearance. On December 18, 1991, the Attorney General interposed formal objection to the proposed plan, finding that the state had not met its § 5 burden of showing that the plan was free of racially discriminatory purpose.

Under § 5, the state could have challenged the Attorney General's objection to its original redistricting plan by filing a declaratory judgment action in the United States District Court for the District of Columbia. After debate, however, it elected not to do this, but instead to revise its original plan in order to meet the Attorney General's objection and secure his approval. In January of 1992, the General Assembly therefore convened in special session and enacted a revised redistricting plan. 1991 N.C.Extra Sess.Laws Ch. 7. This revised plan, which is the Plan under attack here, creates two districts in which African–Americans constitute majorities of both the registered voters and the voting age populations. One of these majority-minority districts, the First, is centered in the rural northeastern part of the state, where a large, dense concentration of African–Americans has long existed, but contains extensions that reach deep into the rural southeastern part of the state. The other, the Twelfth, is located not in the southern part of the state, as the Justice Department had suggested, but runs diagonally across the Piedmont in a jagged band that stretches some 160 miles from Durham to Gastonia, generally following the route of Interstate Highway 85, but with several extensions into the historic "black sections" of the Piedmont cities that lie along its course. The twelve districts created by the Plan are as equally populated as is mathematically possible,[5] but their configurations are such that a number of pre-

---

**3.** As used here and throughout this opinion, the term "majority-minority district" refers to an electoral district in which a majority of both the registered voters and the voting age population are members of the same racial minority.

**4.** Section 5 forbids any jurisdiction within its coverage to implement any change in a "standard, practice, or procedure with respect to voting" without first obtaining federal certification that the change "does not have the purpose and

will not have the effect of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973c. The jurisdiction may obtain such a certification from either the United States District Court for the District of Columbia or the United States Department of Justice. *Id.*

**5.** Seven of the twelve districts have a population of 552,386; the other five a population of 552,- 387.

cincts, townships, cities and counties of the state are split among two or even three congressional districts.

The state submitted its revised Plan to the Attorney General under § 5, and the Attorney General precleared it on February 6, 1992. Almost immediately, the Republican Party of North Carolina and several individual voters associated with it filed suit in federal district court challenging the revised Plan under various provisions of the federal Constitution. Their primary claim was that the Plan violated their rights under the Equal Protection Clause of the Fourteenth Amendment, because its lines were deliberately drawn to favor Democratic incumbents at the expense of Republican political interests. On April 16, 1992, a three-judge district court dismissed that claim under Rule 12(b)(6), holding that the plaintiffs had not, and could not, allege that the Plan had the requisite discriminatory effect on an identifiable political group needed to state a valid political gerrymandering claim under *Davis v. Bandemer*, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986). *Pope v. Blue*, 809 F.Supp. 392 (W.D.N.C.1992). The Supreme Court summarily affirmed. 506 U.S. ——, 113 S.Ct. 30, 121 L.Ed.2d 3 (1992).

Shortly after the complaint in *Pope v. Blue* was filed, plaintiffs herein, five white residents of Durham County, North Carolina who are registered to vote in that county, filed this action challenging the constitutionality of the same congressional redistricting plan. Named as defendants in this action were the Governor, the Board of Elections, and various high-ranking officials of the state of North Carolina (the state defendants), as well as two federal officials who had participated in the § 5 preclearance process, the United States Attorney General and the Assistant Attorney General for the Civil Rights Division (the federal defendants).

Plaintiffs' principal constitutional claim against the state defendants in this action was that the General Assembly's revised Plan violated their rights under the Equal Protection Clause. They based that claim on allegations that the Plan deliberately "creates two Congressional Districts in which a majority of African-American voters was concentrated arbitrarily—without regard to any other considerations, such as compactness, contiguousness, geographical boundaries, or political subdivisions," with the purpose of "creat[ing] Congressional Districts along racial lines" and assuring the election of two African-American Representatives. Amended Complaint ¶ 36(A). Two theories of Equal Protection violation were advanced. First, that the deliberate drawing of district lines so as to create one or more districts in which a particular race has a majority, even if required by the Voting Rights Act, was *per se* unconstitutional under the Equal Protection Clause. Alternatively, that even if such race-based redistricting was not always unconstitutional, the specific redistricting plan at issue here was, because its lines did not observe such traditional districting considerations as geographic compactness, contiguity, and communities of interest, but were instead improperly "gerrymandered" to create two majority-minority districts and insure proportional representation of African-American citizens in North Carolina's congressional delegation.

In addition, plaintiffs alleged that the Plan violated rights secured to them by §§ 2 and 4 of Article I of the Constitution, the Privileges and Immunities Clause of the Fourteenth Amendment, and the Fifteenth Amendment. Finally, they made a two-pronged attack on the constitutionality of the federal defendants' conduct in refusing to preclear a congressional redistricting plan for North Carolina that did not contain two majority-minority districts, arguing both that the federal defendants had misinterpreted amended § 2 of the Voting Rights Act and in consequence applied it unconstitutionally, and, in the alternative, that if amended § 2 in fact required the creation of two majority-minority districts in North Carolina, it was itself unconstitutional.

As relief, plaintiffs sought a declaration that the Plan was unconstitutional; preliminary and permanent injunctive relief against its use by the appropriate state defendants to conduct congressional elections; a declaration that the federal defendants had acted unconstitutionally in demanding that North Carolina adopt a congressional redistricting

plan with two majority-minority districts; and an injunction restraining the federal defendants from taking any action requiring North Carolina to enact such a plan.

Following designation of this three-judge court, both sets of defendants filed motions to dismiss. We dismissed the claims against the federal defendants, concluding that we lacked subject-matter jurisdiction over those claims.[6] 808 F.Supp. at 466–67 (majority op.); *id.* at 474 (Voorhees, C.J., concurring in relevant part).

By a divided vote, we dismissed the claims against the state defendants as well. We were in agreement that to the extent those claims were based on §§ 2 and 4 of Art. I and the Privileges and Immunities Clause of the Fourteenth Amendment, they failed to state a legally cognizable claim. We were also agreed that plaintiffs' Fifteenth Amendment claim was essentially subsumed within their related claim under the Equal Protection Clause of the Fourteenth Amendment, and that to the extent plaintiffs' Equal Protection claim alleged that race-based redistricting was always unconstitutional, even when it was required by the Voting Rights Act, it was foreclosed by *United Jewish Organizations, Inc. v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) (*UJO* ). 808 F.Supp. at 470–72 (majority op.); *id.* at 473–74 (Voorhees, C.J., concurring in relevant part). We were divided as a court, however, on the proper disposition of plaintiffs' alternative Equal Protection claim: that even if race-based redistricting was not always unconstitutional, the specific redistricting plan at issue here was, because its lines were drawn to create two majority-minority districts and assure the election of two African–American members of Congress, without regard to such traditional districting considerations as geographical compactness, contiguity, and communities of interest.

Two of us thought *UJO* disposed of this claim as well. *Id.* at 472–73 (majority op.). We read the various opinions in *UJO* to stand for the proposition that a redistricting scheme violates the Equal Protection rights of white voters only if it is "adopted with the purpose and effect of discriminating against white voters ... on account of their race." *Id.* at 472, *citing UJO,* 430 U.S. at 165–68, 97 S.Ct. at 1009–11 (plurality opinion); *id.* at 179–80, 97 S.Ct. at 1016–17 (Stewart, J., concurring). We concluded that plaintiffs had not alleged the requisite discriminatory purpose, because they had not alleged that the Plan was intended to disadvantage white voters—that is, to deprive them of a fair opportunity, on a state-wide basis, to participate in the political process and to elect candidates of their choice—but only to give effect to African–American voting strength in order to comply with the Voting Rights Act. *Id.* at 472–73. We also concluded that plaintiffs had not, and could not, allege the requisite discriminatory effect, because they could not establish that the Plan unfairly diluted or canceled out white voting strength and led to proportional underrepresentation of white voters on a statewide basis. *Id.* at 473.

Judge Voorhees disagreed with this analysis. He read the plurality opinion in *UJO* to authorize the states to deliberately create majority-minority districts in order to comply with the Voting Rights Act *only* when they employ traditional districting principles such as compactness, contiguity, and communities of interest, *id.* at 475–77 (Voorhees, C.J., dissenting in relevant part), which he believed were "of constitutional dimension," *id.* at 480. The Plan's alleged failure to respect these principles, in his view, "augur[ed] a constitutionally suspect, and potentially unlawful, intent" on the part of the General

---

**6.** We reasoned that the claims against the federal defendants were ones over which § 14(b) of the Voting Rights Act, 42 U.S.C. § 1973l(b), gave the United States District Court for the District of Columbia exclusive jurisdiction. 808 F.Supp. at 466–67 (majority op.); *id.* at 474 (Voorhees, C.J., concurring in relevant part). Two of us also thought that the claims against the federal defendants should be dismissed on a second, alternative ground: that they failed to state a cognizable claim for relief, because they sought judicial review of the Attorney General's preclearance decisions, which was barred by *Morris v. Gressette,* 432 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977). 808 F.Supp. at 467 (majority op.). *But see id.* at 474 (Voorhees, C.J., dissenting in relevant part) (reasoning that because we lacked subject matter jurisdiction over the claims against the federal defendants, we were without power to address those claims on the merits).

Assembly sufficient to state an Equal Protection claim. *Id.* at 477.

Plaintiffs appealed our dismissal of their claims to the United States Supreme Court. In a 5–4 decision, the Court held that plaintiffs had stated a claim under the Equal Protection Clause by alleging that the General Assembly had adopted a redistricting plan that was "so irrational on its face that it can be understood only as an effort to segregate voters into separate voting districts because of their race, and that the separation lacks sufficient justification." *Shaw v. Reno,* —— U.S. ——, —— 113 S.Ct. 2816, 2832, 125 L.Ed.2d 511 (1993). If this "allegation of racial gerrymandering remains uncontradicted," the Court held, "the District Court further must determine whether the North Carolina plan is narrowly tailored to further a compelling governmental interest." *Id.* at ——, 113 S.Ct. at 2832. The Court therefore reversed our dismissal of the plaintiffs' Equal Protection claim and remanded that claim to this court for further consideration. *Id.* at ——, 113 S.Ct. at 2832. The Court expressly affirmed our dismissal of the claims against the federal defendants. *Id.* at ——, 113 S.Ct. at 2823. It expressed no view on the validity of plaintiffs' claims against the state defendants under Art. 1, § 2; Art. I, § 4, the Privileges and Immunities Clause of the Fourteenth Amendment, and the Fifteenth Amendment, *id.* at ——, 113 S.Ct. at 2832, leaving our dismissal of those claims undisturbed but, because unreviewed, still open for possible reconsideration by this court or, if not reconsidered, for possible later review by that Court. In this posture of the case, our consideration has been confined on remand to the one claim found legally viable by the Supreme Court: the claim of improper "racial gerrymandering" in violation of the Equal Protection Clause.

Following the remand of that claim for further consideration, the state defendants filed an answer to the amended complaint, in which they admitted that one of their purposes in enacting the Plan was to respond to the objections interposed by the Attorney General in the § 5 preclearance process by creating two majority-minority districts. Answer to Amended Complaint at ¶ 17; *see id.* at 6. But they contended that the Plan was not a "racial gerrymander" subject to strict scrutiny under *Shaw,* because it did not segregate voters into separate voting districts on the basis of race, but actually created integrated districts, and because its lines were the product of legitimate non-racial redistricting considerations, including compliance with constitutional "one person, one vote" requirements; the creation of communities of interest based on shared historical, social, and economic interests; and the protection of incumbents. *Id.* at 6. Alternatively, they asserted that even if the Plan was subject to strict scrutiny, it was nonetheless constitutional, because it was narrowly tailored to further the state's compelling interests in complying with the preclearance requirements of § 5 of the Voting Rights Act, avoiding a violation of § 2 of the Voting Rights Act, and eradicating the effects of past racial discrimination in the state. *Id.* at 7.

After the state defendants filed their answer, we permitted twenty-two persons registered to vote in North Carolina, both African–American and white, to intervene as defendants in support of the Plan (the defendant-intervenors). We also permitted eleven persons registered to vote as Republicans in North Carolina—including Art Pope, who had been the lead plaintiff in the earlier political gerrymandering challenge to the Plan—to intervene as plaintiffs (the plaintiff-intervenors), on the condition that they adopt as their own the amended complaint filed by the original plaintiffs.[7] Finally, we permitted the United States, on its motion, to appear as amicus curiae by filing briefs in support of the legal positions of the state defendants.

After approximately four months of discovery, the plaintiff-intervenors filed motions, later joined by the original plaintiffs, for a preliminary injunction against further election proceedings under the existing congressional redistricting Plan and a temporary

---

7. We denied motions to intervene filed by Americans for the Defense of Constitutional Rights, Inc. (ADCR), a non-profit corporation associated with the original plaintiffs; the North Carolina Republican Party; and Jack Hawke in his official capacity as Chairman of that Party.

restraining order and preliminary injunction to extend the filing period for candidates for the 1994 congressional elections. We denied both the TRO application and the motion for preliminary injunction, the latter after hearing oral argument.

Following a final pre-trial conference, trial to the three-judge court was held from March 28, 1994 through April 4, 1994, pursuant to a duly adopted pre-trial order. At trial, the parties presented, and the court received, extensive oral and documentary evidence.[8] We deferred decision pending the parties' submission of proposed findings of fact and conclusions of law, briefing, and concluding oral arguments of counsel, which we heard on April 18, 1994.

Having considered the evidence, the memoranda of law submitted by the parties, the stipulations of fact, the proposed findings and conclusions, and the oral arguments of counsel, we now make the following findings of fact and conclusions of law, pursuant to Fed. R.Civ.Proc. 52(a), prefaced by a discussion of our understanding of the governing law and its application in this context.

## II.

### General Legal Principles

We begin by setting out our understanding of the nature of the Equal Protection claim recognized by the Supreme Court in this case, to serve as a framework for our findings of fact and conclusions of law. In the process, we consider conflicting contentions of the parties respecting various aspects of the claim.

### A. General Nature of the Claim

At the outset of this action, plaintiffs' Equal Protection challenge to this congressional redistricting plan took two alternative forms. First, that any state redistricting plan that deliberately creates districts of a certain racial composition necessarily violates the Equal Protection Clause, regardless of its justification. Second, that even if such race-based redistricting is not unconstitution-

al in all circumstances, this particular redistricting plan is, because its lines do not observe traditional districting considerations such as geographical compactness, contiguity, and communities of interest, but are improperly "gerrymandered" to create two majority-minority districts and insure proportional representation of African–American citizens in North Carolina's congressional delegation.

The Supreme Court found the first claim foreclosed by its prior precedents, at least when the legislature's purpose was to comply with the remedial requirements of the Voting Rights Act. *See* —— U.S. at ——, 113 S.Ct. at 2824 (reaffirming that race-conscious redistricting, like other forms of race-conscious state decisionmaking, is "not always unconstitutional"). The Court found legally viable, however, plaintiffs' alternative Equal Protection claim, which it characterized as a claim that the state's redistricting plan, though facially race-neutral, was "so irrational on its face that it can be understood only as an effort to segregate voters into separate voting districts because of their race, and that the separation lacks sufficient justification." *Id.* at ——, 113 S.Ct. at 2832. It is only that Equal Protection claim which plaintiffs and their supporting intervenors now press on remand.

As we understand it, the claim is a newly recognized one in voting rights jurisprudence. Until *Shaw*, the Supreme Court had recognized only two grounds on which a redistricting plan might be subject to challenge under the Equal Protection Clause. The first, based on the "one person one vote" principle, was that its districts were not equal in population, so that the votes cast by individual voters in some districts had less weight than those cast by voters in other districts. *See Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). The second was that though its districts were of equal population, they were drawn with the purpose and had the effect of unfairly "diluting" or canceling out the voting

---

8. In order to expedite trial before the three-judge tribunal required by statute, our pre-trial order limited the fact and expert witnesses available to the parties for live testimony at trial and required

that the testimony of all others be received in the form given in discovery or by written narrative statements subject to live cross-examination upon demand.

strength of an identified group of voters—that is, of so diminishing their ability to influence the political process as essentially to shut them out of it, as opposed to merely making it more difficult for them to elect representatives of their choice in particular districts. *See White v. Regester,* 412 U.S. 755, 765–66, 93 S.Ct. 2332, 2339–40, 37 L.Ed.2d 314 (1973) (racial and ethnic group); *Whitcomb v. Chavis,* 403 U.S. 124, 153–55, 91 S.Ct. 1858, 1874–75, 29 L.Ed.2d 363 (1971) (racial group); *Davis v. Bandemer,* 478 U.S. 109, 131–33, 106 S.Ct. 2797, 2809–11, 92 L.Ed.2d 85 (1986) (plurality opinion) (political group); *id.* at 151–52, 91 S.Ct. at 1873 (O'Connor, J., concurring in judgment).[9] Until *Shaw,* no majority opinion of the Supreme Court had held that a state redistricting plan that did not cause concrete, material harm to the voting strength of an identifiable group of citizens in one of these two ways could nonetheless be challenged under the Equal Protection Clause on the ground that it impermissibly took race into account in drawing district lines; the only intimations to that effect had come in separate opinions of single justices.[10] And a majority of the Supreme Court had squarely held that the Equal Protection Clause did not prevent a jurisdiction subject to § 5 of the Voting Rights Act from deliberately creating districts in which racial minorities were a majority, so long as it did so with the purpose of complying with the Voting Rights Act and did not unfairly dilute or cancel out the voting strength of any other racial group. *UJO v. Carey,* 430 U.S. 144, 161–68, 97 S.Ct. 996, 1007–11, 51 L.Ed.2d 229 (1977) (plurality opinion); *id.* at 179–80, 97 S.Ct. at 1016–17 (Stewart, J., concurring in the judgment);

*see also Metro Broadcasting, Inc. v. FCC,* 497 U.S. 547, 584, 110 S.Ct. 2997, 3019, 111 L.Ed.2d 445 (1990) ("a State subject to § 5 of the Voting Rights Act ... may 'deliberately creat[e] or preserv[e]' black majorities in particular districts in order to ensure that its reapportionment plan complies with [the Voting Rights Act]") (*quoting UJO,* 430 U.S. at 161, 97 S.Ct. at 1007–08).

The Supreme Court's decision in *Shaw* has now recognized a third way, characterized by the Court as analytically distinct from the two earlier recognized, in which a state redistricting plan might offend the Equal Protection Clause. It is that the plan was designed "to separate voters into different districts on the basis of race," without "sufficient justification." *Shaw,* —— U.S. at ——, 113 S.Ct. at 2828. Such race-based redistricting legislation, said the Court, presents the same dangers as any other state law that deliberately classifies citizens by race: it threatens "to stigmatize individuals by reason of their membership in a racial group," "to incite racial hostilit[ies]," and "to stimulate our society's latent race-consciousness." *Id.* at ——, 113 S.Ct. at 2824–25 (internal quotations omitted). It should therefore be subject to "the same close scrutiny that we give other state laws that classify citizens by race," *id.* at ——, 113 S.Ct. at 2825; that is, be upheld only if "narrowly tailored to further a compelling governmental interest." *Id.* at ——, 113 S.Ct. at 2832. The Court made clear that strict scrutiny must be applied even to those race-based redistricting schemes that purport to have been enacted with the "benign" purpose of giving effect to minority voting strength in order to comply with the Voting Rights Act, "because without

**9.** Of course, redistricting plans whose lines were drawn with the purpose and effect of actually *denying* otherwise qualified individuals the right to vote on account of their race were subject to challenge under the *Fifteenth* Amendment, which directly proscribes the denial or abridgment of the right to vote on racial grounds. *See Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).

**10.** *See Gomillion,* 364 U.S. at 348, 81 S.Ct. at 131–32 (Whittaker, J., concurring) (suggesting that redistricting plan whose lines were deliberately drawn to exclude voters of a particular race from a particular district might be subject to challenge under Equal Protection Clause as "an

unlawful segregation of [the] races"); *Wright v. Rockefeller,* 376 U.S. 52, 59–67, 84 S.Ct. 603, 606–11, 11 L.Ed.2d 512 (1964) (Douglas, J., dissenting) (suggesting that redistricting plan whose lines were deliberately drawn to concentrate voters of particular racial and ethnic groups in particular districts, while excluding them from others, was subject to challenge under the Equal Protection Clause as a form of state-sponsored segregation); *id.* at 67–74, 84 S.Ct. at 611–15 (Goldberg, J., dissenting) (same); *City of Mobile v. Bolden,* 446 U.S. 55, 86, 100 S.Ct. 1490, 1509–10, 64 L.Ed.2d 47 (1980) (Stevens, J., concurring in judgment) (same).

[strict scrutiny], a court cannot determine whether or not the discrimination truly is 'benign.'" *Id.* at——, 113 S.Ct. at 2830; *see id.* at ——, 113 S.Ct. at 2826 ("district lines obviously drawn for the purpose of separating voters by race require careful scrutiny under the Equal Protection Clause regardless of the motivations underlying their adoption"). Finally, the Court held that "a plaintiff challenging a [state redistricting] plan under the Equal Protection Clause may state a claim by alleging that the legislation, though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification." *Id.* at ——, 113 S.Ct. at 2828. Because plaintiffs had made such an allegation in their Amended Complaint, the Court concluded, they had stated a valid Equal Protection claim.

This states our understanding of the general nature of the Equal Protection claim recognized by the Court in this case and remanded to us for trial. It is, in effect, the same basic claim that the Court has recognized in other contexts in which race-based remedial measures, or "affirmative action," undertaken by state actors have been challenged, typically by members of the majority race claiming "reverse discrimination." *See Regents of the Univ. of Calif. v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (admission to public institution of higher learning); *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (public employment); and *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (government contracting).[11] That being its general nature, there remain significant problems concerning how the substantive elements and procedural incidents of such a claim are to be transposed to the unique voting rights context: specifically, the problems of standing; the nature of the showing required to trigger strict scrutiny; the allocation of the burden of proof at the strict scrutiny stage; the types of compelling state interests that might justify such race-

based action; and the meaning of narrowly tailored in this context. On all of these matters, the parties are in flat disagreement. We now turn to them.

## B. *Standing*

Defendant-intervenors contend that the action should be dismissed for lack of standing. They point out that the Supreme Court's decision in this case technically held only that, *as a matter of substantive Equal Protection doctrine,* plaintiffs could state a valid Equal Protection challenge to the Plan without alleging that it had the purpose and effect of diluting their group voting strength. They emphasize that the Court did not hold that plaintiffs had standing to assert such a claim, nor did it purport to relieve them from the obligation to satisfy the normal requirements for standing: a showing that they have personally suffered, or are in immediate danger of suffering, some actual "injury in fact" that is "fairly traceable" to the challenged conduct and "likely to be redressed" by the relief they seek. *See Lujan v. Defenders of Wildlife,* 504 U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). And they argue that plaintiffs have now failed to prove that the Plan has caused them the sort of "injury in fact" required to give them standing to challenge it. They concede that the clear implication, if not the actual holding, of the Supreme Court's decision is that plaintiffs need not show that the Plan has caused injury to their *voting strength.* But they read the Court's discussion of the other ways in which race-based districting legislation can injure voters, —— U.S. at ——–——, 113 S.Ct. at 2827–28, as implying that a voter has standing to challenge such legislation only if he can show that it has actually injured his political interests in one of two other ways: (i) by causing the representative elected from his district to represent only the interests of a particular racial group of which he is not a member; or (ii) by exacerbating existing patterns of racial bloc voting by a racial group of which he is not a member. While they concede that the Supreme Court's decision can be read to hold

---

11. It would appear, however, that this claim, even when advanced by members of the majority race, cannot properly be referred to as one of

"reverse discrimination," for it has no "reverse" aspect, but instead claims "equal" discrimination against all individuals. *See infra* at 425–426.

that plaintiffs had sufficiently *alleged* one or both of these injuries to establish standing for purposes of Rule 12(b)(6), they say it cannot be read to foreclose the possibility that this action might yet be dismissed for lack of standing, should plaintiffs fail to prove those allegations at trial. *See Lujan,* 504 U.S. at ——, 112 S.Ct. at 2136–37 (while generalized allegations of injury resulting from the challenged conduct may be adequate to establish standing at the pleading stage, when the court is obliged to accept all material allegations of the complaint as true, they will not suffice to carry plaintiff's burden of proof on standing at trial).

■ Defendant-intervenors' argument is not without some force. The federal courts are not a general forum for the airing of any and all complaints a citizen may have about the way in which his government conducts its business, *Los Angeles v. Lyons,* 461 U.S. 95, 112, 103 S.Ct. 1660, 1670–71, 75 L.Ed.2d 675 (1983), and they do not have "an unconditioned authority to determine the constitutionality of legislative or executive acts." *Valley Forge Christian College v. Americans United,* 454 U.S. 464, 471, 102 S.Ct. 752, 757–58, 70 L.Ed.2d 700 (1982). An unbroken line of Supreme Court decisions establishes that a federal court may decide the merits of a constitutional challenge to a legislative act only when asked to do so by a party who has personally suffered, or is in immediate danger of suffering, some actual "injury in fact" that is "fairly traceable" to the challenged act and "likely to be redressed" by the relief he seeks. *Lujan,* 504 U.S. at ——, 112 S.Ct. at 2136; *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758–59; *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976); *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975); *Flast v. Cohen,* 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968). These three elements—injury in fact, causation, and redressability—are the "irreducible constitutional minimum" for standing, derived directly from the Article III case-or-controversy limitation on the federal judicial power. *Northeastern Florida Contractors v. Jacksonville,* —— U.S. ——, ——————, 113 S.Ct. 2297, 2301–02, 124 L.Ed.2d 586 (1993); *Lujan,* 504 U.S. at ——, 112 S.Ct. at 2136. As such, they are "an indispensable part of the plaintiff's case," which he must prove at trial "with the [same] manner and degree of evidence as any other matter on which [he] bears the burden of proof," *id.* at ——, 112 S.Ct. at 2136, before he is entitled to have the court rule on the merits of his claim. *See Warth,* 422 U.S. at 499, 95 S.Ct. at 2205; *Allen,* 468 U.S. at 750, 104 S.Ct. at 3324.

At first blush, it would appear that plaintiffs have not even alleged, much less proved, the sort of "injury in fact" required by this line of decisions. The Supreme Court has emphasized that such a injury must be "concrete" in both a qualitative and a temporal sense, *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1722–23, 109 L.Ed.2d 135 (1990), which means that it must be both "distinct and palpable" in nature, *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206, as opposed to "[a]bstract," *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974), and "real and immediate," as opposed to "conjectural" or "hypothetical," *Lyons,* 461 U.S. at 101–02, 103 S.Ct. at 1664–65. *See generally Whitmore,* 495 U.S. at 155, 110 S.Ct. at 1722–23. It surely is arguable that the injuries plaintiffs allege the Plan has inflicted upon them do not satisfy these criteria. Their primary claim is that the Plan "injures" them—as well as all other citizens, residents, and registered voters of the State of North Carolina—because it threatens to perpetuate archaic racial stereotypes and to increase racial divisions in society. *See* Plaintiffs' Responses to Defendant–Intervenors' First Set of Interrogatories, Responses Nos. 1 and 2. In addition, the two plaintiffs who reside in districts in which African–Americans are a majority under the Plan—Shaw and Shimm—claim that it "injures" them in another way, by causing them to doubt the quality of their representation in Congress and making them feel "disenfranchised." *See* Shimm testimony, Tr. pp. 1084–93. All of these expressly claimed harms could be thought abstract, theoretical, and merely speculative, not concrete and palpable; all have the marks of the sort of "injury

in perception" rather than "in fact," *Powers v. Ohio*, 499 U.S. 400, 426–27, 111 S.Ct. 1364, 1379–80, 113 L.Ed.2d 411 (1991) (Scalia, J., dissenting), that the Supreme Court has previously found insufficient to confer Article III standing.

■ Nevertheless, as we now understand the nature of the claim, we believe the Supreme Court would hold that the plaintiffs have adequately established their standing to assert it. That claim, as indicated, is that the Plan violates the Equal Protection Clause simply because it "classifies" voters—that is, assigns them to particular voting districts—on the basis of their race, without sufficiently compelling justification. In other contexts, the Supreme Court has recognized that a state's use of racial classifications necessarily inflicts "stigmatic" injury, *Allen*, 468 U.S. at 755, 104 S.Ct. at 3326–27, which, though "abstract" in the sense that it cannot easily be quantified, is sufficient "injury in fact" to give any citizen who has been "personally denied equal treatment" by such a classification standing to challenge it under the Equal Protection Clause. *See Bakke*, 438 U.S. at 281 n. 14, 98 S.Ct. at 2743 n. 14 (opinion of Powell, J., joined by four other justices) (white male applicant to state medical school has standing to challenge admission program that sets aside a certain number of places in the class for minority applicants, even though he cannot show that he would have been admitted but for that set-aside program); *Northeastern Florida Contractors*, —— U.S. at ——, 113 S.Ct. at 2303 (white contractors have standing to challenge municipal ordinance that sets aside a certain percentage of city contracts for minority-owned businesses, even though they cannot show that they would have been awarded a contract but for the set-aside program); *see also Heckler v. Mathews*, 465 U.S. 728, 739–40, 104 S.Ct. 1387, 1395–96, 79 L.Ed.2d 646 (1984) (applying same standing rule in action challenging federal government's use of gender-based classification under the equal protection component of the Due Process Clause of the Fifth Amendment). On remand, plaintiffs seem to have added a claim of such "stigmat-

ic" injury to the list of harms that they claim the Plan has inflicted upon them. *See* Plaintiffs' Post–Trial Brief at 4; Plaintiffs' Responses to Defendant–Intervenors' First Set of Interrogatories, Responses Nos. 1 and 2. Under the reasoning of *Bakke* and its progeny, this "stigmatic" injury would appear sufficient to give them standing to challenge the Plan, if they can show that they were "personally denied equal treatment" by it.

But difficulties remain, which in fairness must be recognized. It is not immediately obvious how this liberal rule of standing developed in *Bakke* and later cases challenging explicit racial classifications can be transposed to race-based districting. To date, all of the cases in which the dignitary injury resulting from a racial classification has been found sufficient to confer Article III standing have involved the use of race to *disadvantage* members of a particular racial group relative to other persons in the distribution of some governmental benefit. *Bakke* and *Northeastern Florida Contractors*, for example, involved explicit racial set-asides that prevented applicants of a certain race from being considered for a particular governmental benefit.[12] In such cases, the classification clearly subjects the members of the disfavored group to "unequal treatment," because it makes it more difficult for them to obtain the benefit in question than it is for other persons. As the Court explained, "the 'injury in fact' in an Equal Protection case of th[at] variety is the denial of equal treatment resulting from the imposition of the barrier" which denies members of one racial group the opportunity to compete for the benefit on an equal footing with members of other racial groups. *Northeastern Florida Contractors*, —— U.S. at ——, 113 S.Ct. at 2303. But laws that assign voters to particular districts on the basis of their race, unlike racial set-asides, do not appear to subject members of any racial group to "unequal treatment" vis-a-vis any other. So long as all citizens may vote, all individual votes receive the same weight, and no racial group's voting strength is unduly diluted, all racial groups are by

---

12. Though *Heckler* was a gender case rather than a race case, it too involved the use of a suspect classification to make it more difficult for certain

otherwise qualified persons to obtain a particular government benefit. *See* 465 U.S. at 731, 104 S.Ct. at 1391 (Social Security benefits).

definition given a fair opportunity to participate in the electoral process, even if some are better positioned than others to elect representatives of their choice in particular districts. *See Shaw,* —— U.S. at —— & n. 4, 113 S.Ct. at 2846 & n. 4 (Souter, J., dissenting); *see also Whitcomb v. Chavis,* 403 U.S. at 153–55, 91 S.Ct. at 1874–75 (fact that redistricting scheme causes members of a particular group to suffer repeated defeats at the polls and fails to provide them with proportional representation does not mean that it denies them an "equal opportunity" to participate in the electoral process); *Davis v. Bandemer,* 478 U.S. at 131–32, 106 S.Ct. at 2809–10 (same).

■ Despite this possible awkwardness, we think the *Shaw* Court must have intended to transpose to race-based districting the expansive concept of standing to challenge racial classifications born in *Bakke* and brought to maturity in *Northeastern Florida Contractors.* The linchpin of the Court's analysis in *Shaw* was that race-based districting is no different than any other legislation that deliberately classifies citizens by race; it was on that basis that the Court held such legislation subject to strict scrutiny under the Equal Protection Clause. *See Shaw,* —— U.S. at —— – ——, 113 S.Ct. at 2824–25. Having equated race-based districting with legislation that explicitly classifies citizens on the basis of race for purposes of the underlying substantive law, it seems inconceivable that the Court would not also equate the two for purposes of standing, which serves merely to define the class of persons who have a sufficient personal stake in a particular substantive claim to litigate it in court. We therefore believe that the same expansive

notion of standing developed in *Bakke* and other cases challenging explicit racial set-asides must also apply to cases challenging race-based districting; that is, that any person who can show that a redistricting plan has assigned him to vote in a particular district at least in part because of his race has standing to challenge it, even if he cannot show that it has caused any concrete injury to his political interests.[13] In this context, the "injury in fact" presumably is the state's decision to deal with the voter as a member of a particular racial class, rather than as an individual, in assigning him to a voting district, which is an affront to his "personal dignity." *See J.E.B. v. Alabama ex rel. T.B.,* —— U.S. ——, ——, 114 S.Ct. 1419, 1434, 128 L.Ed.2d 89 (1994) (Kennedy, J., concurring in the judgment); *Metro Broadcasting, Inc. v. FCC,* 497 U.S. 547, 602, 110 S.Ct. 2997, 3028–29, 111 L.Ed.2d 445 (1990) (O'Connor, J., dissenting) ("At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as 'individuals, not as simply components of a racial ... class'"). That race-based redistricting necessarily visits this indignity equally upon all races would appear to be of no consequence in the standing analysis, for "racial classifications do not become legitimate [because] all persons suffer them in equal degree." *Powers,* 499 U.S. at 410, 111 S.Ct. at 1370.

Such a broad standing principle concededly, and with all respect, has disquieting implications, which defendant-intervenors contend demonstrate its unacceptability. It would appear to mean that any person registered to vote in a jurisdiction with a districting plan that contains one or more districts which

---

**13.** Defendant-intervenors' suggestion that plaintiffs lack standing to challenge the Plan unless they can show that it has either caused the representatives elected from their districts to represent only the interests of a particular racial group of which they are not members or exacerbated patterns of bloc voting by a racial group of which they are not members, *see supra* at 423, is effectively an effort to read back into the constitutional analysis (albeit in the guise of Article III standing, rather than substantive Equal Protection law) a *threshold* requirement that a plaintiff seeking to challenge a race-based redistricting plan demonstrate that it has caused some sort of concrete and material injury to his political interests.

The *Shaw* Court expressly refused to impose such a threshold requirement as a matter of substantive Equal Protection law, and we cannot believe that it would countenance an effort to reintroduce it as a matter of standing law. We read the passage in the *Shaw* opinion upon which defendant-intervenors rely, —— U.S. at —— – ——, 113 S.Ct. at 2827–28, as not intended to limit the class of voters who have standing to challenge race-based districting legislation, but merely to point out some of the pernicious effects that such legislation can have, in order to explain why it should be subject to the same strict scrutiny as other laws that deliberately classify citizens by race.

have been deliberately designed to have a certain racial composition has standing to challenge that plan, even if he is not assigned to vote in one of those districts himself.[14] And its ultimate implication, as defendant-intervenors emphasize, is that any member or members of a racial minority for whose presumed benefit a majority-minority district has been created would have standing to challenge it as an improper "racial classification," even if they cannot prove the sort of injury to their group voting strength required to make out a constitutional or statutory vote-dilution claim. *See Croson,* 488 U.S. at 494, 109 S.Ct. at 722 (plurality) (all racial classifications immediately suspect under Equal Protection Clause, regardless of which race is benefitted or burdened).

Despite these difficulties, we understand *Shaw* necessarily to have implied a standing principle that accords standing to challenge a race-based redistricting plan to any voter who can show that it has assigned him to vote in a particular electoral district in part at least because of his race.

### C. Proof Required to Trigger Strict Scrutiny

The threshold showing required by *Shaw* to establish that a particular districting plan is subject to strict scrutiny is not immediately clear, as the conflicting contentions of the parties illustrate.

Plaintiffs and their supporting intervenors contend that after *Shaw,* strict scrutiny applies to any districting plan in which consideration of race is shown to have played a "substantial" or "motivating" role in the line-drawing process, even if it was not the only factor that influenced that process. They note that it has long been established, outside the districting context, that strict scrutiny applies to any legislation in which a racially-discriminatory purpose is shown to have played a "substantial" or "motivating" role, even if it was not the "sole," "dominant," or even the "primary" purpose of the legislation. *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450 (1977); *see Hunter v. Underwood,* 471 U.S. 222, 231, 105 S.Ct. 1916, 1921–22, 85 L.Ed.2d 222 (1985). They contend that *Shaw* simply transposed the *Arlington Heights* "substantial" or "motivating" role test to the districting context, and that in this context, it is necessarily satisfied by proof that the lines of a particular plan were deliberately drawn so as to create one or more districts in which a particular racial group has a majority, even if factors other than race also played a substantial role in the location and shape of those districts. As they point out, this is the interpretation of *Shaw* adopted by all three members of the court in *Hays v. Louisiana,* 839 F.Supp. 1188 (W.D.La.1993) (*Hays I* ), vacated, —— U.S. ——, 114 S.Ct. 2731, 129 L.Ed.2d 853 (1994),[15] the first three-judge

---

**14.** *See* Pildes & Niemi, Expressive Harms, "Bizarre Districts," and Voting Rights: Evaluating District Appearances after *Shaw v. Reno,* 92 Mich.L.Rev. 483, 514–515 & n. 115 (1993); Aleinikoff & Issacharoff, Race and Redistricting: Drawing Constitutional Lines after *Shaw v. Reno,* 92 Mich.L.Rev. 588, 642 (1993).

**15.** *Hays I* struck down Louisiana's then-existing congressional redistricting plan, which contained two majority-minority districts designed to comply with the Voting Rights Act, as an unconstitutional racial gerrymander under *Shaw.* While an appeal from that decision was pending before the United States Supreme Court, the Louisiana legislature repealed the invalidated plan and enacted a revised congressional redistricting plan, which redrew the two majority-minority districts so as to correct some of the problems that the district court had identified in declaring the earlier plan unconstitutional. Act 1 of the Second Extraordinary Session of the 1994 Louisiana Legislature. The *Hays* plaintiffs promptly moved to amend their complaint to add a challenge to

the revised plan, and the parties filed supplemental briefs in the Supreme Court addressing the effect of the enactment of the revised plan on the pending appeal from the decision invalidating its predecessor.

Shortly thereafter, the Supreme Court issued a brief order vacating the district court decision in *Hays I.* —— U.S. ——, 114 S.Ct. 2731, 129 L.Ed.2d 853 (1994). Though the State argued to the Court that the enactment of the revised plan rendered the appeal from the decision invalidating its predecessor moot, and that the Court should therefore vacate that decision under *United States v. Munsingwear,* 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950), the Court's order did not make clear that it was basing its decision to vacate on that ground. The order stated that "[t]he judgment [below] is vacated and the case is remanded to the United States District Court ... for further consideration in light of Act 1 of the Second Extraordinary Session of the 1994 Louisiana Legislature and the parties' filings in this Court concerning Act 1," *id.* at ——, 114

court to consider a *Shaw*-like challenge to a race-based redistricting plan in the aftermath of the Supreme Court's decision here. *See id.* — U.S. at — & n. 46, 113 S.Ct. at 1202 & n. 46 (majority op.) (under *Shaw,* strict scrutiny is triggered by proof that race was an "important" or "significant[ ]" factor in the line-drawing process, even if it was not the *only* factor that influenced that process); *id.* — U.S. at —, 113 S.Ct. at 1216 (Walter, J., concurring) (strict scrutiny applies if race was "a motivating factor" in the line-drawing process); *Jeffers v. Tucker,* 847 F.Supp. 655, 671–72 (E.D.Ark.1994) (Eisele, J., concurring) (same).

The state and its allies, by contrast, argue that mere proof that the legislature deliberately drew district lines in order to create one or more districts in which a particular racial group has a majority is not sufficient to trigger strict scrutiny under *Shaw.* Instead, they read *Shaw* as holding that strict scrutiny applies only to plans that are shown to (i) create districts with highly irregular shapes; (ii) in which citizens of particular racial groups are concentrated in numbers disproportionate to their representation in the state's population as a whole; and (iii) whose shape and location cannot rationally be explained by reference to any districting factor other than race. While they concede that proof of the first two factors may give rise to an *inference* that a plan is a "racial gerrymander" triggering strict scrutiny, they maintain that the state may rebut that inference by presenting evidence that the location

and shape of the districts can rationally be explained by reference to some districting principle other than race, and that if the state does this, strict scrutiny does not apply and the plan must be judged instead under the lenient rational basis test. In their view, the *Shaw* Court was concerned not about *all* deliberate use of race in redistricting, but only about a narrow category of "exceptional cases" in which race-based redistricting produces majority-minority districts so peculiar-looking that they call attention to their racial purpose and thereby serve to exacerbate, rather than to alleviate, the existing racial divisions in society.

It is certainly possible to read the majority opinion in *Shaw* as holding no more than the state and its allies say it does. *See DeWitt v. Wilson,* 856 F.Supp. 1409 (E.D.Cal.1994) (adopting this reading of *Shaw* ). As they point out, the plaintiffs' reading of *Shaw* is hard to square with the nature of the Supreme Court's remand in this case. It was clear, on the record before the Court, that the desire to create two districts in which African–Americans were a majority of voting age population was indeed a substantial motivating factor behind the enactment of this particular plan. Our opinion below had indicated that the state had conceded this fact in the proceedings before us, 808 F.Supp. at 470, and several of the dissents in the Supreme Court called this concession to the majority's attention. *See* — U.S. at —, 113 S.Ct. at 2838 (White, J., dissenting); *id.* at —, 113 S.Ct. at 2843 (Stevens, J., dis-

S.Ct. at 2731, which is not the language the Court normally uses when vacating a lower court decision under *Munsingwear. See, e.g., Gantt v. Skelos,* — U.S. —, 113 S.Ct. 30, 121 L.Ed.2d 3 (1992) (direct appeal from three-judge district court in Voting Rights Act case) ("The judgment is vacated and the case is remanded to the United States District Court ... with instructions to dismiss the appeal as moot. *United States v. Munsingwear,* 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950)."); *Yellow Freight System, Inc. v. United States,* — U.S. —, 113 S.Ct. 31, 121 L.Ed.2d 4 (1992) (petition for certiorari from United States Court of Appeals) ("The judgment is vacated and the case is remanded to the United States Court of Appeals ... with directions to dismiss as moot."). For this reason, the order of vacation could be read to indicate some doubt

about the validity of the *Hays I* court's rulings on the merits.

On remand, the district court permitted the *Hays* plaintiffs to amend their complaint to challenge the constitutionality of the revised plan, and then ruled that it too was unconstitutional under *Shaw. Hays v. Louisiana,* 862 F.Supp. 119 (W.D.La.1994) (*Hays II*). The court's brief opinion explaining this ruling stated that it continued to adhere to the interpretation of *Shaw* set forth in its *Hays I* opinion, notwithstanding the uncertainty about the validity of that interpretation after the Supreme Court's action, and that it was adopting by reference the constitutional analysis set forth in that earlier opinion. *Id.* at 121. Because *Hays II* does not reiterate that analysis in any detail, but simply incorporates by reference the discussion in *Hays I,* we continue to cite to *Hays I* here.

senting). If the deliberate creation of majority-minority districts was all that it took to trigger strict scrutiny, the most logical thing for the Court to have done would have been to note the state's concession, announce that strict scrutiny was therefore applicable, and remand for application of that standard, since the factual record at that stage was not sufficiently well-developed to allow the Court to do so itself. But the Court did not do this; instead, it held only that plaintiffs' allegations were sufficient to state a claim that the Plan was a racial gerrymander subject to strict scrutiny, *id.* at ——, 113 S.Ct. at 2832, and it suggested several times that the state might yet avoid strict scrutiny on remand, by producing evidence that would somehow "rebut" or "contradict" that allegation of racial gerrymandering. *Id.* at ——, 113 S.Ct. at 2832 ("If the allegation of racial gerrymandering remains uncontradicted, the District Court further must determine whether the North Carolina plan is narrowly tailored to further a compelling governmental interest"); *id.* at ——, 113 S.Ct. at 2830 ("[I]f appellants' allegations of a racial gerrymander are not contradicted on remand, the District Court must determine whether the General Assembly's reapportionment plan satisfies strict scrutiny"). In addition, the majority explicitly reserved the question whether the deliberate creation of majority-minority districts, without more, always triggers strict scrutiny, *id.* at ——, 113 S.Ct. at 2828 ("[W]e express no view as to whether 'the intentional creation of majority-minority districts, without more,' always gives rise to an equal protection claim"). For these reasons, the state's reading of *Shaw* cannot be rejected out of hand.

■ Despite its surface plausibility, however, we do not think the state's interpretation of *Shaw* can be correct. If *Shaw* meant no more than the state says it does, it would have precious little practical effect on race-based districting, for it would require states to defend the deliberate creation of majority-minority districts under strict scrutiny *only* when they could not come up with any ra-

tional explanation for the location and shape of those districts other than race. This would seldom be the case, given the wide variety of other districting principles that may be used to justify even the most peculiar-looking districts. The language and structure of the Court's opinion, if not its actual holding, strongly suggest that the Court intended to do much more than this. As we read the opinion, it was intended to place race-based redistricting legislation into the same category as all other forms of race-based state action after *Croson,* for purposes of analysis under the Equal Protection Clause: subject to strict scrutiny upon a showing that the state's use of race to distinguish among citizens was deliberate, whether or not it can be said to have had a "benign" or "remedial" purpose. There are admittedly some problems with this reading, though, which the state defendants and their allies properly point out. We therefore analyze the relevant portions of the Court's opinion in some detail.

■ The whole thrust of the Court's description of the remanded claim is to locate it within post-*Croson* "color-blind" Equal Protection jurisprudence, in which strict scrutiny is triggered simply by the fact that legislation "classifies" citizens by race—whatever its asserted purpose, however its presumed benefits and burdens are cast, and whether the racial classification is overt or implicit. The Court begins with a textbook exposition of the basic premises and precepts of that jurisprudence: The "central purpose" of the Equal Protection Clause is "to prevent the States from purposefully discriminating between individuals on the basis of [their] race." —— U.S. at ——, 113 S.Ct. at 2824. Laws that deliberately distinguish between citizens on the basis of their race are "odious to a free people whose institutions are founded upon the *doctrine of equality,*" because they "threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." *Id.* at ——, 113 S.Ct. at 2824 (internal quotations omitted).[16] They must therefore be subject to

---

16. Throughout its opinion, the Court seems to be using the term "racial discrimination" to mean simply deliberately *distinguishing* between people on the basis of their race, without regard to whether the distinction results in *disadvantageous treatment* of one racial group vis-a-vis an-

the strictest judicial scrutiny, even when claimed to have a "benign" or "remedial" purpose, for " '[a]bsent searching judicial inquiry ..., there is simply no way of determining wh[ich] [racial] classifications are "benign" or "remedial" and wh[ich] are in fact motivated by illegitimate notions of racial inferiority or simple racial politics.' " *Id.* at ——, 113 S.Ct. at 2824 (*quoting Croson,* 488 U.S. at 493, 109 S.Ct. at 721–22 (plurality)). This strict scrutiny applies not only to legislation that is overtly race-based—that is, that draws "explicit racial distinctions" on its face, as did the minority set-aside policy in *Croson*—but also to legislation that employs a classification which, though facially race-neutral, is shown to be " 'an obvious pretext for racial discrimination.' " *Id.* at ——, 113 S.Ct. at 2825. And one way to prove that a facially race-neutral law is in fact a pretext for racial discrimination is to show that it draws distinctions that are " 'unexplainable on grounds other than race.' " *Id.* at ——, 113 S.Ct. at 2825.

■■■■■ The Court then turns to a discussion of how these principles apply in the context of electoral districting. *Id.* at ——, 113 S.Ct. at 2825–28. It begins by stating that "district lines obviously drawn for the purpose of separating voters by race require careful scrutiny under the Equal Protection Clause, regardless of the motivations underlying their adoption." *Id.* at ——, 113 S.Ct. at 2826. It observes that it is normally difficult to prove that a single-member districting plan "purposefully distinguishes between voters on the basis of race," because such plans "typically do[ ] not classify persons at all," but "tracts of land, or addresses," and there are many legitimate non-racial

reasons why a legislature might choose to construct districts in a way that concentrated members of a particular racial group in one or more of them. *Id.* at ——, 113 S.Ct. at 2826. But it says there are a handful of "exceptional cases" in which proving that a redistricting plan "purposefully distinguishes between voters on the basis of race," hence is subject to strict scrutiny, "will not be difficult at all": those in which the plan contains district lines "so highly irregular" that they "rationally cannot be understood as anything other than an effort to 'segregat[e] ... voters' on the basis of race." *Id.* at ——, 113 S.Ct. at 2826. Two examples of plans that fall into this category are given: the actual plan in *Gomillion,* in which "a tortured municipal boundary line was drawn to exclude black voters," and a hypothetical plan that "concentrate[s] a dispersed minority population in a single district by disregarding traditional districting principles such as compactness, contiguity, and respect for political subdivisions." *Id.* at ——, 113 S.Ct. at 2826–27. In such cases, the Court explains, the irregular shape of the districts serves as powerful circumstantial evidence that the legislature was in fact motivated by a racial purpose when it drew them. *See id.* at ——, 113 S.Ct. at 2827 (the legislature's failure to observe "traditional districting principles" is "objective" evidence that the districts were "gerrymandered on racial lines"); *id.* at ——, 113 S.Ct. at 2827 (" 'dramatically irregular shapes may have sufficient probative force to call for an explanation' ") (quoting *Karcher v. Daggett,* 462 U.S. 725, 755, 103 S.Ct. 2653, 2672, 77 L.Ed.2d 133 (1983) (Stevens, J., concurring)).[17]

---

other. *See id.* at ——, 113 S.Ct. at 2824–26 (using "discriminating" and "distinguishing" interchangeably). This is consistent with the Court's general shift, in recent years, from the "anti-discrimination" model of the Equal Protection Clause, under which strict scrutiny was warranted only when race was used to single out historically-disadvantaged minority groups for further adverse treatment, to the more individualistic "colorblind" model, under which any deliberate use of race to distinguish between citizens triggers strict scrutiny, regardless of whom it benefits or burdens, because race is presumptively irrelevant to legitimate governmental decisionmaking. *See generally* Klarman,

An Interpretive History of Modern Equal Protection, 90 Mich.L.Rev. 213, 308–16 (1991).

**17.** As the *Hays I* Court recognized, the *Shaw* majority apparently uses the term "racial gerrymander" to refer to districting legislation which, though race-neutral on its face, is in fact deliberately designed to produce one or more districts of a certain racial composition, so that it can be said to reflect a deliberate policy of assigning citizens to voting districts on the basis of their race. *Hays I,* 839 F.Supp. at 1194 (majority op.) (defining a "racial gerrymander" under *Shaw* as a districting plan that "intentionally draws one or more districts along racial lines or otherwise intentionally segregates citizens into voting dis-

We think it readily apparent from the Court's analysis that what it finds potentially offensive about the Plan under challenge here—from a constitutional standpoint—is not that it is aesthetically "ugly," but that its drafters may deliberately, and unjustifiably, have taken race into account in assigning voters to particular districts. *See* —— U.S. at ——, 113 S.Ct. at 2832 ("race-based districting by our state legislatures," like "[r]acial classifications of any sort," must be subject to "close judicial scrutiny," because it "reinforce[s] the belief, held by too many for too much of our history, that individuals should be judged by the color of their skin," and threatens to "balkanize us into competing racial factions"). The peculiar, "bizarre," or "ugly" shapes of its districts has some significance in the constitutional analysis at this stage, but only as *circumstantial evidence* that the disproportionate concentration of members of a particular race in certain districts was something the line-drawers deliberately set about to accomplish, as opposed to being simply an *accidental consequence* of a line-drawing process driven by other districting concerns. *See id.* at ——, 113 S.Ct. at 2827.

▆▆▆ The necessary implication of this analysis is that strict scrutiny of an electoral redistricting plan is now triggered by proof— by any means, including state concession, bizarre shape, or some combination of the

various factors typically used to prove the "intent" element of an Equal Protection claim under *Arlington Heights*—that racial considerations played a "substantial" or "motivating" role in the line-drawing process, even if they were not the only factor that influenced that process. *See Hays I,* 839 F.Supp. at 1202 & n. 46 (majority op.); *id.* at 1216 (Walter, J., concurring); *Jeffers,* 847 F.Supp., at 671–72 (Eisele, J., concurring). This "race-a-motivating-factor" triggering test is necessarily met by proof that the plan's lines were deliberately drawn so as to create one or more districts in which a particular racial group is a majority, even if factors other than race are shown to have played a significant role in the precise location and shape of those districts. If the line-drawing process is shown to have been infected by such a deliberate racial purpose, strict scrutiny cannot be avoided simply by demonstrating that the shape and location of the districts can rationally be explained by reference to some districting principle other than race, for the intentional classification of voters by race, though perhaps disguised, is still likely to reflect the "impermissible racial stereotypes," *Shaw,* —— U.S. at ——, 113 S.Ct. at 2827, " 'illegitimate notions of racial inferiority' " and " 'simple racial politics,' " *id.* at ——, 113 S.Ct. at 2824, that strict scrutiny is designed to " 'smoke out.' " *Croson,* 488

---

tricts based on their race"); *id.* at 1214 (Walter, J., concurring) (defining a "racial gerrymander" under *Shaw* as "[districting] legislation that manipulates district lines to achieve a predetermined racial result"). This focus on deliberate manipulation of district lines to achieve an ulterior purpose is consistent with the traditional understanding of a "gerrymander." *See Black's Law Dictionary* at 618 (5th ed. 1979) (defining "gerrymandering" as "the process of dividing a state or other territory into the authorized ... political divisions, but with such a geographical arrangement as to accomplish an ulterior or unlawful purpose, as, for instance, to secure a majority for a given political party in districts where the result would be otherwise if they were divided according to obvious natural lines").

In its most extreme form, a "racial gerrymander" may result in districts that actually "segregate" or "separate" the races for voting purposes—the sort of redistricting plan that the *Shaw* majority characterizes as "political apartheid." *Shaw,* —— U.S. at ——, 113 S.Ct. at

2827. But it need not be this extreme to trigger strict scrutiny; neither *Gomillion* nor *Wright*— upon which the *Shaw* majority relies in reaching its conclusion that race-based redistricting plans are subject to strict scrutiny, and from which it draws the language about "segregating" voters by race—involved plans that *completely* separated the races for purposes of voting. *See Gomillion,* 364 U.S. at 341, 81 S.Ct. at 127 (redistricting plan removed from particular electoral district all but "four or five" out of 400 voters of a particular racial minority); *Wright,* 376 U.S. at 59, 84 S.Ct. at 606–07 (Douglas, J., dissenting) (redistricting plan resulted in "substantial, though not complete, segregation [of voters] by race"). The critical feature of a racial gerrymander is not that it completely separates the races for purposes of voting, but that it reflects the deliberate manipulation of district lines so as to accomplish a particular racial result. *See Shaw,* —— U.S. at ——, 113 S.Ct. at 2823 (describing a "racial gerrymander" as "the deliberate and arbitrary distortion of district boundaries ... for [racial] purposes") (internal citations omitted).

U.S. at 493, 109 S.Ct. at 721 (plurality).[18] This is the obvious implication of the *Shaw* majority's effort to import post-*Croson* Equal Protection principles into the electoral districting context, *see* Aleinikoff & Isaacharoff, *supra,* at 664–43, and it is the reading of *Shaw* most consistent with the views on Equal Protection expressed by the members of the *Shaw* majority in their various opinions in *Wygant, Croson,* and *Metro Broadcasting.*[19] *See also Johnson v. De Grandy,* — U.S. —, —, 114 S.Ct. 2647, 2664–67, 129 L.Ed.2d 775 (1994) (Kennedy, J., concurring in part and concurring in the judgment) (reading *Shaw* as applying "to the drawing of electoral and political boundaries" the *Croson* principle that "the sorting of persons with an intent to divide by reason of race raises the most serious constitutional questions," triggering strict scrutiny under the Equal Protection Clause regardless of the race of those burdened or benefited by it, and therefore admonishing "state and federal officials with responsibilities related to redistricting, as well as reviewing courts, to recognize that explicit race-based districting . . . must comply with the overriding demands of the Equal Protection Clause"). But, the state defendants and their allies fairly ask, if the Court intended the deliberate creation of majority-minority districts, standing alone, to trigger strict scrutiny, why did it not rest its remand simply on that ground, as it easily could have done here, given the state's concession? Why did it deliberately reserve the question whether the deliberate creation of majority-minority districts, without more, will always give rise to an Equal Protection claim, and write an opinion that can be read to confine strict scrutiny to cases in which the lines cannot rationally be explained on any ground other than race?

The question is by no means easily answered, but we think there must be an answer that does not undercut our previously-stated understanding of *Shaw.* Several can be ventured. First, a broad holding that strict scrutiny applies to any plan that deliberately creates majority-minority districts, even when those districts are not highly irregular, would have required the Court to overrule its earlier decision in *UJO.* By confining its discussion to bizarre-looking districts, the Court was able to distinguish *UJO* as involving a majority-minority district of relatively normal shape. *See* — U.S. at —, 113 S.Ct. at 2829. Second, the Court may have thought it unfair to hold the State of North Carolina, which had not yet even filed an answer in this action, to a concession it made in response to a Rule 12(b)(6) motion at a time when it had fair reason to believe that *UJO,* under which the concession would have made no difference, was still the controlling authority. Finally, the Court may have viewed the concession made by the state here as an aberration that was unlikely to occur in the vast majority of cases, and ignored it in order to announce a rule that would permit plaintiffs making comparable claims to prove the "intentional" use of race necessary to trigger strict scrutiny inferentially, when the state did not concede it. In any event, we have no need to identify the exact reason for this action by the Court; it suffices here simply to demonstrate that the

---

**18.** Of course, if a legislature could show that it would have enacted precisely the same plan even if it had not considered race at all, then it ought to be able to avoid strict scrutiny. *See Arlington Heights,* 429 U.S. at 270–71 n. 21, 97 S.Ct. at 556–67 n. 21; *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). But that would be a rare case indeed.

**19.** *See, e.g., Wygant,* 476 U.S. at 284–85, 106 S.Ct. at 1852–53 (O'Connor, J., concurring in part and concurring in the judgment) (" 'Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination' ") (*quoting Bakke,* 438 U.S. at 291, 98 S.Ct. at 2748 (opinion of Powell, J.) );

*Croson,* 488 U.S. at 493–94, 109 S.Ct. at 721–22 (opinion of O'Connor, J., joined by Rehnquist, C.J., and White and Kennedy, JJ.); *id.* at 518, 109 S.Ct. at 734–35 (Kennedy, J., concurring in part and concurring in the judgment) ("The moral imperative of racial neutrality is the driving force of the Equal Protection Clause"); *id.* at 520, 109 S.Ct. at 736 (Scalia, J., concurring in the judgment) ("to classify and judge men and women on the basis of . . . the color of their skin" is "fatal to a Nation such as ours"); *Metro Broadcasting,* 497 U.S. at 602–10, 110 S.Ct. at 3028–33 (O'Connor, J., joined by Rehnquist, C.J., and Scalia and Kennedy, JJ., dissenting); *id.* at 631–38, 110 S.Ct. at 3044–47 (Kennedy, J., joined by Scalia, J., dissenting).

state has not identified the only possible reason.

Before leaving this point, we also need, in fairness, to consider one other objection that the state and its allies raise to the reading of *Shaw* suggested by plaintiffs and their supporting intervenors: that it will require virtually *all* redistricting plans to be defended under strict scrutiny, since it is almost always possible to show that a legislature was *aware* to some degree of the racial impact of the lines it was drawing, particularly now that all redistricting is done with computers into which racial data is loaded. *See Shaw,* —— U.S. at ——, 113 S.Ct. at 2826 ("redistricting differs from other kinds of state decisionmaking in that the legislature always is *aware* of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors") (emphasis in original).

We do not believe any such drastic consequence will result from our reading of *Shaw.* The Supreme Court's Equal Protection cases have long recognized that there is a critical distinction between "race-conscious" action and "race-based" action, and that the "intentional" use of race required to trigger strict scrutiny of legislative action cannot be established simply by showing that the legislature adopted a particular course of action with knowledge that it was likely to have a particular racial impact. *See Personnel Adm. of Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (the sort of

"discriminatory purpose" required to trigger strict scrutiny of a facially-neutral statute "implies more than intent as volition or intent as awareness of consequences"; it requires a showing "that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group"). The *Shaw* majority specifically stated that the "intentional" or "deliberate" use of race required to trigger strict scrutiny in the redistricting context, as elsewhere, means not just taking action with knowledge or awareness that it is likely to have a particular racial impact, but taking it with the *specific intent* to bring about such an impact. *See* —— U.S. at ——, 113 S.Ct. at 2826 (noting that "the legislature *always* is aware of race when it draws district lines," but that "[t]hat sort of race consciousness does not lead inevitably to impermissible race discrimination") (emphasis in original). Properly applied, this distinction between "race-conscious" and "race-based" districting should prevent legislatures from having to defend all districting plans under the strict scrutiny standard.[20]

Nor will our reading of *Shaw* condemn to constitutional invalidity all majority-minority districts drawn to give effect to minority voting strength in order to comply with the requirements of the Voting Rights Act. As the cases involving affirmative action in higher education and public employment demonstrate, although strict scrutiny places significant limitations on the ability of state actors

20. As a practical matter, there will probably be only two types of redistricting cases in which plaintiffs will consistently be able to prove the intent necessary to trigger strict scrutiny: (i) those in which a redistricting plan creates more majority-minority districts than did the prior plan, and there is direct evidence that this has been done in response to either a private suit under the Voting Rights Act or a § 5 objection from the Justice Department; and (ii) those in which a plan creates one or more districts in which citizens of a particular racial group are concentrated in numbers disproportionate to their representation in the state's population as a whole, whose shapes are so highly irregular as to give rise to an inference that the concentration was something the legislature affirmatively set out to achieve, as opposed to being merely an accidental side-effect of a redistricting process in which racial considerations played no role.

In all other situations, proof of the requisite intent will be difficult indeed, since redistricting legislation is almost always facially race-neutral and proving the intent of a collective body like a legislature, which is notoriously difficult in the best of circumstances, is even more difficult when it is engaged in the highly political "horse-trading" that marks the redistricting process. *See Shaw,* —— U.S. ——, 113 S.Ct. at 2826; *see also Wright,* 376 U.S. at 53–58, 84 S.Ct. at 603–06 (finding that plaintiffs failed to prove that legislature was motivated by racial considerations when it drew congressional redistricting plan in which members of particular racial and ethnic minorities were concentrated in a single district in numbers disproportionate to their representation in the population as a whole, where that concentration could be explained by reference to existing patterns of residential segregation).

## 434

to take race-based remedial action, it need not be "strict in theory, fatal in fact." *Fullilove v. Klutznick*, 448 U.S. 448, 518–19, 100 S.Ct. 2758, 2795–96, 65 L.Ed.2d 902 (1980). Application of strict scrutiny to all redistricting proven to be race-based will certainly make state legislatures look before they leap when it comes to voluntary compliance with the Voting Rights Act. But it should not prevent them from attempting to comply with it altogether, so long as the "narrowly tailored to further a compelling state interest" standard is applied in a way that is sensitive not only to the state legislatures' statutory obligation to create majority-minority districts to give effect to minority voting strength in areas where minorities have been subjected to persistent discrimination in the political process, but also to the special compromises that they must make in order to pass plans that draw such districts.

With that in mind, we turn now to the problems of how, under *Shaw*, strict scrutiny is to be applied in the redistricting context.

### D. *Application of The Strict Scrutiny Standard in the Redistricting Context*

*Shaw* holds that any deliberately race-based state redistricting plan is subject to "strict scrutiny" under the Equal Protection Clause, and that it can survive that scrutiny only if its use of race is both justified by a "compelling governmental interest" and "narrowly tailored" to further that interest. —— U.S. at ——, 113 S.Ct. at 2832. But while *Shaw* offers some brief suggestions about what this standard might require in the redistricting context, *see id.* at ——, 113 S.Ct.

at 2830–32, it does not actually apply it to this particular redistricting plan. Nor has any other decision of the Supreme Court ever applied strict scrutiny under the Equal Protection Clause to specific electoral redistricting legislation. In seeking to understand how that is to be done here, we must look for guidance primarily to the Court's decisions applying the strict scrutiny standard to race-based remedial measures voluntarily undertaken by state actors in other contexts: higher education, employment, and government contracting. *See Regents of the Univ. of Calif. v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), and *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).[21]

■ Here again, we confront the problem of transposing to the redistricting context a legal standard developed in very different factual contexts. There are difficulties— again emphasized by the parties' conflicting contentions—arising from the fact that race-based electoral redistricting differs, in several critical respects, from the race-based remedial measures which the Court has previously analyzed under the strict scrutiny standard. First, and most critically, unlike the use of racial preferences in educational admissions, employment, and government contracting, the drawing of district lines so as to give effect to minority voting strength is specifically mandated by a federal statute enacted by Congress under its broad constitutional authority to remedy the effects of past discrimination.[22] Second, unlike dis-

---

**21.** In our view, a race-based redistricting plan enacted by a state, even under pressure from the Justice Department, is most closely analogous to an affirmative action plan voluntarily adopted by a state actor, for purposes of analysis under the Equal Protection Clause. By contrast, a race-based redistricting plan imposed upon a state by a federal court as a remedy for a found violation of federal law is analogous to a judicially-imposed affirmative action plan, which may require greater justification at the compelling interest stage of the strict scrutiny analysis than its voluntarily-adopted counterpart. *See United States v. Paradise*, 480 U.S. 149, 187 n. 2, 107 S.Ct. 1053, 1075 n. 2, 94 L.Ed.2d 203 (1987) (Powell, J., concurring). *Cf. Voinovich v. Quilter*, —— U.S. ——, ——–——, 113 S.Ct. 1149, 1156–57, 122

L.Ed.2d 500 (1993) (noting that a state legislature's power to create majority-minority districts voluntarily is considerably broader than a federal court's power to order it to do so).

**22.** The United States as *amici* suggests that the redistricting plan at issue here should be judged under the intermediate scrutiny standard applied to "benign" race-based measures mandated by Congress in *Metro Broadcasting v. Federal Communications Comm'n*, 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990) ("substantially related" to the achievement of an "important" governmental interest that is within the scope of Congress' legislative power), rather than the more exacting strict scrutiny standard generally applied to such measures when they are under-

crimination in education, employment, and government contracting, the specific type of discrimination that race-based redistricting is designed to redress—denial of fair and effective representation—threatens the very legitimacy of our nation's political system. Third, unlike most other types of affirmative action, race-based redistricting is a remedy whose benefits inure, in large part, to individuals who have themselves been victims of the discriminatory practices that it is designed to dismantle. *See* Grofman, Would Vince Lombardi Have Been Right If He Said: "When It Comes to Redistricting, Race Isn't Everything, It's the *Only* Thing?", 14 Cardozo L.Rev. 1237, 1246 & n. 40 (1993). Finally, as noted in our standing discussion, unlike the use of racial preferences in making admissions to medical school, deciding which employees to lay off, and awarding government contracts, the drawing of district lines so as to give effect to minority voting strength does not necessarily disadvantage members of other racial groups. So long as all citizens may vote, all individual votes receive the same weight, and no racial group's voting strength is unduly diluted by the resulting

districting scheme, there is no unequal treatment *as between* affected groups. *See Shaw,* — U.S. at —, 113 S.Ct. at 2846 (Souter, J., dissenting); *Bakke,* 438 U.S. at 305, 98 S.Ct. at 2756 (Powell, J.) (noting that deliberate creation of majority-minority districts in order to give effect to existing minority voting strength "improve[s] the previously disadvantaged group's ability to participate without excluding individuals belonging to any other group from enjoyment of the relevant opportunity—meaningful participation in the electoral process"). As discussed more fully below, these differences give rise to several specific difficulties in transposing developed strict scrutiny principles to the context of remedial redistricting.

### 1. *Burden of proof*

The parties disagree at the outset about the allocation of the burden of proof at the strict scrutiny stage of the Equal Protection analysis. Although plaintiffs and their supporting intervenors concede that they have the burden of proving the Plan is a "racial gerrymander" subject to strict scrutiny, they

---

taken by state and local governments. The argument is apparently that because the Plan was enacted in direct response to a § 5 objection from the United States Justice Department, to whom Congress has delegated authority to enforce the Voting Rights Act, and was later approved by the Justice Department in the § 5 preclearance process, it was "mandated by Congress" in the same sense as the minority-preference policies adopted and maintained by the FCC in *Metro Broadcasting,* and thus should be evaluated under the more forgiving intermediate scrutiny standard announced in that case.

We disagree. Even if *Metro Broadcasting's* holding that race-based affirmative action programs mandated by Congress are not subject to strict scrutiny survives the retirement of Justices Brennan and Marshall, we do not think it can properly be applied in this context. The racial preference policies at issue in *Metro Broadcasting* had been specifically approved, indeed mandated, by Congress, in their exact form: though the FCC had developed them on its own, Congress had thereafter specifically directed the FCC to maintain them. *See* 497 U.S. at 560, 563, 110 S.Ct. at 3006, 3008. We do not think a race-based redistricting plan enacted by a state can be said to carry the same imprimatur of congressional approval, even when it is done with the purpose of complying with the Voting Rights Act or the Justice Department's interpretation thereof. The Voting Rights Act itself does not com-

mand a state to adopt a particular redistricting plan; instead, it simply forbids it to adopt plans that have the purpose or effect of diluting the voting strength of certain protected minority groups. Nor does the Justice Department have statutory authority to order a state to adopt a particular redistricting plan. Of course, the Justice Department may, and frequently does, tell a state, in the course of the § 5 preclearance process, that it believes its redistricting plan must contain a certain number of majority-minority districts in order to comply with the Act. But such a statement cannot fairly be considered a mandate from *Congress* to enact a plan with that number of majority-minority districts, since Congress has specifically given the state the right to challenge the Justice Department's interpretation of the Act in the United States District Court for the District of Columbia. For these reasons, we believe that the *Metro Broadcasting* principle cannot be used to justify application of something less than strict scrutiny here.

This is not to say, however, that the fact that this particular race-based redistricting plan was enacted in response to a § 5 objection from the Justice Department has no relevance in the Equal Protection analysis. To the contrary, we think it has considerable relevance, in deciding whether the state has a compelling interest in creating majority-minority districts. *See infra* at 441–443.

argue that if they succeed in doing this, the burden then shifts to the state to prove that the Plan's use of race is narrowly tailored to further a compelling governmental interest. According to them, this is how the three-judge court in *Hays I* viewed the state's burden of justification at the strict scrutiny stage of a racial gerrymandering case like this one. The state and its allies, by contrast, maintain that the state's burden is merely to identify a compelling justification for its use of race, and that plaintiffs retain the ultimate burden of persuading the court that its proffered justification is not compelling or that the Plan is not narrowly tailored to further it.

■■■■■■ think the state has the better of this argument. The Supreme Court repeatedly has emphasized that when members of a racial minority bring an Equal Protection challenge to a state law or policy, they bear the ultimate burden of persuasion throughout the proceeding. *See, e.g., Batson v. Kentucky*, 476 U.S. 79, 93–94 & n. 18, 106 S.Ct. 1712, 1721–22 & n. 18, 90 L.Ed.2d 69 (1986). The rule is no different for Equal Protection challenges to state laws or policies brought by members of the majority race. *Cf. Croson*, 488 U.S. at 494, 109 S.Ct. at 722 (plurality) ("the guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color"). In such a reverse-discrimination case, as in any other Equal Protection case, "[t]he ultimate burden remains with the [plaintiff] to demonstrate the unconstitutionality of [the] affirmative-action program." *Wygant*, 476 U.S. at 277–78, 106 S.Ct. at 1848–49 (plurality); *id.* at 292, 106 S.Ct. at 1856–57 (O'Connor, J., concurring in part and concurring in the judgment) ("in 'reverse discrimination' suits, as in any other suit, it is the plaintiffs who must bear the burden of demonstrating that their rights have been violated"). Proof that the challenged law or policy is race-based gives rise to a presumption that it is unconstitutional and shifts to the state the burden of "demonstrating" that its use of race was justified by a compelling governmental interest. *Croson*, 488 U.S. at 505, 109 S.Ct. at 728 (majority). But the burden thus shifted is one of production only, not persuasion; plain-

tiffs still "bear the ultimate burden of persuading the court that the [state's] evidence did not support an inference of prior discrimination and thus a remedial purpose, or that the [remedial action] instituted on the basis of this evidence was not sufficiently 'narrowly tailored,'" and they can "establish a violation of their constitutional rights," and thus prevail on their Equal Protection claim, "[o]nly by meeting this burden." *Wygant*, 476 U.S. at 293, 106 S.Ct. at 1857 (O'Connor, J., concurring).

■■■■ Nothing in *Shaw* purports to alter these well-settled principles of Equal Protection jurisprudence. Nor do we read the passage in *Hays I* upon which plaintiffs and their supporting intervenors rely as holding that the state bears the burden of persuasion with respect to either prong of the strict scrutiny inquiry. While the *Hays I* court did remark that there was a rough "parallelism" between "the State's burden here of establishing the affirmative justification of a compelling state interest" and a "criminal defendant's burden—*at common law*—of establishing an affirmative defense," 839 F.Supp. at 1206 (emphasis in original), it was very careful to point out that it was *not* using this analogy to make any point about the location of the burden of persuasion with respect to the presence or absence of such justification. *Id.* at 1206 n. 59. We therefore conclude that in a *Shaw*-like challenge to a race-based redistricting plan, as in any other sort of Equal Protection case, the state's burden at the strict scrutiny stage is producing evidence that the plan's use of race is narrowly tailored to further a compelling state interest, and that plaintiffs retain the ultimate burden of persuading the court either that the proffered justification is not compelling or that the Plan is not narrowly tailored to further it. *See Wygant*, 476 U.S. at 292–93, 106 S.Ct. at 1856–57 (O'Connor, J., concurring).

2. ■■■■■■ *State Interest*

■■■ We next consider the circumstances in which a state might have a "compelling interest" in engaging in race-based redistricting to give effect to minority voting strength.

At the outset, we note that, contrary to plaintiffs' suggestion, the critical question at this stage of the analysis is not whether the state had a compelling interest in enacting the *particular* race-based redistricting plan under challenge, with all of its twists and turns, but whether it had a compelling interest in enacting *any* race-based redistricting plan. Whether the particular plan under challenge takes race into account to a greater degree than necessary to further a compelling state interest is a question for the "narrowly tailored" prong of the strict scrutiny analysis, which examines the "fit" between the compelling state interest and the precise means chosen by the state to accomplish it. *See Wygant,* 476 U.S. at 280 & n. 6, 106 S.Ct. at 1850 & n. 6 (opinion of Powell, J.); *Fullilove,* 448 U.S. at 507, 100 S.Ct. at 2789–90 (Powell, J., concurring). We therefore focus our attention here on the types of state interests that might be considered sufficiently "compelling" to justify race-based redistricting. The state and its allies have suggested two: compliance with the Voting Rights Act and eradicating the effects of past and present racial discrimination in North Carolina's political processes. We take these in turn.

a. *Compliance with the Voting Rights Act*

 We agree that a state may have a "compelling" interest in engaging in race-based redistricting in order to comply with the substantive requirements of the Voting Rights Act. The Supreme Court has long recognized that a state's interest in eradicating the effects of its own past or present racial discrimination is sufficiently "compelling" to support its undertaking of race-based remedial action. *See Shaw,* —— U.S. at ——, 113 S.Ct. at 2831; *Croson,* 488 U.S. at 491–93, 509–10, 109 S.Ct. at 720–22, 730 (plurality); *id.* at 518, 109 S.Ct. at 734–35 (Kennedy, J., concurring in part and concurring in the judgment); *Wygant,* 476 U.S. at 280–82, 106 S.Ct. at 1850–51 (plurality); *id.* at 286, 106

S.Ct. at 1853 (O'Connor, J., concurring); *Bakke,* 438 U.S. at 307, 98 S.Ct. at 2757 (opinion of Powell, J.). The Court also has recognized that this interest extends to remedying past or present violations of federal *statutes* that are designed to eradicate such discrimination in particular aspects of life. *See Croson,* 488 U.S. at 500, 109 S.Ct. at 725 (majority) ("constitutional or statutory violation[s]"); *Wygant,* 476 U.S. at 274–75, 106 S.Ct. at 1847–48 (plurality) (Title VII); *id.* at 289, 106 S.Ct. at 1854–55 (O'Connor, J., concurring) ("violation[s] of federal statutory or constitutional requirements"); *Bakke,* 438 U.S. at 307–09, 98 S.Ct. at 2757–58 (opinion of Powell, J.) ("constitutional or statutory violations"). Finally, the Court has made clear that a state need not await a judicial finding that it is guilty of past or present discrimination before embarking on a voluntary program of remedial action designed to eradicate that discrimination, so long as it has a "strong basis in evidence" for concluding that such remedial action is "necessary." *Croson,* 488 U.S. at 500, 109 S.Ct. at 725 (majority); *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1848–49 (plurality); *id.* at 286, 106 S.Ct. at 1853 (O'Connor, J., concurring) ("a firm basis for believing that remedial action is required").[23] Indeed, the political branches of state government have an affirmative constitutional *duty* to take voluntary remedial action in the face of such evidence. *See Wygant,* 476 U.S. at 277, 106 S.Ct. at 1848–49 (plurality); *id.* at 291, 106 S.Ct. at 1856 (O'Connor, J., concurring); *Croson,* 488 U.S. at 519, 109 S.Ct. at 735 (Kennedy, J., concurring).

 Under these principles, we think it clear that a state has a "compelling" interest in engaging in race-based redistricting to give effect to minority voting strength whenever it has a "strong basis in evidence" for concluding that such action is "necessary" to prevent its electoral districting scheme from violating the Voting Rights Act. If a state's interest in remedying a violation of the anti-

---

23. At one point, Justice Powell suggested that a state has a compelling interest in taking race-based remedial action only in the face of "judicial, legislative, or administrative *findings* of constitutional or statutory violations." *Bakke,* 438 U.S. at 307, 98 S.Ct. at 2757 (opinion of Powell, J.) (emphasis added). But he later revised this view, concluding that it was sufficient that the

state have a "strong basis in evidence for [the] conclusion that remedial action [is] necessary." *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1848–49 (plurality). A majority of the Court adopted this "strong basis in evidence" test in *Croson. See* 488 U.S. at 500, 109 S.Ct. at 725 (O'Connor, J., joined in relevant part by Rehnquist, C.J., and White, Stevens, and Kennedy, JJ.).

discrimination provisions of Title VII is sufficiently "compelling" to support its undertaking of race-based affirmative action, *see Wygant*, 476 U.S. at 274–75, 106 S.Ct. at 1847–48 (plurality); *id.* at 289–93, 106 S.Ct. at 1854–57 (O'Connor, J., concurring), its interest in remedying a violation of the anti-discrimination provisions of the Voting Rights Act is even more compelling, for Title VII is based only on the commerce power, whereas the Voting Rights Act is a direct exercise of Congress' broad constitutional power to enforce the provisions of the Fourteenth and Fifteenth Amendments. Indeed, the Supreme Court has recognized consistently that the Voting Rights Act is the single most important piece of federal anti-discrimination legislation ever passed by Congress—enacted, and then twice extended, with the avowed purpose of putting a stop to nearly a century of " 'unremitting and ingenious defiance' of the commands of the Fifteenth Amendment" by the states and " 'banish[ing] the blight of racial discrimination in voting' once and for all." *McCain v. Lybrand*, 465 U.S. 236, 244, 104 S.Ct. 1037, 1043, 79 L.Ed.2d 271 (1984) (*quoting South Carolina v. Katzenbach*, 383 U.S. 301, 308–09, 86 S.Ct. 803, 808–09, 15 L.Ed.2d 769 (1966)).

◼ Nothing in *Shaw* suggests that a state's interest in complying with the Voting Rights Act is not sufficiently "compelling" to justify its engaging in race-based redistricting. Indeed, the *Shaw* majority specifically confirms that the states "have a very strong interest in complying with [the Voting Rights Act]," at least to the extent it is "constitutionally valid as interpreted and as applied." —— U.S. at ——, 113 S.Ct. at 2830. We do not believe any of the provisions of the Voting Rights Act to be constitutionally infirm, at least when they are applied in accordance with the Supreme Court's established interpretation of them. The Court has

specifically upheld the § 5 preclearance requirement as a legitimate exercise of Congress' power to enforce the Fifteenth Amendment, *South Carolina v. Katzenbach*, 383 U.S. 301, 334–35, 86 S.Ct. 803, 821–22, 15 L.Ed.2d 769 (1966); *see City of Rome v. United States*, 446 U.S. 156, 180–82, 100 S.Ct. 1548, 1563–64, 64 L.Ed.2d 119 (1980) (finding 1975 extension of § 5 constitutional on same ground), and it has rejected a claim that the "effect" prong of § 5 exceeds Congress' power under the Fifteenth Amendment because it reaches conduct which may not itself have violated the Fifteenth Amendment. *Id.* at 185–87, 100 S.Ct. at 1565–67. The constitutionality of the "purpose" prongs of § 5 and § 2 cannot be doubted, since they merely reiterate the substantive standards imposed upon the states by the Fourteenth and Fifteenth Amendments themselves. *See Chisom v. Roemer*, 501 U.S. 380, 392–93, 111 S.Ct. 2354, 2362, 115 L.Ed.2d 348 (1991). And we think it clear that the "results" prong of amended § 2, as interpreted in *Thornburg v. Gingles*, is constitutional under the test set forth in *South Carolina v. Katzenbach* and *City of Rome. See* 446 U.S. at 177, 100 S.Ct. at 1561–62 ("under section 2 of the Fifteenth Amendment, Congress may prohibit practices that in and of themselves do not violate § 1 of the Amendment, so long as the prohibitions attacking racial discrimination in voting are 'appropriate,' as that term is defined in *McCulloch v. Maryland* [17 U.S. 316, 4 L.Ed. 579 (1819) ] and *Ex parte Virginia* [100 U.S. 339, 25 L.Ed. 676 (1879) ] "); *see also Croson*, 488 U.S. at 490, 109 S.Ct. at 720 (opinion of O'Connor, J., joined by Rehnquist, C.J., and White, J) ("Congress ... has a specific constitutional mandate to enforce the dictates of the Fourteenth Amendment," which "may at times also include the power to define situations which *Congress* determines threaten principles of equality and to adopt prophylactic rules to deal with those situations") (emphasis in original).[24] We therefore hold that a

24. We recognize that the constitutionality of amended § 2 technically remains an open one, notwithstanding the magnitude of all that has been done under the authority of *Gingles. See Chisom v. Roemer*, 501 U.S. 380, 418, 111 S.Ct. 2354, 2376, 115 L.Ed.2d 348 (1991) (Kennedy, J., dissenting) (writing separately solely to reserve this issue); *De Grandy*, —— U.S. at ——,

114 S.Ct. at 2665–66 (Kennedy, J., concurring in part and concurring in the judgment) (again reserving this point); *see also Shaw*, —— U.S. at ——, 113 S.Ct. at 2831 (reserving question that "if § 2 did require adoption of North Carolina's revised plan, § 2 is to that extent unconstitutional"). But we believe that once legislation of such magnitude and consequential importance

state necessarily has a "compelling" interest in engaging in race-based redistricting whenever it has a firm basis for concluding that such action is necessary to bring its electoral districting scheme into compliance with the Voting Rights Act. *Accord Hays I,* 839 F.Supp. at 1217 (Walter, J., concurring).

 As in other affirmative action contexts, a state need not await a judicial finding that its existing districting scheme (or a proposed revision thereof) actually violates the Voting Rights Act before it enacts a race-based redistricting plan designed to give effect to minority voting strength, so long as it has a "strong basis in evidence" for concluding that such action is "necessary" to avoid a violation of the Act. *See Croson,* 488 U.S. at 500, 109 S.Ct. at 725 (majority); *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1848–49 (plurality); *id.* at 286, 106 S.Ct. at 1853 (O'Connor, J., concurring). Nor must the state legislature make an explicit finding that the state's existing districting plan (or a proposed revision thereof) violates the Act before it draws one that deliberately gives greater effect to minority voting strength. *See id.* at 277–78, 10 S.Ct. at 1848–49 (plurality); *id.* at 289–90, 106 S.Ct. at 1854–55 (O'Connor, J., concurring). Such a specific contemporaneous finding of discrimination is of course useful to a court, because it provides "a means by which it can be made absolutely certain that the governmental actor truly is attempting to remedy its own unlawful conduct when it adopts an affirmative action plan, rather than attempting to alleviate the wrongs suffered through general societal discrimination." *Id.* at 289, 106

S.Ct. at 1854. But it is not essential; all that is required is evidence that the legislature "act[ed] on the basis of information which g[ave] [it] a sufficient basis for concluding that [such] remedial action [was] necessary." *Id.* at 291, 106 S.Ct. at 1856.[25] As Justice O'Connor has explained, a rule that a state actor must make an explicit finding that it is guilty of illegal discrimination before it can take voluntary steps to remedy that discrimination "would severely undermine [the state's] incentive to meet voluntarily [its] civil rights obligations," which would "clearly be at odds with [the] Court's and Congress' consistent emphasis on the value of … voluntary compliance" with the federal discrimination laws. *Id.* at 290, 106 S.Ct. at 1855 (internal citations omitted).

 A state has a "strong basis in evidence" for concluding that it must engage in race-based redistricting in order to comply with the Voting Rights Act when it has information sufficient to support a *prima facie* showing that its failure to do so would violate the Act. *See Croson,* 488 U.S. at 500, 109 S.Ct. at 725 (majority) (evidence "approaching a prima facie case of a constitutional or statutory violation"); *Wygant,* 476 U.S. at 292, 106 S.Ct. at 1856–57 (O'Connor, J., concurring) ("demonstrable evidence…. sufficient to support a prima facie Title VII … claim by [the] minority"); *see also Johnson v. Transportation Agency,* 480 U.S. 616, 650–52, 107 S.Ct. 1442, 1461–63, 94 L.Ed.2d 615 (1987) (O'Connor, J., concurring in the judgment) (evidence sufficient for a "Title VII prima facie case" by the relevant minority).[26]

has been fully analyzed, interpreted, and applied by the Supreme Court, as amended § 2 has been in *Gingles, Voinovich v. Quilter,* —— U.S. ——, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993), *Growe v. Edmison,* —— U.S. ——, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993), and *De Grandy,* its constitutionality must be assumed by lower federal courts (and all other branches of state and federal government), even though the Court has never expressly confirmed it.

**25.** Though *Croson* requires a state or local governmental actor to "identify" specific instances of past or present discrimination "with some specificity" before undertaking race-based remedial action, 488 U.S. at 504, 109 S.Ct. at 727 (majority), it does not alter the *Wygant* rule that the governmental actor is not required to make a

formal finding of such discrimination on the record before doing so. *See id.* at 500, 109 S.Ct. at 725 (majority) (sufficient if state actor has " 'a strong basis in evidence for its conclusion that remedial action was necessary' ") (quoting *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1848–49 (plurality)). Instead, *Croson* holds only that the governmental actor must be able to demonstrate that it was attempting to remedy specific instances of past or present discrimination within its own jurisdiction, as opposed to general "societal discrimination." *See id.* at 504–05, 109 S.Ct. at 727–28 (majority).

**26.** This does not mean, of course, that a state attempting to defend a race-based redistricting plan designed to comply with the Voting Rights Act must prove that its existing plan (or a pro-

There are at least two situations in which this might be the case, both of which are suggested by the state° and its allies here.

The first is when the state has before it information sufficient to support a *prima facie* § 2 challenge to the existing districting plan by members of the relevant minority group. To make out a *prima facie* § 2 challenge to a single-member districting scheme, members of a protected racial minority must show three things: (i) that their population is "sufficiently large and geographically compact to constitute a majority" in more single-member districts than the number in which they have a majority under the challenged scheme; (ii) that they are "politically cohesive," and (iii) that "the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate" in districts that are not majority-minority. *See Growe v. Emison*, —— U.S. ——, ——, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993) (internal quotations omitted); *Voinovich v. Quilter*, —— U.S. ——, ——, 113 S.Ct. 1149, 1157, 122 L.Ed.2d 500 (1993).[27] When a state legislature has before it information sufficient to permit it to conclude that the relevant minority group could make out such a *prima facie* § 2 challenge to the existing plan, then it has a "strong basis in evidence" for concluding that it needs to engage in race-based redistricting to comply with § 2, and it has necessarily established a compelling interest in doing so.[28] *See Hays*

posed revision thereof) actually violates the Act in order to meet its burden of justification at the strict scrutiny stage; nor does it mean that the court must make such a finding in order to uphold the plan under strict scrutiny. *See Wygant*, 476 U.S. at 292, 106 S.Ct. at 1856–57 (O'Connor, J., concurring) (a reverse-discrimination challenge to a state's voluntary affirmative action plan "does not automatically impose upon the [state] the burden of convincing the court of its liability for prior unlawful discrimination; nor does it mean that the court must make an actual finding of prior discrimination based upon the [state's] proof before [its] affirmative action plan will be upheld"); *Johnson*, 480 U.S. at 652–53, 107 S.Ct. at 1562–63 (O'Connor, J., concurring in the judgment) (same). Such a rule would impose an unfair burden of omniscience upon the state, which is "trapped between the competing hazards of liability to minorities if affirmative action *is not* taken to remedy apparent ... discrimination [in its electoral districting scheme] and liability to nonminorities if affirmative action *is* taken." *Wygant*, 476 U.S. at 291, 106 S.Ct. at 1856 (O'Connor, J., concurring). Instead, the court need only find that the state enacted the race-based redistricting plan based on information which gave it "a strong basis in evidence for ... conclu[ding] that [such] remedial action was necessary" to comply with the Voting Rights Act. *Id.* at 277, 106 S.Ct. at 1848–49 (plurality); *id.* at 292–93, 106 S.Ct. at 1856–57 (O'Connor, J., concurring).

27. *De Grandy* does not alter this settled understanding of the nature of a *prima facie* case under § 2. The Court there made explicit the notion, already implicit in its earlier § 2 cases, that while proof of the three *Gingles* conditions is *necessary* to establish a § 2 violation, it is not necessarily *sufficient*, "either in the sense that a court's examination of relevant circumstances [is] complete once the three factors [are] found to exist, or in the sense that the three in combination necessarily and in all circumstances demon-

strate[ ] dilution." —— U.S. at ——, 114 S.Ct. at 2657. Instead, proof that the three *Gingles* conditions exist with respect to a particular plan will support a finding that the plan violates § 2 only if the court further finds, after considering all other factors that "arguably bear[ ] on the issue of equal political opportunity," that the circumstances in totality show that the plan would deny minority voters an equal opportunity "to participate in the electoral process and to elect representatives of their choice." *Id.* at ——, 114 S.Ct. at 2658–62. The Court's holding that proof of the three *Gingles* conditions does not necessarily compel a finding of a § 2 violation, however, cannot fairly be read to alter the settled understanding that such proof is sufficient to make out a *prima facie* case under § 2. *Cf. St. Mary's Honor Center v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (proof of *McDonnell Douglas* factors, though sufficient to make out a *prima facie* case of discrimination under Title VII, will not necessarily suffice to prove a Title VII violation, even if unrebutted).

28. That is, unless the existing plan already creates majority-minority districts in substantial proportion to the minority's share of voting-age population. In such a case, a state will not have a "strong basis in evidence" for concluding that further race-based remedial action is necessary to bring its electoral scheme into compliance with § 2, unless it has some compelling evidence that the existing plan's lines, though appearing to confer political and electoral power upon the minority in rough proportion to its share of the relevant population, nonetheless deny the minority an equal opportunity to participate in the electoral process and to elect representatives of its choice. *Cf. De Grandy*, —— U.S. at ——, 114 S.Ct. at 2658–62 (in a § 2 challenge to a single-member districting plan, a showing that the plan "[creates] majority-minority districts in substantial proportion to the minority's share of voting-

*I,* 839 F.Supp. at 1217 (Walter, J., concurring); *see also Croson,* 488 U.S. at 500, 109 S.Ct. at 725 (majority) (evidence "approaching a prima facie case of a constitutional or statutory violation"); *Wygant,* 476 U.S. at 292, 106 S.Ct. at 1856–57 (O'Connor, J., concurring) (evidence "sufficient to support a prima facie Title VII … claim by [the] minority"); *Johnson v. Transportation Agency,* 480 U.S. 616, 650–52, 107 S.Ct. 1442, 1461–63, 94 L.Ed.2d 615 (1987) (O'Connor, J., concurring in the judgment) (evidence sufficient for a "Title VII prima facie case" by the relevant minority).[29]

The second, which is a possibility only in jurisdictions subject to the preclearance requirements of § 5, is that a plan previously proposed by the state for the same round of redistricting has been denied preclearance on the ground that it fails to give sufficient effect to minority voting strength to satisfy § 5. Section 5 forbids a covered jurisdiction to put a redistricting plan into effect unless it proves, to the satisfaction of either the United States District Court for the District of Columbia or its surrogate, the United States Department of Justice, that the proposed plan had neither the "purpose … [nor] the effect of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973c; *see Georgia v. United States,* 411 U.S. 526, 531–35, 93 S.Ct. 1702, 1706–08, 36 L.Ed.2d 472 (1973); *McDaniel v. Sanchez,* 452 U.S. 130, 137, 101 S.Ct. 2224, 2229–30, 68 L.Ed.2d 724 (1981). The Supreme Court has consistently held that the § 5 standard has two prongs, a "purpose" prong and an "effect" prong, and that a plan cannot be precleared unless it satisfies both of them. *McCain v. Lybrand,* 465 U.S. 236, 247, 104 S.Ct. 1037, 1044–45, 79 L.Ed.2d 271 (1984); *City of Lockhart v. United States,* 460 U.S. 125, 130 & n. 4, 103 S.Ct. 998, 1002 & n. 4, 74 L.Ed.2d 863 (1983); *City of Port Arthur v. United States,* 459 U.S. 159, 168, 103 S.Ct. 530, 535–36, 74 L.Ed.2d 334 (1982); *City of Rome v. United States,* 446 U.S. 156, 172, 100 S.Ct. 1548, 1559, 64 L.Ed.2d 119 (1980); *Beer v. United States,* 425 U.S. 130, 136 n. 7, 141, 96 S.Ct. 1357, 1361 n. 7, 1363–64, 47 L.Ed.2d 629 (1976); *City of Richmond v. United States,* 422 U.S. 358, 372–73, 95 S.Ct. 2296, 2304–05, 45 L.Ed.2d 245 (1975). As currently interpreted by the Supreme Court, the "effect" prong of § 5 is relatively toothless, being satisfied—at least in the context of legislative reapportionment—simply by proof that the proposed plan will not "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer,* 425 U.S. at 141, 96 S.Ct. at 1364.[30] The "purpose" prong, by contrast, requires a showing that the proposed plan was not designed to dilute minority voting strength in the sense forbidden by the Constitution. *City of Port Arthur,* 459 U.S. at 168, 103 S.Ct. at 535–36; *City of Richmond,* 422 U.S. at 372, 378–79, 95 S.Ct. at 2304–05, 2307–08.[31] The Supreme

age population" should make a court reluctant to conclude that it denies minority voters equal opportunity to participate in the political process and to elect representatives of their choice, hence violates § 2).

**29.** If the Justice Department has denied preclearance to an earlier plan on the ground that it was in "clear violation" of § 2, as its § 5 regulations permit it to do, *see* 28 C.F.R. § 51.55(b)(2), this fact, standing alone, would probably be sufficient to give the state a "substantial basis in evidence" for concluding that it needed to engage in race-based redistricting in order to avoid a violation of § 2. *See Bakke,* 438 U.S. at 305, 98 S.Ct. at 2756 (opinion of Powell, J.) (§ 5 objection by Justice Department is properly viewed as "an administrative finding of discrimination," which is sufficient to give the state a compelling interest in taking race-based remedial action). But that issue is not presented in this case, since the Justice Department's denial of preclearance was not based on the ground that the proposed plan was in clear violation of § 2, but on the ground that the state had failed to meet its burden of demonstrating that the plan did not violate the "purpose" prong of § 5 itself. Accordingly, we need not address plaintiff-intervenors' argument that the Justice Department has exceeded its authority under § 5 by incorporating the § 2 "results" standard into the § 5 preclearance analysis.

**30.** The Justice Department has argued elsewhere that Congress intended the 1982 amendments to § 2 to alter *Beer's* interpretation of the "effect" prong of § 5. The Supreme Court has specifically reserved this question, *City of Lockhart,* 460 U.S. at 133 n. 9, 103 S.Ct. at 1003 n. 9, and we do not reach it here.

**31.** The "purpose" prong of § 5 thus essentially duplicates the constitutional vote dilution standard, except that it shifts the burden of proof with respect to the constitutionality of a pro-

Court has previously upheld the denial of preclearance to redistricting plans which, though non-retrogressive, have not been shown to be free from such a racially discriminatory purpose. *See, e.g., Busbee v. Smith,* 549 F.Supp. 494, 516 (D.D.C.1982) (three-judge court), *aff'd,* 459 U.S. 1166, 103 S.Ct. 809, 74 L.Ed.2d 1010 (1983); *see also City of Richmond,* 422 U.S. at 372, 378–79, 95 S.Ct. at 2304–05, 2307–08.[32]

 When an earlier version of a state's redistricting plan is denied preclearance by the United States District Court for the District of Columbia on the ground that it fails to satisfy either the "purpose" or "effect" prong of the § 5 test, the state obviously has a "strong basis in evidence" for concluding that the Voting Rights Act requires it to engage in race-based redistricting in order to remedy that problem. *See Bakke,* 438 U.S. at 307, 98 S.Ct. at 2757 (opinion of Powell, J.) (judicial finding of statutory violation sufficient to give state a compelling interest in taking race-based remedial action). The same is normally true when preclearance is denied by the Justice Department, which Congress has authorized to serve as a surrogate for the District Court in reviewing § 5 submissions. *See id.* at 305, 98 S.Ct. at 2756 (opinion of Powell, J.) (§ 5

objection by Justice Department is properly viewed as "an administrative finding of discrimination," which is sufficient to give the state a compelling interest in taking race-based remedial action). Contrary to plaintiffs' suggestion, the Equal Protection Clause does not require a state to challenge a Justice Department denial of preclearance in the United States District Court for the District of Columbia, and lose, before it may safely conclude that it has a compelling interest in adopting a new plan to address the concerns upon which the Department's denial of preclearance was based. Such a rule would indicate disrespect for the judgment of the Attorney General, who has been authorized by Congress to serve as a surrogate for the District Court in reviewing § 5 submissions. It would also be inconsistent with the general federal policy of encouraging the states to comply voluntarily with their obligations under the federal civil rights laws. *See Wygant,* 476 U.S. at 290–91, 106 S.Ct. at 1855–56 (O'Connor, J., concurring). Finally, it would encourage needless litigation, which would undermine the central purpose of the § 5 preclearance requirement: to prevent jurisdictions whose electoral systems have been infected with official racial discrimination in the recent past[33] from avoiding their consti-

---

posed redistricting plan from affected minority groups to the covered jurisdiction. *See Beer,* 425 U.S. at 147–48, 96 S.Ct. at 1366–67 (Marshall, J., dissenting); Days, Section 5 and the Role of the Justice Department, in *Controversies in Minority Voting: The Voting Rights Act in Perspective* (ed. B. Grofman and C. Davidson, 1993), at 53.

**32.** As did the three-judge court in *Hays I, see* 839 F.Supp. at 1207 (majority); *id.* at 1218 (Walter, J., concurring), plaintiffs and their supporting intervenors read *Beer* as holding that the § 5 standard is necessarily satisfied so long as the proposed plan is not "retrogressive." With all respect, this is simply incorrect. *Beer* held only that the "effect" prong of § 5 is satisfied by proof that a proposed plan does not have a retrogressive effect; it did not purport to define the meaning of the "purpose" prong. Indeed, the *Beer* Court specifically stated that even a nonretrogressive redistricting plan would fail to satisfy § 5 if it "so discriminates on the basis of race or color as to violate the Constitution." *Beer,* 425 U.S. at 141, 96 S.Ct. at 1364–65; *see also id.* at 142 n. 14, 96 S.Ct. at 1364 n. 14. The discussion of § 5 in *Shaw,* —— U.S. at —— – ——, 113 S.Ct. at 2830–31, does not cast doubt on this settled understanding of the two-pronged nature of the

§ 5 standard. Though the Court indicates that a state would have a firm basis for concluding that § 5 required it to give greater effect to minority voting strength if it had evidence that its proposed plan would have a "retrogressive" effect on the position of minority voters, *id.* at ——, 113 S.Ct. at 2830, the Court does not say this is the *only* basis on which a state might properly conclude that further race-based remedial action was necessary to comply with § 5.

The interpretation of § 5 suggested by plaintiffs, which would allow jurisdictions whose existing districting schemes were already unconstitutionally diluting minority voting strength to obtain preclearance of plans that deliberately perpetuated that constitutional wrong, so long as they did not make it worse, would undermine the central purpose of § 5, which was to break the cycle of "unremitting and ingenious defiance" of the constitutional guarantees of nondiscrimination in voting by covered states. *See Katzenbach,* 383 U.S. at 309, 86 S.Ct. at 808–09.

**33.** Coverage under § 5 is tantamount to a congressional finding that the jurisdiction in question has committed identified violations of the Fifteenth Amendment in the relatively recent

tutional duty to remedy the effects of that discrimination by engaging in protracted litigation over the nature of that obligation. *See McCain,* 465 U.S. at 244–46, 104 S.Ct. at 1043–44; *see also South Carolina v. Katzenbach,* 383 U.S. at 335, 86 S.Ct. at 822. Instead, we believe that a state has a "strong basis in evidence" for concluding that it must engage in race-based redistricting to comply with § 5 whenever the Justice Department has refused to preclear a plan it has proposed for the same round of redistricting on the ground that it fails to satisfy the § 5 standard, and the state reasonably concludes, after conducting its own independent reassessment of the rejected plan in light of the concerns identified by the Justice Department, that the Justice Department's conclusion is legally and factually supportable.[34]

b. *Eradicating Effects of Past or Present Discrimination In North Carolina's Political Processes*

The state and its allies also argue that a state may have a "compelling" interest in engaging in race-based redistricting to eradicate the effects of past or present racial discrimination in its political processes, even when it has no basis for believing that the Voting Rights Act requires it to do so. We agree.

The Supreme Court has recognized repeatedly that a state has a compelling interest in taking race-based affirmative action where it has a firm basis for concluding that such action is necessary to eradicate the effects of past or present racial discrimination within its own jurisdiction, even when it has no federal statutory mandate to do so. *See, e.g., Croson,* 488 U.S. at 491–93, 109 S.Ct. at 720–21 (opinion of O'Connor, J., joined by Rehnquist, C.J., and White, J.); *id.* at 509, 109 S.Ct. at 730 (plurality); *id.* at 518, 109 S.Ct. at 734–35 (Kennedy, J., concurring); *Wygant,* 476 U.S. at 280–82, 106 S.Ct. at 1850–51 (plurality); *id.* at 286, 106 S.Ct. at 1853 (O'Connor, J., concurring). Of course, generalized evidence that past "societal discrimination" has continuing effects within the state is not sufficient to trigger this compelling interest. *See Croson,* 488 U.S. at 504–06, 109 S.Ct. at 727–28 (majority); *Wygant,* 476 U.S. at 276, 106 S.Ct. at 1848 (plurality) ("Societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy"); *Bakke,* 438 U.S. at 308–09, 98 S.Ct. at 2757–58 (Powell, J., concurring). Instead, the state must demonstrate that it had a "strong basis in evidence" for believing that race-based remedial action was "necessary" to remedy specific instances of racial discrimination, either public or private, within its own jurisdiction. *Croson,* 488 U.S.

past, *see McCain v. Lybrand,* 465 U.S. at 244–45, 104 S.Ct. at 1043–44; *Bakke,* 438 U.S. at 302 n. 41, 98 S.Ct. at 2754 n. 41 (opinion of Powell, J.), which could conceivably be regarded as sufficient, in and of itself, to give that jurisdiction a "strong basis in evidence" for thinking that it must engage in race-based redistricting to avoid a violation of the Voting Rights Act, leaving only the question whether the particular race-based plan it enacts is "narrowly tailored" to further that interest. *See id.* at 307, 98 S.Ct. at 2757 (legislative finding of identified past discrimination sufficient to trigger compelling interest in taking race-based remedial action). *Compare Croson,* 488 U.S. at 504, 109 S.Ct. at 727 (majority) (general congressional finding that there had been past discrimination in the nation's construction industry as a whole was not sufficiently "specific" or "particularized" to give city a strong basis for believing that race-based remedial action was required to remedy the effects of that discrimination within its own jurisdiction). But we need not decide here whether § 5 coverage, standing alone, is sufficient to give a state a "strong basis in evidence" for concluding that it must engage in race-based redistricting to com-

ply with the Voting Rights Act, for in this case, the state's conclusion that it had to engage in race-based redistricting to comply with § 5 was based not merely on the fact that it was subject to § 5, but on an explicit finding by the Justice Department that its proposed plan did not satisfy § 5.

**34.** This is not to say, of course, that a state which has submitted a proposed redistricting plan to the Justice Department for administrative preclearance, and been denied it, may not challenge the Department's denial of preclearance in the United States District Court for the District of Columbia, if it believes it to be unfounded, before enacting a race-based alternative plan. It is only to say that a state may properly regard the Justice Department's denial of preclearance as an "administrative finding" that its proposed plan violates the anti-discrimination provisions of the Voting Rights Act, which is sufficient—unless clearly legally and factually unsupportable—to justify its adoption of a race-based alternative plan designed to remedy that violation. *See Bakke,* 438 U.S. at 305–07, 98 S.Ct. at 2756–57 (opinion of Powell, J.).

at 500–06, 109 S.Ct. at 725–28 (majority); *see id.* at 518, 109 S.Ct. at 734–35 (Kennedy, J., concurring). While the state must "identify that discrimination, public or private, with some particularity" before it may take race-based remedial action, *id.* at 504, 109 S.Ct. at 727, it need not make an explicit finding of discrimination on the record, so long as it can demonstrate that it acted on the basis of evidence that would have permitted it to do so. *See Wygant,* 476 U.S. at 289–91, 106 S.Ct. at 1854–56 (O'Connor, J., concurring).

■ Under these principles, we think it clear that a state may have a compelling interest in engaging in race-based redistricting to give effect to minority voting strength, even when it has no reason to believe that the Voting Rights Act requires it to do so, where it has a substantial basis in evidence for concluding that such action is necessary to eradicate the effects of identified past or present racial discrimination in its own political processes.[35] *Accord Hays I,* 839 F.Supp. at 1215 (Walter, J., concurring). As a practical matter, a state defending a race-based redistricting plan against a *Shaw*-like challenge will seldom need to rely very heavily on this particular justification, for the evidence required to establish the existence of this compelling interest will normally be sufficient to demonstrate that the State had a firm basis for believing that race-based redistricting was required to avoid a potential § 2 violation, and thus that it had a compelling interest in taking such action to comply with the Voting Rights Act. But there may be cases in which a state will have a compelling interest in engaging in race-based redistricting to remedy identified instances of discrim-

ination in its own political processes, even when it has no firm basis for concluding that § 2 requires it to do so: for example, when it has a history of official racial discrimination in its electoral system, which has resulted in the virtual exclusion of members of a particular racial minority from participation in its political processes, but it knows that the creation of majority-minority districts is not required by the "effects" prong of § 5, because it has never had such districts before, and that the relevant minority group cannot show that § 2 requires the creation of any majority-minority districts, because it is too widely dispersed to constitute a majority in a single-member district that is "geographically compact" under *Gingles.* For that reason, we think it important to recognize this as an independent compelling interest that may justify race-based redistricting.

### 3. *Narrowly Tailored*

We turn, finally, to the question of how to determine whether a particular race-based redistricting plan, if supported by a compelling state interest, is "narrowly tailored" to the achievement of that interest. *Shaw* itself has very little to say about this aspect of the strict scrutiny analysis, except to indicate that a plan which deliberately creates majority-minority districts in order to comply with the Voting Rights Act would not be "narrowly tailored" to that goal if it "went beyond what was reasonably necessary to avoid" a violation of the Act. —— U.S. at ——, 113 S.Ct. at 2831. We therefore seek guidance in the Court's decisions applying the "narrowly tailored" standard to other types of race-based remedial measures.

---

**35.** The *Shaw* majority recognized the possibility that a State might have a compelling interest in engaging in race-based redistricting to eradicate the effects of past discrimination in its electoral processes that was "entirely distinct from the Voting Rights Act." —— U.S. at ——, 113 S.Ct. at 2931–32. It is true that the Court remarked that "only three Justices in *UJO* were prepared to say that States have a significant interest in minimizing the consequences of racial bloc voting apart from the requirements of the Voting Rights Act," and that those three Justices "specifically concluded" that race-based redistricting could be justified on this ground "only when the State 'employ[s] sound districting principles.'" *id.* at ——, 113 S.Ct. at 2832 (citing *UJO,* 430 U.S. at 167–68, 97 S.Ct. at 1010–11 (White, J., joined by Stevens and Rehnquist, JJ.)). But we do not read this statement as implying that a state cannot have a compelling interest in engaging in race-based redistricting to remedy the effects of identified instances of past or present discrimination in its own political processes unless it has reason to believe that the Voting Rights Act requires it to do so. Instead, we think the Court meant only that a race-based redistricting plan adopted to further this interest, like any other type of redistricting plan, must be based on *rational* districting principles that ensure that all citizens covered by it receive fair and effective representation. *See infra* at 450–451 & n. 44.

■ In other contexts, the Supreme Court has looked to five basic factors to decide whether a race-based affirmative action program is "narrowly tailored" to further a compelling state interest in remedying identified discrimination: (i) the efficacy of alternative remedies; (ii) whether the program imposes a rigid racial "quota" or just a flexible racial "goal"; (iii) the planned duration of the program; (iv) the relationship between the program's goal for minority representation in the pool of individuals ultimately selected to receive the benefit in question and the percentage of minorities in the relevant pool of eligible candidates; and (v) the impact of the program on the rights of innocent third parties. *See United States v. Paradise,* 480 U.S. 149, 171–85, 107 S.Ct. 1053, 1066–74, 94 L.Ed.2d 203 (1987) (plurality); *id.* at 186–89, 107 S.Ct. at 1074–76 (Powell, J., concurring); *Sheet Metal Workers v. EEOC,* 478 U.S. 421, 485–89, 106 S.Ct. 3019, 3054–57, 92 L.Ed.2d 344 (1986) (Powell, J., concurring in part and concurring in the judgment); *see also Croson,* 488 U.S. at 507–08, 109 S.Ct. at 729 (majority); *Wygant,* 476 U.S. at 279–84, 106 S.Ct. at 1849–52 (plurality); *Fullilove v. Klutznick,* 448 U.S. 448, 510–15, 100 S.Ct. 2758, 2791–94, 65 L.Ed.2d 902 (1980) (opinion of Powell, J.) (applying same strict scrutiny analysis to affirmative action plan adopted by Congress).[36] Though these factors were developed in the context of affirmative action programs in public employment and government contracting, we think they can be transposed fairly easily to the context of race-based redistricting. *See Hays I,* 839 F.Supp. at 1206–09 (majority) (looking to same five factors in deciding whether a race-based redistricting plan is "narrowly tailored" under *Shaw* ); *id.* at 1215 (Walter, J., concurring) (same).

■ The first factor requires the court to decide whether the state could have accomplished its compelling purpose just as well by some alternative means that was either completely race-neutral or made less extensive use of racial classifications. *See Wygant,* 476 U.S. at 280 n. 6 (plurality) (" 'whether a nonracial approach or a more narrowly-tailored racial classification could promote the [compelling] interest about as well and at tolerable administrative expense' "); *Croson,* 488 U.S. at 507, 109 S.Ct. at 729 (majority); *see also Sheet Metal Workers,* 478 U.S. at 486–87, 106 S.Ct. at 3055–56 (Powell, J., concurring); *Paradise,* 480 U.S. at 171–77, 107 S.Ct. at 1066–69 (plurality); *id.* at 188, 107 S.Ct. at 1075 (Powell, J., concurring); *id.* at 199–201, 107 S.Ct. at 1081–82 (O'Connor, J., dissenting). A state that has a compelling interest in engaging in race-based redistricting to comply with the Voting Rights Act obviously has no *completely* race-neutral alternative means of accomplishing that end.[37]

---

36. Applying these factors, the Court has held that three race-based affirmative action programs were sufficiently "narrowly tailored" to pass constitutional muster, *see Paradise,* 480 U.S. at 171–86, 107 S.Ct. at 1066–74 (plurality); *id.* at 187–89, 107 S.Ct. at 1074–76 (Powell, J., concurring); *Sheet Metal Workers,* 478 U.S. at 479–81, 106 S.Ct. at 3051–53 (plurality); *id.* at 485–89, 106 S.Ct. at 3054–57 (Powell, J., concurring); *Fullilove,* 448 U.S. at 480–92, 100 S.Ct. at 2775–82 (opinion of Burger, J.); *id.* at 510–15, 100 S.Ct. at 2791–94 (Powell, J., concurring); and that two others were not, one because it imposed a rigid racial quota and was adopted without consideration of race-neutral alternatives, *see Croson,* 488 U.S. at 507–08, 109 S.Ct. at 729 (majority), and the other because it unduly burdened third-party interests, *see Wygant,* 476 U.S. at 279–84, 106 S.Ct. at 1849–52 (plurality); *id.* at 293–94, 106 S.Ct. at 1857–58 (O'Connor, J., concurring).

*Paradise* and *Sheet Metal Workers* involved Equal protection challenges to affirmative actions plans that were judicially-imposed; *Wygant* and *Fullilove* challenges to ones that were volun-

tarily-adopted. But the distinction is of no consequence at this stage of the analysis, for the Court has applied the same "narrowly tailored" analysis—derived essentially from Justice Powell's plurality opinion in *Wygant* and his earlier concurrence in *Fullilove*—to both types of plans. *Compare Paradise,* 480 U.S. at 171–85, 107 S.Ct. at 1066–73 (plurality); *id.* at 186–89, 107 S.Ct. at 1074–76 (Powell, J., concurring) and *Sheet Metal Workers,* 478 U.S. at 479–81, 106 S.Ct. at 3051–53 (plurality); *id.* at 485–89, 106 S.Ct. at 3054–57 (Powell, J., concurring) *with Wygant,* 476 U.S. at 279–84, 106 S.Ct. at 1849–52 (plurality); and *Fullilove,* 448 U.S. at 510–15, 100 S.Ct. at 2791–94 (Powell, J., concurring).

37. This does not mean that any race-based redistricting plan adopted to comply with the Voting Rights Act necessarily fails constitutional scrutiny for want of proper consideration of race-neutral alternative means of remedying the discrimination in question. *See Croson,* 488 U.S. at 507, 109 S.Ct. at 729 (majority). Congress itself carefully considered and rejected race-neutral al-

*Compare Croson,* 488 U.S. at 510, 109 S.Ct. at 730–31 (plurality). In such a case, the primary inquiry with respect to this factor will therefore be whether the state could have complied with the Act by enacting a redistricting plan which, though race-based, made *less extensive* use of racial classifications than the one it chose.[38] Because the "racial classification" at issue here is the use of race to assign voters to districts, we agree with the three-judge court in *Hays I* that inquiry here is properly confined to two questions: whether the plan creates more majority-minority districts than is reasonably necessary to comply with the Act, and whether the majority-minority districts it creates contain substantially larger concentrations of minority voters than is reasonably necessary to give minority voters a realistic opportunity to elect representatives of their choice in those districts. *See Hays I,* 839 F.Supp. at 1206–08 (majority); *id.* at 1218 (Walter, J., concurring).[39]

▮▮▮▮ The second factor requires a court to determine whether the challenged plan imposes a "strict racial quota" designed "to achieve and maintain racial balance," or simply a "flexible goal" to be used as a "benchmark" for gauging the success of the state's efforts to eliminate the particular discrimination in question. *Sheet Metal Workers,* 478 U.S. at 477–78, 106 S.Ct. at 3050–51 (plurality); *see id.* at 487–88 & n. 4, 106 S.Ct.

at 3056–37 & n. 4 (Powell, J., concurring). As Justice O'Connor has explained repeatedly, a rigid racial quota is constitutionally impermissible, even to further a compelling interest in remedying identified discrimination, because it rests upon the " 'completely unrealistic' assumption" that members of various racial groups would be represented in particular positions "in lockstep proportion to their proportion in the [general] population," were it not for unlawful discrimination. *Croson,* 488 U.S. at 507, 109 S.Ct. at 729 (majority); *see Paradise,* 480 U.S. at 197, 107 S.Ct. at 1080 (O'Connor, J., dissenting). But race-based redistricting plans will seldom be invalid on this ground, for they do not impose the sort of "rigid racial quota" that the Court has previously found constitutionally infirm. Unlike the racial set-aside provisions invalidated in *Bakke* and *Croson,* a redistricting plan which creates a certain number of electoral districts in which members of a racial minority constitute a majority of the voting age population (or even of registered voters) does not guarantee members of that race a fixed percentage of the benefit ultimately at stake (here, membership in the relevant legislative body), for it does not prevent nonminority candidates for running for office in such districts, nor does it guarantee that they will not be elected from them.[40] *See De Grandy,* —— U.S. at ——, 114 S.Ct. at 2665 (Kennedy, J., concurring in part and concurring in the judgment) ("The assumption that

---

ternatives for remedying discrimination in the states' electoral processes when it enacted, and then twice extended, the provisions of the Voting Rights Act that require the states to consider race in redistricting. *See UJO,* 430 U.S. at 175–76, 97 S.Ct. at 1014–15 (Brennan, J., concurring in part) ("[T]he history of the Voting Rights Act provides reassurance that ... the congressional decision to authorize the use of race-oriented remedies in this context was the product of substantial and careful deliberations ... [and] represents an unequivocal and well-defined congressional consensus on the national need for 'sterner and more elaborate measures' to secure the promise of the Fourteenth and Fifteenth Amendments with respect to the exercise of the franchise"); *see also McCain v. Lybrand,* 465 U.S. 236, 243–48, 104 S.Ct. 1037, 1043–45, 79 L.Ed.2d 271 (1984); *City of Rome v. United States,* 446 U.S. 156, 172–78, 180–83, 100 S.Ct. 1548, 1559–62, 1563–65, 64 L.Ed.2d 119 (1980); *South Carolina v. Katzenbach,* 383 U.S. 301, 308–09, 86 S.Ct. 803, 808–09, 15 L.Ed.2d 769 (1966).

**38.** The same cannot necessarily be said for a state that engages in race-based redistricting not to further a compelling interest in complying with the Voting Rights Act, but to further an independent interest in eradicating the effects of past or present racial discrimination in its political processes. *See supra* at 443–444.

**39.** The race-based redistricting plan at issue in *Hays I* was found to be not "narrowly tailored" to the state's asserted interest in complying with the Voting Rights Act chiefly because it "packed" minority voters into majority-minority districts in percentages "well in excess" of those reasonably necessary to give them a fair opportunity to elect candidates of their choice in those districts. *See* 839 F.Supp. at 1207–08 (majority); *id.* at 1218 (Walter, J., concurring).

**40.** The North Carolina General Assembly, for example, has three white members elected from majority-minority districts created by the *Gingles* redistricting. *See infra* at 472.

majority-minority districts elect only minority representatives ... is false as an empirical matter"). While such a plan guarantees the minority a fair *opportunity* to elect a certain number of representatives of their choice, that number cannot fairly be termed a "quota," since there is no guarantee that it will be achieved; instead, can only be viewed as a flexible "goal" for minority representation in the relevant legislative body. *See Sheet Metal Workers,* 478 U.S. at 487–88 & n. 4, 106 S.Ct. at 3056 & n. 4 (Powell, J., concurring). *Compare Ravitch v. City of New York,* 1992 WL 196735 (S.D.N.Y. Aug. 3, 1992), at *7 (provision in city charter requiring racial minorities to be represented on appointed city commission in direct proportion to their percentage in the city's population as a whole was not "narrowly tailored" to city's compelling interest in remedying past discrimination, because it imposed a "rigid" racial quota).

The third factor asks whether the challenged affirmative action plan is a temporary measure with some built-in mechanism to prevent it from lasting longer than is reasonably necessary to eliminate the effects of the particular discrimination it is designed to redress. *See Fullilove,* 448 U.S. at 513, 100 S.Ct. at 2792–93 (Powell, J., concurring) (a "temporary" measure that "will not last longer than the discriminatory effects it is designed to eliminate"); *Sheet Metal Workers,* 478 U.S. at 479, 106 S.Ct. at 3051–52 (plurality) (a "temporary tool for remedying [identified] discrimination" that "will end as soon as ... it is no longer needed to remedy [that] discrimination"); *id.*

at 487, 106 S.Ct. at 3056 (Powell, J., concurring) ("of limited duration"); *Paradise,* 480 U.S. at 178, 107 S.Ct. at 1070 ("temporary in application," with a term "contingent upon the [state's] own conduct"); *see also Croson,* 488 U.S. at 498, 109 S.Ct. at 724 (plurality) (not "timeless in its ability to affect the future"). A race-based redistricting plan governing elections to the United States Congress or a state legislature will almost always satisfy this requirement: such plans are inherently temporary in nature, because the states are, as a practical matter, required to redraw them after each decennial census, in order to even out irregularities in district population caused by intervening demographic changes. *See Karcher v. Daggett,* 462 U.S. 725, 731, 103 S.Ct. 2653, 2658–59, 77 L.Ed.2d 133 (1983) (congressional districting); *Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973) (districting for state legislature). When the state legislature undertakes this redistricting process after each census, it will of course be forced, by considerations of suits like this one, to re-evaluate the continued need for race-based redistricting in light of the electoral experiences under the prior plan. *Compare Ravitch, supra,* at *7 (provision in city charter that required appointments to city commission to be made on basis of race was not "narrowly tailored" to its compelling purpose in remedying past discrimination, because it "made no provision whatsoever for its termination" but was of "indefinite" duration).[41]

The fourth factor asks whether there is a reasonable relationship between the challenged plan's goal for minority repre-

---

**41.** Section 5 of the Voting Rights Act, which serves as the impetus for most race-based redistricting, is itself a temporary remedy, both generally and in its application to particular jurisdictions. The Voting Rights Act provides that § 5 will expire of its own accord in 2007, 42 U.S.C. § 1973b(a)(7) (Supp.1994), and specifically requires Congress to reconsider it in 1997, *id.* § 1973b(a)(8). And the Act's "bailout" provisions ensure that no jurisdiction will labor under § 5's mandate for any longer than reasonably necessary to eliminate the effects of the particular discrimination which it is designed to eradicate. *See id.* § 1973b(a)(1) (authorizing any jurisdiction subject to § 5 coverage to escape from that coverage by persuading the District Court for the District of Columbia that it has been free

from the sort of discrimination that triggered its § 5 coverage for a certain number of years).

Though amended § 2 has no expiration date, it too has a built-in mechanism which ensures that its race-based remedies will not be available any longer than is reasonably necessary to eliminate the effects of the particular discrimination which they are designed to redress. That mechanism is § 2's substantive requirement that the relevant minority prove the continued existence of racial bloc voting in order to obtain race-based relief under it. In application, this requirement means that § 2 can be used to compel race-based remedial redistricting only so long as its elections continue to be characterized by significant racial bloc voting—the most lasting effect of the official discrimination which § 2 is designed to remedy.

sentation in the pool of individuals ultimately selected to receive the benefit in question (be it a government contract, a place in a medical school class, or a job) and the percentage of minorities in the relevant pool of eligible candidates. *See Paradise,* 480 U.S. at 187, 107 S.Ct. at 1074–75 (Powell, J., concurring) (such a goal must be directly related to "the percentage of minority group members in the relevant population or work force"); *id.* at 198–99, 107 S.Ct. at 1080–81 (O'Connor, J., dissenting) ("of vital importance" that such a goal "not substantially exceed the percentage of [eligible] minority group members in the relevant population or work force"). In the redistricting context, we think this factor is satisfied so long as the percentage of majority-minority districts created by the plan— which, as indicated earlier, is best seen as a flexible goal for minority representation in the pool of individuals selected to receive the ultimate benefit of membership in the relevant legislative body—does not substantially exceed the percentage of minority voters in the jurisdiction as a whole. *Cf. De Grandy,* —— U.S. at ——, 114 S.Ct. at 2658 & n. 11 (endorsing this notion of "proportionality" between the number of majority-minority voting districts and the number of minorities in the relevant population group as a rough proxy for the equality of political and electoral opportunity that the Voting Rights Act guarantees); *id.* at ——, 114 S.Ct. at 2664 (O'Connor, J., concurring) (same).

The fifth and final factor asks whether the challenged plan "impose[s] an unacceptable burden on innocent third parties." *Paradise,* 480 U.S. at 182, 107 S.Ct. at 1072 (plurality); *see Fullilove,* 448 U.S. at 514–15, 100 S.Ct. at 2793–94 (Powell, J., concurring). The Court has invalidated the use of racial preferences in selecting employees for layoff on this ground, because it "imposes the entire burden of achieving racial equality" on innocent individuals and causes "serious disruption" to their lives and "settled expectations." *Wygant,* 476 U.S. at 283, 106 S.Ct. at 1851–52 (plurality). But the Court has held that an affirmative action plan may be "narrowly tailored" to its goal of remedying identified discrimination even though it requires innocent third parties to bear some of the burden of eradicating the effects of that discrimina-

tion. *See Wygant,* 476 U.S. at 280–81, 106 S.Ct. at 1850–51 (plurality) ("As part of this Nation's dedication to eradicating racial discrimination, innocent persons may be called upon to bear some of the burden of the remedy"); *id.* at 287, 106 S.Ct. at 1853–54 (O'Connor, J., concurring) (an affirmative action program designed "to further a legitimate remedial purpose" is not constitutionally invalid because it forces "innocent individuals" to bear some of the burden of the remedy, so long as it "do[es] not impose disproportionate harm on the interests, or unnecessarily trammel the rights, of innocent individuals directly and adversely affected by [its] racial preference"); *Fullilove,* 448 U.S. at 484, 100 S.Ct. at 2777–78 (opinion of Burger, C.J.) ("such a sharing of the burden [of remedying the effects of past discrimination] by innocent parties is not impermissible"); *id.* at 514–15, 100 S.Ct. at 2793–94 (Powell, J., concurring); *see also Croson,* 488 U.S. at 509, 109 S.Ct. at 730 (plurality); *id.* at 518– 19, 109 S.Ct. at 734–75 (Kennedy, J., concurring). The Court has specifically found affirmative action plans which burdened innocent individuals to some degree to be "narrowly tailored" to a compelling interest in remedying the effects of past discrimination, where those burdens were "relatively light" and "diffuse" ones that "foreclos[ed] only one of several opportunities" and did not result in "serious disruption" of their lives or "settled expectations." *See Fullilove,* 448 U.S. at 484, 100 S.Ct. at 2777–78 (opinion of Burger, J.) (racial set-aside in government contracting); *id.* at 515, 100 S.Ct. at 2793–94 (Powell, J., concurring); *Sheet Metal Workers,* 478 U.S. at 479, 106 S.Ct. at 3051–52 (plurality) (racial goals in union membership); *id.* at 488, 106 S.Ct. at 3056 (Powell, J., concurring); *Paradise,* 480 U.S. at 182–83, 107 S.Ct. at 1072–73 (plurality) (racial hiring and promotion goals in public employment); *id.* at 188–89, 107 S.Ct. at 1075–76 (Powell, J., concurring). *See generally Wygant,* 476 U.S. at 283, 106 S.Ct. at 1851–52 (plurality). In such cases, the "marginal unfairness" to innocent third parties is "outweigh[ed]" by the compelling interest in eradicating the effects of past or present discrimination. *Id.; see Fullilove,* 448 U.S. at 515, 100 S.Ct. at 2793– 94 (Powell, J., concurring).

Plaintiffs and their supporting intervenors contend that, as the panel majority in *Hays I* held, a race-based redistricting plan imposes an undue burden on innocent third parties, hence is not "narrowly tailored," if it deviates from traditional notions of geographical compactness, contiguity, and respect for the integrity of political subdivisions to a greater degree than is necessary to accomplish its compelling purpose. *See* 839 F.Supp. at 1208–09 (majority). In their view, strict scrutiny requires a court to invalidate a race-based redistricting plan whenever it finds that the legislature could have drawn some alternative plan that would have accomplished its compelling purpose while "do[ing] substantially less violence to traditional redistricting principles"—both those that are constitutionally-mandated, like the "one-person, one-vote" standard, and those that are not, like geographical compactness, contiguity, and respect for the integrity of political subdivisions. *Id.* at 1208.

We agree with the district court in *Hays I* that a race-based redistricting plan imposes an unacceptable burden upon third parties, hence is not sufficiently "narrowly tailored" to survive constitutional muster, if it fails to comply with redistricting principles that are themselves constitutionally-mandated, like the "one person, one vote" standard and the prohibition against undue dilution of the voting strength of any identifiable group of voters. A plan which causes concrete and material harm to the voting rights of an identified group of persons in one of these two ways certainly imposes the sort of "unacceptable burden" on third party interests which cannot survive strict scrutiny, even when supported by a compelling state interest. But we cannot agree that a race-based redistricting plan imposes an unacceptable burden upon third parties simply because it deviates from traditional notions of geo-

graphical compactness, contiguity, and respect for the integrity of political subdivisions, which are not themselves constitutionally-mandated districting principles, to a greater degree than a federal court may think was necessary to accomplish the state's compelling purpose.

As the Supreme Court has emphasized time and again, there is no general constitutional requirement that the states design their redistricting plans to produce districts that are compact and contiguous and that maintain the integrity of political subdivisions. *See, e.g., Gaffney v. Cummings,* 412 U.S. 735, 752 n. 18, 93 S.Ct. 2321, 2331 n. 18, 37 L.Ed.2d 298 (1973); *White v. Weiser,* 412 U.S. 783, 793–97, 93 S.Ct. 2348, 2353–56, 37 L.Ed.2d 335 (1973); *see also Cline v. Robb,* 548 F.Supp. 128, 132–33 (E.D.Va.1982) (three-judge court); *Cook v. Luckett,* 735 F.2d 912, 920 (5th Cir.1984). Compactness, contiguity, and respect for political subdivisions are of course rational districting principles which the states *may* take into account in designing redistricting plans. *See Reynolds v. Sims,* 377 U.S. 533, 578, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964); *Mahan v. Howell,* 410 U.S. 315, 320–30, 93 S.Ct. 979, 983–88, 35 L.Ed.2d 320 (1973). But they are not constitutional imperatives, *see Gaffney,* 412 U.S. at 752 n. 18, 93 S.Ct. at 2331 n. 18 ("compactness or attractiveness has never been held to constitute an independent federal constitutional requirement" for state redistricting schemes), and the Court has repeatedly rejected claims that a state redistricting plan violates the Equal Protection Clause because it sacrifices these considerations in order to achieve other legitimate redistricting objectives, such as protecting incumbents, preserving the integrity of established neighborhoods, and recognizing the voting strength of various political parties.[42]

---

42. *See, e.g., Gaffney,* 412 U.S. at 752 n. 18, 93 S.Ct. at 2331 n. 18 (rejecting claim that plan for redistricting of state legislature violated Equal Protection Clause because it created districts whose shapes were "indecent" and split many political subdivisions, where these oddities were the result of state's legitimate policy of allocating seats in the legislature between major political parties in rough proportion to their statewide political strength); *Wright v. Rockefeller,* 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964)

(rejecting claim that congressional redistricting plan violated Equal Protection clause because its "zigzag, tortuous lines" resulted in districts with highly irregular shapes and an 11-sided, step-shaped boundary between two districts, where those lines were designed to preserve the integrity of established neighborhoods); *see also White,* 412 U.S. at 793–97, 93 S.Ct. at 2356 (in crafting a remedy for a "one person, one vote" violation, district court abused its discretion in ordering

In *Shaw* itself, all nine members of the Court expressly reaffirmed the long-standing rule that adherence to traditional notions of compactness, contiguity, and respect for political subdivisions is *not* a general constitutional requirement for state redistricting plans. *See* —— U.S. at ——, 113 S.Ct. at 2827 (majority); *id.* at ——, 113 S.Ct. at 2841 (White, J., joined by Blackmun, J., dissenting); *id.* at ——, 113 S.Ct. at 2843 (Stevens, J., dissenting); *id.* at ——, 113 S.Ct. at 2849 (Souter, J., dissenting). And we find no indication that the *Shaw* majority intended to create an exception to this general rule that would make adherence to traditional notions of compactness, contiguity, and respect for political subdivisions a constitutional imperative for a certain class of redistricting plans: those designed to give effect to minority voting strength in order to further a compelling state interest in remedying identified discrimination in the state's electoral processes. The majority held that a state legislature's disregard of traditional notions of compactness, contiguity, and respect for the integrity of political subdivisions in crafting a plan which creates majority-minority districts is of *some* relevance in the Equal Protection analysis, because it serves (when combined with evidence of the racial makeup of the districts) as circumstantial proof that race played a sufficiently important role in the plan's design to warrant application of strict scrutiny. *Id.* at ——, 113 S.Ct. at 2826–27. But it made clear that compliance with these criteria was not to be used as the ultimate test of the plan's constitutionality. *See id.* at ——, 113 S.Ct. at 2826–27 ("We emphasize that [adherence to] these criteria [is] important not because they are constitu-

tionally required—they are not, *cf. Gaffney v. Cummings,* 412 U.S. 735, 752, n. 18, 93 S.Ct. 2321, 2331, n. 18, 37 L.Ed.2d 298 (1973)—but because they are objective factors that may serve to defeat a claim that a district has been gerrymandered on racial lines"); *see also id.* at ——, 113 S.Ct. at 2827 ("'One need not use [adherence to these criteria] ... as an ultimate standard for judging the constitutionality of a gerrymander to recognize that dramatically irregular shapes may have sufficient probative force to call for an explanation.'") (*quoting Karcher,* 462 U.S. at 755, 103 S.Ct. at 2672–73 (Stevens, J., concurring)).[43] And while the Court remarked in *dicta* that a race-based redistricting plan designed to further an interest in remedying identified discrimination *apart* from the Voting Rights Act is "constitutionally permissible only when the State 'employ[s] sound districting principles.'" *id.* at ——, 113 S.Ct. at 2832 (*quoting UJO,* 430 U.S. at 167–68, 97 S.Ct. at 1010–11 (opinion of White, J., joined by Stevens and Rehnquist, JJ.)), we think it meant only that such a plan, like any other redistricting plan, must employ *rational* districting principles that ensure fair and effective representation to all citizens, *see Reynolds,* 377 U.S. at 568, 84 S.Ct. at 1385 (redistricting plan that was a "crazy quilt[ ], completely lacking in rationality, ... could be found invalid on that basis alone"), be they compactness, contiguity, and respect for political subdivisions, or any of a host of other race-neutral principles—including preservation of the core constituencies of incumbents and recognition of distinctive urban and rural interests—which a state may legitimately and rationally take into account in designing electoral districts.[44] We therefore conclude

state to adopt a redistricting plan that failed to respect "the districting preferences of the state legislature"—including its policy of preserving the core constituencies of incumbents—simply because it was "significantly more compact and contiguous" than the proposed alternatives).

**43.** The passage from Justice Stevens' concurrence in *Karcher* upon which the *Shaw* majority relies explains that "drastic departures from compactness" and "extensive deviation for established political boundaries" are "signal[s] that something may be amiss," which, when coupled with evidence that the plan has "a significant adverse impact upon a defined ... group of voters," will suffice to establish a "prima facie

showing of gerrymandering" and "shift the task of justification to the state," 462 U.S. at 754–61, 103 S.Ct. at 2672–76. But it expressly warns against using adherence to traditional notions of compactness and respect for the integrity of political subdivisions as an "ultimate standard for judging the constitutionality of a gerrymander." *Id.* at 755 & n. 15, 103 S.Ct. at 2672–73 & n. 15.

**44.** The passage in *UJO* from which the *Shaw* majority quotes reads in full that "we think it ... permissible for a State, employing sound districting principles *such as* compactness and population equality, to attempt to prevent racial minorities from being repeatedly outvoted by creating districts that will afford fair representation to the

that *Shaw* itself cannot be read to hold that a race-based redistricting plan is not "narrowly tailored" if it deviates from traditional notions of compactness, contiguity, and respect for political subdivisions to a greater degree than a federal court thinks is necessary to accomplish the state's compelling purpose.

Nor do we believe that the Supreme Court will ultimately adopt a definition of "narrow tailoring" in the redistricting context that requires consideration of whether the challenged plan deviates from traditional notions of compactness, contiguity, and respect for political subdivisions to a greater degree than is necessary to accomplish the state's compelling purpose. As one set of commentators has suggested, such a rule would "confuse the purpose of *Shaw's* strict scrutiny standard," which is not to ensure that the state creates wise or aesthetically-pleasing districts, but to ensure that it "is not covertly pursuing forbidden ends" when it draws district lines. Pildes & Niemi, *supra*, at 584–85. It would also make little sense from a practical standpoint, for several reasons.

■ In the first place, compactness, contiguity, and respect for political subdivisions have little inherent value in the districting process. The ultimate purpose of legislative apportionment and redistricting is to ensure " 'fair and effective representation for all citi-

zens.' " *Gaffney*, 412 U.S. at 748, 93 S.Ct. at 2329 (*quoting Reynolds*, 377 U.S. at 565–66, 84 S.Ct. at 1383–84). Districts that are compact, contiguous, and respect existing political subdivisions have traditionally been thought to facilitate the realization of that goal, because they link together citizens who are likely to share common needs and interests, reduce the cost of campaigning, and make it easier for legislators to maintain close contact with their constituents. *See Prosser v. Elections Bd.*, 793 F.Supp. 859, 863 (W.D.Wis.1992) (three-judge court). But, as plaintiffs' own experts have testified, there is no consensus, nor even any empirical evidence, that adherence to these criteria is *necessary* to ensure fair and effective representation. *See* O'Rourke testimony, Tr. pp. 274–75; Hofeller testimony, Tr. pp. 139–42; Niemi Dep. at 83; O'Rourke Dep. at 89–93. As the Court explained in *Reynolds*, arguments that "geographic considerations" should receive primary emphasis in redistricting, while perhaps valid at one point in our history, are "unconvincing" today, because "[m]odern developments and improvements in transportation and communications" mean that small and compact legislative districts are no longer necessary to insure that all citizens have access to their representatives. 377 U.S. at 580, 84 S.Ct. at 1391.[45]

members of those racial groups who are sufficiently numerous and whose residential patterns afford the opportunity of creating districts in which they will be in the majority." *UJO*, 430 U.S. at 167–68, 97 S.Ct. at 1010–11 (opinion of White, J., joined by Stevens and Rehnquist, JJ.) (emphasis added). Neither the *UJO* plurality nor the *Shaw* majority indicates that compactness, contiguity, and respect for political subdivisions are the *only* districting principles which can be considered "sound," and long-standing Supreme Court precedent makes clear that they are not. *See Gaffney*, 412 U.S. at 754, 93 S.Ct. at 2332 (recognizing the voting strength of political parties); *White v. Weiser*, 412 U.S. at 791, 93 S.Ct. at 2352–53 (preserving the core constituencies of incumbents); *Burns v. Richardson*, 384 U.S. 73, 89 n. 16, 86 S.Ct. 1286, 1295 n. 16, 16 L.Ed.2d 376 (1966) (avoiding contests between incumbents).

**45.** There appears to be general agreement in both the United States Congress and the state legislatures that strict adherence to traditional notions of compactness, contiguity, and respect for political subdivisions in designing congressional districts is no longer appropriate today.

From 1842 to 1929, federal statutory law required that all single-member congressional districts be composed of "contiguous territory." *Wood v. Broom*, 287 U.S. 1, 6, 53 S.Ct. 1, 2, 77 L.Ed. 131 (1932) (citing Reapportionment Acts of 1842, 1872, 1882, 1891, 1901, and 1911). From 1901 until 1929, federal statutory law also required them to be geographically compact. Reapportionment Act of 1901, ch. 93, § 3, 31 Stat. 733, 734; Reapportionment Act of 1911, ch. 5, § 3, 37 Stat. 13, 14. In the Reapportionment Act of 1929, however, Congress repealed both the contiguity requirement and the compactness requirement. *Wood*, 287 U.S. at 6–7, 53 S.Ct. at 2–3. Since 1929, there have been a number of bills introduced in Congress to reimpose requirements of compactness and contiguity for all single-member congressional districts, but all have been defeated by substantial margins. *See, e.g.*, H.R. 2648, 82d Cong., 1st Sess. (1951); H.R. 970, 89th Cong., 1st Sess. (1965); H.R. 2508, 90th Cong., 1st Sess. (1967). Federal statutory law has never required that congressional districts respect the integrity of political subdivisions.

Roughly half of the states—including North Carolina—impose requirements of compactness,

Nor are compact and contiguous districts which respect the integrity of political subdivisions any guarantee of fair and effective representation. As *Reynolds* demonstrates, and plaintiffs' expert has conceded, even the most perfectly-shaped districts may "do great harm to fair representation," O'Rourke Dep. at 89, and "the use of highly compact districts may be the most effective way to shut out a minority from equal participation." Comment, Constitutional Challenges to Gerrymanders, 45 U.Chi.L.Rev. 845, 879 (1978). Requiring states to adhere strictly to these criteria in crafting remedial redistricting plans would thus serve "no obvious purpose." Pildes & Niemi, *supra*, at 584–85.

Second, even if compactness, contiguity, and respect for political subdivisions had some inherent value, there is no "relatively simple and judicially manageable" standard, *Davis v. Bandemer*, 478 U.S. at 149, 106 S.Ct. at 2819 (O'Connor, J., concurring in the judgment), for determining whether a particular redistricting plan deviates from these principles to a greater extent than is necessary to accomplish the state's compelling interest.[46] While it is easy enough to determine whether a district is technically "contiguous" or not, there is no principled means of determining whether a district which satisfies this threshold requirement is still less contiguous than it needs to be. Nor is there any principled means of determining whether

a congressional redistricting plan, which must deviate from the boundaries of established political subdivisions to some extent in order to comply with the constitutional command that it create districts which are as nearly equal in population as is mathematically possible, *see Kirkpatrick v. Preisler*, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969); *Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), nonetheless fails adequately to respect the integrity of those political subdivisions. Finally, there is no generally-accepted definition of what it means for a district to be "compact." *See* Pildes & Niemi, *supra*, at 540–59. While plaintiffs' experts and others have suggested a number of different ways in which district compactness can be measured mathematically, *see* Hofeller testimony, Tr. pp. 118–20; O'Rourke testimony, Tr. pp. 212–14; *see also Karcher*, 462 U.S. at 756–57 n. 19, 103 S.Ct. at 2673–74 n. 19 (Stevens, J., concurring); R. Niemi, B. Grofman, C. Carlucci, & T. Hofeller, Measuring Compactness and the Role of a Compactness Standard in a Test for Partisan and Racial Gerrymandering, 52 J. Pol. 1155 (1990); Pildes & Niemi, *supra*, at 553–59, there is admittedly no consensus as to which of these is most valid. *See* B. Grofman, Criteria for Districting: A Social Science Perspective, 33 UCLA L.Rev. 77, 85 (1985) ("There are many different ways of applying a compactness requirement but

---

contiguity, and/or respect for the integrity of political subdivision lines upon their *state* legislative districts. *See* Pildes & Niemi, *supra*, at 528; N.C. Constit. Art. II. §§ 3 and 5. But only a handful impose such requirements upon their *congressional* districts, Pildes & Niemi, *supra*, at 528 & n. 140, and North Carolina is not among them. Stip. 20. And while contiguity and respect for the integrity of *precincts* and *census blocks* were among the general criteria adopted by the North Carolina General Assembly's *redistricting committees* for consideration in designing the 1990 congressional redistricting plan, neither compactness nor respect for county or municipal boundaries were. *See* Stip. Ex. 9; Fitch Testimony, Tr. pp. 719; Cohen Testimony, Tr. pp. 319.

This general legislative unwillingness to impose requirements of compactness, contiguity, and respect for political subdivisions upon congressional districts may represent nothing more than a recognition that it is virtually impossible to adhere strictly to these conventions in designing congressional districts, as opposed to state

legislative districts, since the former stretch over a much larger geographic area and are subject to a more stringent "one person, one vote" standard than the latter. But it may also represent a consensus that there is less correlation between adherence to these principles and the creation of districts whose citizens share common political interests when the redistricting is for the national legislature than the state legislature, since the former deals almost exclusively with legislation that affects the state as a whole, whereas the latter is more apt to deal with legislation that affects only certain discrete geographic areas within it.

**46.** Compare the *Reynolds v. Sims* rule of mathematical equality in district population, which serves as a "relatively simple and judicially manageable" standard for determining whether a state legislative apportionment scheme complies with the Equal Protection Clause's requirement that the votes of all citizens be given equal weight. *Bandemer*, 478 U.S. at 149, 106 S.Ct. at 2819 (O'Connor, J., concurring).

none is generally accepted as definitive."). And even if there were, the long experience with state-law requirements of district compactness stands as vivid testimony to the fact that these proposed measures of compactness are not "judicially manageable." *See Karcher,* 462 U.S. at 756, 103 S.Ct. at 2673–74 (Stevens, J., concurring) (state compactness requirements "have been of limited utility because they have not been defined and applied with rigor and precision"); Pildes & Niemi, *supra,* at 529–31 (state compactness requirements have been "ineffective" in producing more compact districts, because the courts have been either unwilling or unable to enforce them).[47] The inquiry suggested by the *Hays I* Court thus promises to be "so standardless as to make the [principled] adjudication of [racial gerrymandering] claims impossible," *Bandemer,* 478 U.S. at 157, 106 S.Ct. at 2823 (O'Connor, J., concurring), which in turn will make it virtually impossible for the state legislatures to determine what is required to make a race-based remedial plan comply with the Constitution.

Finally, and most critically, the "narrowly tailored" inquiry suggested by plaintiffs would result in undue interference by the federal judiciary in matters that have long been thought to be the primary province of the state legislatures. From its earliest ventures into the "political thicket" of legislative reapportionment, *Colegrove v. Green,* 328 U.S. 549, 556, 66 S.Ct. 1198, 1201, 90 L.Ed. 1432 (1946) (opinion of Frankfurter, J.), the Supreme Court has hewed fast to the view that the task of redistricting is fundamentally a political one for the state legislatures, *see Reynolds v. Sims,* 377 U.S. at 586, 84 S.Ct. at 1394; *Burns v. Richardson,* 384 U.S. 73, 84–85, 92, 86 S.Ct. 1286, 1292–93, 1296–97, 16 L.Ed.2d 376 (1966); *Gaffney v. Cummings,*

412 U.S. at 749, 93 S.Ct. at 2329–30; *Mahan v. Howell,* 410 U.S. at 327, 93 S.Ct. at 986; *White v. Weiser,* 412 U.S. at 794–95, 93 S.Ct. at 2354–55; *Wise v. Lipscomb,* 437 U.S. 535, 539–40, 98 S.Ct. 2493, 2496–97, 57 L.Ed.2d 411 (1978), into which the unelected federal judiciary should not intrude any more than is absolutely necessary to protect constitutional rights. *White,* 412 U.S. at 795, 93 S.Ct. at 2354–55. This "hands off" approach is not some accident of history, but a deliberate recognition of the fact that the process of redistricting "is fundamentally a political affair," *Bandemer,* 478 U.S. at 145, 106 S.Ct. at 2817 (O'Connor, J., concurring), and that the state legislatures, as the very "fountainhead of representative government in this country," *Reynolds,* 377 U.S. at 564, 84 S.Ct. at 1384, are the organs of government best situated to identify and strike an appropriate balance between the many different—and often conflicting—considerations that are at stake in it. *Connor v. Finch,* 431 U.S. 407, 414–15, 97 S.Ct. 1828, 1833–34, 52 L.Ed.2d 465 (1977); *see Growe v. Emison,* — U.S. at —, 113 S.Ct. at 1081 ("[R]eapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court") (internal quotations omitted); *Voinovich v. Quilter,* — U.S. at —, 113 S.Ct. at 1157 ("Because the States do not derive their reapportionment authority from the Voting Rights Act, but rather from independent provisions of state and federal law, the federal courts are bound to respect the States' apportionment choices unless those choices contravene federal requirements.") (internal quotations omitted).[48] The "narrowly tailored" analysis suggested by plaintiffs, which would force the federal courts "to attempt to recreate the complex process of legislative apportionment

---

**47.** The same lack of a meaningful objective measure of compactness has plagued courts attempting to implement the "geographic compactness" prong of the *Gingles* prima facie case under § 2 of the Voting Rights Act. *See* Pildes & Niemi, *supra,* at 532–46 (noting "considerable inconsistency" in approach and widespread use of "intuitive, eyeball assessments" in decisions of lower federal courts attempting to implement this requirement); P. Karlan, Maps and Misreadings: The Role of Geographic Compactness in Racial Vote Dilution Litigation, 24 Harv.C.R.–C.L.L.Rev. 173, 204–13 (1989) (same).

**48.** It is for this reason that the federal courts, upon finding that redistricting is necessary to remedy a proven violation of federal law, have traditionally given the state legislature an opportunity to devise a plan that will remedy the violation found, before undertaking to fashion one themselves. *See White v. Weiser,* 412 U.S. at 794–95, 93 S.Ct. at 2354–55; *Chapman v. Meier,* 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975); *McGhee v. Granville County,* 860 F.2d 110 (4th Cir.1988).

in the context of adversary litigation" and embroil them in after-the-fact "second-guessing" of the wisdom of legislative judgments about how best to balance competing districting considerations that are not themselves of constitutional stature, *Bandemer,* 478 U.S. at 146–47, 106 S.Ct. at 2817–18 (O'Connor, J., concurring), is fundamentally inconsistent with this principle. We do not believe the *Shaw* majority intended to "open[ ] the door to [such] pervasive and unwarranted judicial superintendence of the legislative task of [redistricting]," *id.* at 147, 106 S.Ct. at 2818, and "bog[ ] [the federal courts] down in [such] a vast, intractable ... slough, particularly when there is little, if anything, to be accomplished by doing so." *Gaffney,* 412 U.S. at 750, 93 S.Ct. at 2330.[49]

It is one thing to tell the states that the Voting Rights Act does not give them license to engage in race-based redistricting, · even with the "benign" purpose of giving effect to minority voting strength, unless they have a substantial basis for believing that such remedial action is required to comply with the Act; and that they must take care, even then, not to take race into account in drawing district lines any more than is reasonably necessary to provide minority ,voters the "equal political opportunity," *De Grandy,* —— U.S. at ——, 114 S.Ct. at 2658 that the , Voting Rights Act requires. That is the fundamental point of *Shaw,* and it is a point well worth making, if this nation is ever to attain the goal that the Voting Rights Act itself was designed to bring about—that is, to overcome its long history of racial discrimination in electoral politics and transform its political system into one in which the color of an individual's skin has no bearing on his ability to participate effectively in the political process. But it is another thing entirely to tell a state which *does* have a substantial basis for concluding that it must engage in race-based redistricting to comply with the Voting Rights Act that it can do so only if it

draws districts whose lines are sufficiently "regular" or "pleasing" in their appearance to satisfy the aesthetic sensibilities of a handful of unelected federal judges. *Shaw* itself holds no such thing, and we do not believe its reasoning compels us to do so here.

▇▇▇ For all these reasons, we cannot agree with the *Hays I* court that a race-based redistricting plan enacted to further a compelling state interest in complying with the Voting Rights Act imposes an unacceptable burden upon innocent third parties, hence is not sufficiently "narrowly tailored" to survive constitutional muster, simply because it deviates from traditional notions of geographical compactness, contiguity, and respect for the integrity of political subdivisions to a greater degree than a federal court later concludes was necessary to accomplish the state's compelling purpose. Instead, we believe that such a plan imposes an undue burden on innocent third parties only if it fails to give equal weight to the votes of all individuals, *see Reynolds,* unconstitutionally dilutes the voting strength of any identified group of voters, *see Whitcomb, Bandemer,* or is not grounded in rational districting principles which ensure that all citizens receive "fair and effective representation," *see Reynolds,* 377 U.S. at 568, 84 S.Ct. at 1385. So long as the plan stays within these basic constitutional boundaries, it "unsettles no legitimate, firmly-rooted expectation" on the part of any voter, *Johnson v. Transportation Agency,* 480 U.S. 616, 638, 107 S.Ct. 1442, 1455, 94 L.Ed.2d 615 (1987), including the nonminority voters it places in majority-minority districts, for no voter has a legitimate right to expect that he will be placed in a district in which he is part of the majority or that his preferred candidate will win, *see Whitcomb,* 403 U.S. at 149, 154, 91 S.Ct. at 1872, 1875–76; *UJO,* 430 U.S. at 166, 97 S.Ct. at 1010, nor does he have a legitimate right to expect that his district will have a certain shape, *see infra* n. 60.[50]

---

**49.**· The voluminous evidentiary record developed by the parties in this case, which attempts to reconstruct—some years after the fact—the complex and compromise-ridden legislative process that led to the enactment of the challenged Plan, in order to somehow divine the precise reason for each dip and turn in the district lines, is a

perfect illustration of the inadvisability of adopting the "narrowly tailored" inquiry suggested by the plaintiffs.

**50.** We do not agree with the dissent's suggestion, *post* at 484–485, 490–491, that to·be "narrowly tailored"·to a compelling interest in avoiding a

■ Of course, on current doctrine, a race-based redistricting plan that complies with these requirements may cause some "stigmatic" or "dignitary" harm to the voters—both minority and nonminority—that it "classifies" by race. Though we believe this harm is sufficient, on that doctrine, to give those voters standing to challenge the plan, *see supra* at 423–427, we do not think it suffices to establish that the plan imposes an "unacceptable" burden on innocent third parties for purposes of the "narrowly tailored" prong of the strict scrutiny analysis. Congress carefully considered the burdens that the drawing of district lines to give effect to minority voting strength would impose upon the citizenry when it enacted, amended, and extended the provisions of the Voting Rights Act that require the states to take such

action to remedy the effects of past and present discrimination in their electoral processes. *See UJO,* 430 U.S. at 175–78, 97 S.Ct. at 1014–16 (Brennan, J., concurring in part); *Gingles v. Edmisten,* 590 F.Supp. at 356–57 & nn. 17–20. *See generally* Boyd & Markman, The 1982 Amendments to the Voting Rights Act: A Legislative History, 40 Wash. & Lee L.Rev. 1347 (1983). And it made "a considered decision," *Fullilove,* 448 U.S. at 473, 100 S.Ct. at 2772 (opinion of Burger, C.J., joined by White and Powell, JJ.), after "substantial and careful deliberations," *UJO,* 430 U.S. at 176, 97 S.Ct. at 1015 (Brennan, J., concurring in part), that these burdens were not unacceptable, given the national consensus on the compelling need for "sterner and more elaborate measures" to eradicate the effects of the states' "unre-

violation of amended § 2, a plan which creates majority-minority districts must "incorporate" in those majority-minority districts the specific "geographically compact" minority population which led the state to believe that § 2 required it to engage in race-based redistricting in the first place. With all respect, this argument is based on a fundamental misconception of the nature of the "wrong" which § 2 forbids, and the role that the *Gingles* "geographical compactness" inquiry plays in establishing a § 2 violation.

As amended, § 2 of the Voting Rights Act forbids a state to adopt or maintain any districting plan that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a). Section 2(b) provides that such an impermissible "denial or abridgement of the right . . . to vote" occurs where, "based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of [the relevant minority group] . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 1973(b). To make out a claim that a single-member districting plan results in such an impermissible "dilution" of minority voting strength, a plaintiff must show, among other things, that the relevant minority group is "sufficiently large and geographically compact" to constitute a majority in more single-member districts than the number in which it has a majority under the challenged plan. *Growe,* — U.S. at —, 113 S.Ct. at 1084 (*citing Gingles,* 478 U.S. at 50–51, 106 S.Ct. at 2766–67). Such a showing that it is possible to draw more majority-minority districts than the challenged plan does, together with evidence that the minority is "politically

cohesive" and that the white majority "votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate" in districts that are not majority-minority, is *necessary* to establish that the plan impermissibly "dilutes" the voting strength of a distinctive minority group, hence violates § 2. *Id.* But such a showing is not necessarily *sufficient* to establish that the challenged plan results in an impermissible dilution of minority voting strength; instead, the court may properly find a violation of § 2 only if it further finds, after assessing the probative significance of the inference arising from the three *Gingles* factors in light of all other circumstances "with arguable bearing on the issue of equal political opportunity," that the plan's lines do in fact operate to deny the minority an equal opportunity to participate in the electoral process and to elect candidates of their choice. *De Grandy,* — U.S. at —, 114 S.Ct. at 2655–60. The "wrong" which constitutes a violation of § 2 is therefore not that the plan fails to make a majority-minority district out of every pocket of minority voters that is sufficiently large and geographically compact, as the dissent seems to think, but that its lines, considered in light of all relevant circumstances, operate to deny the members of the relevant minority group equal political opportunity; its failure to create as many majority-minority districts as the minority's residential patterns will permit is merely one of the telltale symptoms of that wrong. *Id.* at —, 114 S.Ct. at 2655–60. It therefore makes no sense to say that a race-based redistricting plan designed to avoid a potential § 2 violation cannot be "narrowly tailored" to that particular "wrong" unless the majority-minority districts which it creates incorporate the specific "geographically compact" minority population which first led the state to suspect that its existing districting scheme might violate § 2.

mitting and ingenious defiance" of the Fourteenth and Fifteenth Amendments' guarantees of racial equality in the exercise of the franchise. *South Carolina v. Katzenbach,* 383 U.S. at 308–09, 86 S.Ct. at 808–09 (1966); *see McCain,* 465 U.S. at 243–48, 104 S.Ct. at 1042–45; *City of Rome,* 446 U.S. at 172–78, 180–83, 100 S.Ct. at 1559–62, 1563–65, 64 L.Ed.2d 119. We are obligated to give considerable deference to Congress' judgment on that score, *see Fullilove,* 448 U.S. at 472, 100 S.Ct. at 2771–72 (opinion of Burger, C.J.), given its "specially informed legislative competence" in the area of voting rights, *Katzenbach v. Morgan,* 384 U.S. 641, 656, 86 S.Ct. 1717, 1726–27, 16 L.Ed.2d 828 (1966), and the fact that the Voting Rights Act is an exercise of its "specific constitutional mandate" to enforce by "appropriate" legislation the guarantees of racial equality in the Fourteenth and Fifteenth Amendments, *Croson,* 488 U.S. at 490, 109 S.Ct. at 720 (opinion of O'Connor, J., joined by Rehnquist, C.J., and White, J.), a mandate which the Supreme Court has consistently recognized gives it unique and far-reaching remedial powers. *Id.* at 488, 109 S.Ct. at 718–19; *see Fullilove,* 448 U.S. at 483, 100 S.Ct. at 2777 (opinion of Burger, C.J.) ("[I]n no organ of government, state or federal, does there repose a more comprehensive remedial power than in the Congress, expressly charged by the Constitution with competence and authority to enforce the equal protection guarantees" of the Civil War Amendments); *id.* at 516, 100 S.Ct. at 2794 (Powell, J., concurring); *see also Metro Broadcasting,* 497 U.S. at 605, 110 S.Ct. at 3030 (O'Connor, J., joined by Rehnquist, C.J., and Scalia and Kennedy, JJ., dissenting) ("Congress has considerable latitude, presenting special concerns for judicial review, when it exercises its 'unique remedial powers ... under § 5 of the Fourteenth Amendment'"). We believe that Congress "adequately struck th[e] balance" between the need for race-based redistricting as a remedy for past and present discrimination in the states' electoral processes and the burden that such measures impose upon innocent third parties when it enacted, and twice extended, "the carefully conceived remedial scheme embodied in the Voting Rights Act." *UJO,* 430 U.S. at 175, 97 S.Ct. at 1014–15 (Brennan, J., concurring). Any argument that the passage of time has thrown that balance out of kilter, or that those measures have accomplished their purpose and outlived their usefulness, is properly addressed to Congress, which has the power to call an end to the extraordinary remedial effort embodied in the Voting Rights Act, rather than to the federal courts. *See City of Rome v. United States,* 446 U.S. at 180–82, 100 S.Ct. at 1563–64 (specifically refusing "to overrule Congress' judgment that the 1975 extension [of § 5's preclearance requirement] was warranted" in order "to counter the perpetuation of 95 years of pervasive vomination," despite "undeniable" increases in the number of African–Americans registered to vote and elected to public office since it was first enacted).

## III.

### *Findings of Fact* [51]

#### A. *General Background*

##### *The Legislative Setting*

As the General Assembly of North Carolina went about the task of congressional redistricting required by the 1990 decennial

---

**51.** At intervals in our narrative findings we cite to particular items in the evidentiary record. These references are intended to identify the most critical evidentiary support for the immediately preceding finding(s), not necessarily the exclusive support. We received much of the evidence in the record—testimonial, documentary, witness statements, discovery materials—subject to objections, and reserved rulings pending our written decision. In keeping with customary practice in bench trials, we have considered all the evidence in the record (with one exception to be noted), exercising our judgment and discretion respecting that which properly could be relied upon. *See generally* 1 McCormick on Evidence, § 60 (4th ed. 1992). For purposes of the record, therefore, all objections by the parties to any evidence received by the court can be considered now overruled by the court. The one exception is certain evidence concerning an official investigation of campaign practices during the 1990 political campaign for the United States Senate in North Carolina which, on motion of the United States, was sealed by the court. Objection to the admissibility of that evidence is sustained. It has not been considered by the court.

census, several extra-legislative factors, newly at work, crucially shaped its deliberative process and the legislative decisions that emerged.

First off, population growth had produced a new seat to work into the ultimate plan, hence a need to divide the state geographically into twelve districts rather than the former eleven. Stip. 19. The legislature could not, therefore, start with the then-existing congressional districts and adjust them only as required by the one-person-one-vote principle coupled with the eternal problems of incumbency protection and raw partisan politics.[52] As plaintiff-intervenor's expert witness testified, gaining a new (or losing an existing) seat always creates its own "turbulence" in the redistricting process. Hofeller testimony, Tr. pp. 135–36.

Next, new developments in the way that census data was organized geographically, both by the U.S. Bureau of Census and by state legislative staff, coupled with new computer technology for processing and using that data in redistricting, had created new capabilities for rapid, accurate consideration and adjustments of proposed plans, and for line-drawing not so bound, as formerly, to existing political boundaries.

Without attempting a full description of these interrelated technical developments, the dramatic new capabilities they provided for the redistricting process can be summarized. In the first place, the critical redistricting data—total population, voting age population by race or national origin, voter registration by party and race—was now made available by the Census Bureau and state legislative staff not only at traditional governmental levels down to townships and precincts, but even further down to the level of the "census block," a geographical unit usually smaller than precincts. Incorporated into a newly acquired computer software program along with digital map files, these allowed the rapid call-up and visual display on computer terminals of critical demographic and statistical data down to the census block level, along with geographic features—highways, streets, rivers, railroads—and political boundaries, including the 1980's congressional district lines, throughout the state. And, in a further refinement developed by legislative staff, precinct election results in a number of recent statewide elections were included in the computer database, making available at the precinct level partisan voting patterns that might affect particular candidacies in potential districts. The capability thus provided to call up demographic and statistical data and on its basis to make district line adjustments at this geographic level had therefore significantly increased the flexibility of the redistricting process, freeing up the planners from their former confinement to existing political boundaries in attempting to "get the numbers right," whether for basic one-person-one-vote purposes, incumbency protection, or for other purposes. Around 229,000 of these census blocks, with their associated demographic and statistical data, were now newly available for use as basic building blocks in the redistricting process. This not only made possible a new degree of refinement in getting the numbers right (including the rather incredible achievement of mathematically perfect equal population districts), it also encouraged the drawing of boundary lines with more obvious irregularities and facial oddities than typically occurred under the less sophisticated methodology formerly available. For the new capability made it more possible than formerly it had been for the planners to yield to specific importunings for special treatment of narrowly confined local situations (such as incumbent residency) or to shift quite small numbers of desired types of voters (whether by party affiliation or race) in drawing district lines. And because the census block boundaries were either visible physical features or existing governmental unit lines, it was now possible to use them as boundary-defining portions of a district and thereby to split governmental units down to the precinct level between districts when the demands of numbers, or incumbency protection, or partisan political advantage were thought to require it. Stip. 29–33; Cohen testimony, Tr. pp. 283–86, 289–98, 412–13; Cohen Dep. 96–

---

**52.** That is, if it wanted to have a redistricting plan in place in time for the 1992 congressional primary and general elections. *See* 2 U.S.C. §§ 2a(c); 2c.

113; Cohen Dep.Ex. 7; generally, D.Exs. 405, 416–35.

A third factor heavily influencing the redistricting process was a recently developed perception by the Republican Party of North Carolina and members of that Party in the General Assembly, freely conceded in this litigation, that it and they could derive partisan political advantage from the creation of as many majority-minority districts as arguably could be justified by the requirements of federal voting rights law. Pope testimony, Tr. pp. 1046; Hawke Dep. pp. 15, 18–19; Farr closing arg. Tr. p. 15. This perception, and Republican legislator action upon it, gave rise to powerful political cross-currents and unusual political alignments that figured critically in the redistricting process and that in turn bear significantly upon the issues in this case.

The bicameral state legislature that developed and enacted the challenged plan was heavily white by race, Democratic by party. In the Senate there were 36 Democrats, 14 Republicans; in the House, 81 Democrats, 39 Republicans. By race, the Senate had 45 white members, 5 African–American members; the House, 105 white members, 14 African–American members and one Native American member. Stips. 10–16. Congressional redistricting (unlike that for state legislative seats) was carried out as a shared responsibility of both houses. Bipartisan and bi-racial congressional redistricting committees were appointed for both Senate and House, that in the Senate being a sub-committee of a general redistricting committee chaired by Senator Dennis J. Winner. Senator Russell G. Walker was chairman of the Senate sub-committee, and Representatives Milton "Toby" Fitch, R. Samuel Hunt, III

and Edward C. Bowen were co-chairman of the House Committee. All of these but Fitch, an African–American, were white, and all were Democrats. Stips. 24–27. They, together with House Speaker Dan Blue, an African–American, and Senator Dennis Winner, who was white, constituted what came to be the generally recognized "Democratic leadership" in devising the congressional redistricting Plan now challenged. Cohen testimony, Tr. pp. 308; Fitch testimony, Tr. pp. 661–663.

This "Democratic leadership" group, acting through the Senate and House redistricting committees, effectively directed the process that led ultimately to enactment of the challenged Plan. Their decisions from time to time as the Plan evolved were implemented at the mechanical, "line-drawing" level by the Director of the Bill Drafting Division of the General Assembly, Gerry Cohen, to whom that responsibility had been delegated. Using the computer resources above described, Cohen took his instructions from this group and translated them into district configurations that were then submitted for consideration to the redistricting committees and ultimately to the floors of the House and Senate for vote.[53] Cohen testimony, Tr. pp. 359, 379–80.

*Basic Geographic and Demographic Features Affecting the Statewide Congressional Redistricting Process*

Certain basic geographic and demographic features of the State—knowledge of whose essentials by the General Assembly we must assume—provided essential background for the statewide congressional redistricting process.

---

**53.** Cohen's role in the redistricting process, though that of staff employee without decisional authority, was nevertheless singular, and critical. Ultimately, every legislative decision respecting the configuration of the evolving congressional redistricting Plan was communicated to him in the form of instructions by members of the Democratic "leadership group" exercising the ultimate power of the majority party in the General Assembly. The congressional district lines that finally emerged in the challenged Plan were thus all originally drawn by Cohen, acting upon these instructions. The lines that he drew and the instructions upon which he acted therefore directly reflect the legislative intent behind their drawing and the private and public interests they were intended by the legislative majority to serve. *See Voinovich v. Quilter,* — U.S. at ——, 113 S.Ct. at 1158–59 (looking to evidence of intent of individual employed by state legislature to draft its redistricting plan as evidence of the legislative intent behind the plan). Cohen's testimony, in deposition and at trial, describing his role, the instructions he received, the reasons given him, and the action he took upon the instructions, has been extensively relied upon as an accurate, credible description of the process in which he was involved.

Total state population, by the 1990 census, was 6,628,637. Of that total, 5,008,491 (75.- 6%) were white; 1,456,323 (22%) were African–American; and 80,135 (1.2%) were Native American. Stip. 19; 1990 Census. This meant that each of the state's twelve districts was required by constitutional "one person, one vote" principles to have a population as close as practicable to the "ideal" district population of 552,386. Stip.Ex. 10 p. 117. *See supra* n. 5.

North Carolina has three distinctive geographic regions, each with its equally distinctive history, culture, and economy: the Mountain region, the Piedmont region, and the Coastal Plain region.

The Coastal Plain, extending inland from the Atlantic coast roughly to the geologic fall line, historically has been and remains essentially rural and agricultural. It has no city with a population of 100,000 or more, and though it has a number of smaller cities such as Rocky Mount, Wilson, Goldsboro, Kinston, New Bern, Fayetteville and Wilmington, it is not as a region heavily populated. The Mountain region, running generally westward from the front range of the Appalachians to the Tennessee line, is also predominantly rural and sparsely populated, with only one city, Asheville, of any size.

The Piedmont, the foothill region lying between the fall line and the front range of the mountains, is by far the most heavily populated of the three regions. As of 1990, it contained 54.7% of the state's population, all five of the State's cities with populations greater than 100,000, and 47 of its 84 smaller cities and towns with populations greater than 5,000. Stuart Rpt., Fig. 1; *id.* pp. 15, 23–24. Within the Piedmont region, the "Piedmont Urban Crescent" constitutes a long-recognized distinctive subregion. Stip. Exs. 44–47. Extending through eleven counties in a general arc from Wake County at its eastern end southwestwardly to Gaston

County at its western, it includes the State's five largest cities, Raleigh, Durham, Greensboro, Winston–Salem and Charlotte. Stip. Ex. 47. Substantially industrialized, predominantly urban, and containing most of the State's institutions of higher learning (including its three largest), it is rightly described as "the urban, economic and cultural heart and soul of the State." Goldfield Dep.Ex. 1, p. 2.

Of great significance to the issues in this case is the location within the state of the 22% of its population that is African–American. While African–American citizens reside in every region of the State, they are by no means evenly dispersed throughout any, nor throughout the whole state. Instead, there are major, discrete concentrations of African–American population throughout the state, the most significant ones of which, reflecting historical forces dating from slavery, are in the Coastal Plain and the Piedmont. Within the Coastal Plain, there remains a large, dense concentration (50% or above of census tract total populations), long in place, in the heavily rural, agricultural northeast; and smaller dense concentrations, also long in place, in other rural areas further south in the region and in the historic "black sections" of the country towns that are scattered across this agricultural region. Within the Piedmont, there are dense concentrations in the historic "black sections" of the state's five largest cities and of the other smaller cities—Burlington, High Point, Thomasville, Lexington, Salisbury, Statesville, and Gastonia—that are scattered across the Piedmont Urban Crescent, with no significant concentration in the rural areas between those cities. D.Ex. 415; Goldfield Dep.Ex. 1, pp. 8–11.

B. *The Legislative Redistricting Process as Revealing of Legislative Intent and Purpose* [54]

Before developing any specific redistricting proposals, the House and Senate redistrict-

54. A large part of the voluminous evidentiary record produced in this case by four months of discovery, extensive stipulations of fact, and the deliberately liberal reception of testimonial and documentary evidence during a six-day trial, is devoted to the ins and outs of the laborious legislative process that led finally to enactment of the challenged Plan. The process revealed inevi-

tably was a complicated, highly politically-charged, and ultimately, in many of its details, obscure one. The evidence depicting it was correspondingly exhaustive in its detail, as are the proposed findings of fact based upon it that have been submitted by the parties at our request. Inevitably, much of that evidence and many of the proposed findings of fact are now revealed to

ing committees conducted a total of fifteen public hearings around the state during the spring of 1991. At these, they received citizen comments and suggestions, which had been invited by public notice, about the criteria the General Assembly should use in the redistricting process, and the ethnic, geographic, economic or other communities of interest it should consider. Stips. 38–42; Stip.Ex. 200, pp. 2–3, 8; Fitch testimony, Tr. pp. 665–67.

In mid-April, 1991, the committees jointly adopted written standards to guide the congressional redistricting process. These included compliance with one-person-one-vote requirements, the federal Voting Rights Act, the Fourteenth and Fifteenth Amendments, and 2 U.S.C. § 2c's requirement of single-member districts; the use of contiguous territory; and the retention of precinct and census block integrity where compatible with the redistricting computer database. Stip. 43.

As these adopted criteria indicate, the committees were well aware that one of their principal considerations must be compliance with provisions of the Voting Rights Act and the federal constitution that protect racial minorities in matters of redistricting. To give special guidance in this area, the General Assembly had, in fact, employed special legal counsel experienced in voting rights litigation, who worked closely throughout with those directing the redistricting process. L. Winner Dep. pp. 38–39.

In the early stages of their deliberations, there was division within the councils of the Democratic leadership as to whether any majority-minority congressional districts need, and should, be drawn. There was sentiment within the Senate leadership group that none should be drawn, in the main because it would benefit the Republican Party. D. Winner Dep. pp. 13–15; Fitch testimony, Tr.

pp. 665. There was opposing sentiment in the House committee that two could, and must under the Voting Rights Act, be drawn. And on the Republican side, there was a concerted move to encourage the drawing of two. Stips. 49, 54, 61; Cohen testimony, Tr. p. 461.

In the end, the Democratic leadership group came to the conclusion, presumably driven in part by the advice of legal counsel, that at least one such district must be included in the plan. Fitch testimony, Tr. pp. 665, 670–671. To this end, the redistricting committee chairmen then prepared a number of "base plans" which, beginning in May 1991, were presented to these committees, at a public hearing, and finally on the House and Senate floors. All included one majority-minority district centered on the large rural area of proportionately dense African–American population in the northeastern portion of the Coastal Plain, with an arm extending westwardly to include an African–American population concentration in the inner-city of Durham, on the eastern end of the "Piedmont Urban Crescent," and another arm extending southwardly into the center of the Coastal Plain. Stip.Ex. 10, pp. 44–49. At the same time that these committee base plans were being considered, several Republican-sponsored alternative plans with two majority-minority districts were also being considered. In each of these plans, one of those majority-minority districts was located in the same area as the one included in all the committee-proposed base plans—in the northeastern and central portion of the Coastal Plain. Location of the second such district varied among the Republican plans, but the one receiving most support was that in the "Balmer Congressional 6.2" plan, which ran from downtown Charlotte at the western end of the Piedmont Urban Crescent southeastwardly approximately 200 miles through all or portions of a number of rural

---

be in much of their detail only marginally, if at all, material to the dispositive legal issues we have identified: (1) whether the congressional redistricting Plan reflects a legislative intent deliberately to include one or more districts having a particular racial composition of voters, and (2) whether, if so, the districting so done was "narrowly tailored" to serve one or more "compelling state interests."

Our findings of fact in this section, being confined to those we consider necessary and material to resolution of those issues, are, in consequence, much more selective and "ultimate" than are the findings proposed by any of the various parties.

counties along the South Carolina border (Union, Anson, Richmond, Scotland, Robeson, Columbus, Brunswick, and New Hanover) across the Coastal Plain into downtown Wilmington on the coast. Stip.Ex. 10, 23, 27. The achievement of a majority of minority voters in this proposed district depended upon aggregating the African–American voter population with the substantial Native–American (Lumbee Indian) population primarily concentrated in Robeson County. Cohen testimony, Tr. p. 412; Fitch testimony, Tr. pp. 682–684.

In any event, all of the Republican-sponsored two-majority-minority-district plans which went to floor vote were rejected on party-line votes, with all the African–American legislators voting against them. The plan eventually enacted, in mid-summer 1991, as Chapter 601 of the 1991 Session Laws, was a conference committee modification of the redistricting committees' several base plans which included the single majority-minority district centered in the rural northeast and central portions of the Coastal Plan with an arm extending westward into the inner-city precincts of Durham. Stip.Ex. 10, pp. 44–49. This plan was supported by an overwhelming majority of the Democratic legislators, including all the African–American legislators. Stips. 55–60, 62–63. Stip.Exs. 17–18.

In submitting Chapter 601's redistricting plan for preclearance by the Attorney General under § 5 of the Voting Rights Act, the state's supporting materials defended its provision of a single majority-minority district against objections lodged to it by the ACLU, national and state Republican Party officials, Republican members of the General Assembly, and other groups, that its failure to provide two such districts should deny it preclearance. The thrust of the State's submission was that the enacted plan, with its single majority-minority district, should pass muster under § 5 because it neither reflected a racially discriminatory purpose nor any retrogressive effect, nor would it result in a clear violation of § 2 of the Voting Rights Act. Stips. 64–65, 67–68; Stip.Ex. 21. In advancing this position, the State also emphasized the negative aspects of the various

two-majority-minority district plans that had been proposed as alternatives to the enacted plan, and contended that adoption of none of those plans was required to warrant preclearance under § 5. Cohen testimony, Tr. pp. 311–17; Stip.Exs. 24–26.

Following up on the State's written submission, members of the Democratic leadership group, Speaker Dan Blue, Senator Dennis Winner and Representative Toby Fitch, met with U.S. Department of Justice officials on two occasions, in September and December, 1991, to press for preclearance. Stips. 70, 71. All members of this delegation urged that preclearance was warranted under § 5, despite Senator Winner's continued private belief that no majority-minority districts were legally required, D. Winner Dep. pp. 13–15, and Representative Fitch's private belief that two should have been included and might yet be required to comply with the Voting Rights Act. Fitch testimony, Tr. p. 665. During this same period, the Republican leadership in the General Assembly and Republican Party officials at the state and national levels were actively urging Justice Department officials to deny preclearance on the basis that the plan failed to include two majority-minority districts, which they believed to be required by the Voting Rights Act. Pope testimony, Tr. pp. 1048–54; Pope Dep. pp. 139–47; Stip. 69; Stip.Exs. 22, 23.

On December 18, 1991, the Attorney General objected to and refused to preclear the congressional redistricting plan enacted as Chapter 601 (as well as the State's House and Senate redistricting plans), finding that the state had not met its burden, under § 5, of proving that the Plan did not have a racially-discriminatory purpose. The Attorney General's objection letter explained the basis for this conclusion. The letter began by noting that "the proposed configuration of the district boundary lines in the south-central to southeastern part of the state appear to minimize minority voting strength given the significant minority population in this area." It noted further that the General Assembly "was well aware of the significant interest on the part of the minority community in creating a second majority-minority congressional district in North Carolina," and

that it had before it several alternative plans that provided for a second majority-minority district in the south-central to southeastern part of the state—some of which utilized "boundary lines that were no more irregular than [those] found elsewhere in the proposed plan"—but that it had dismissed the possibility of creating two majority-minority districts for reasons that appeared to be "pretextual." The letter concluded that the General Assembly's "decision to place the concentration of minority voters in the southern part of the state into white majority districts" appeared to be designed "to ensure the election of white incumbents while minimizing minority electoral strength." Stip. 72, Stip.Ex. 27.

The Attorney General's contemporaneous objection to and refusal to preclear the State's House and Senate redistricting plans also emphasized a belief that the legislature intentionally had acted to protect white incumbent interests by improperly minimizing minority voting strength in a number of identified instances. Stip. 72; Stip.Ex. 27.

The Attorney General's refusal to preclear the congressional redistricting plan in Chapter 601 presented the legislature with a difficult decision. It could yield to the official objection and enact a new plan with two majority-minority districts, or it could seek a declaratory judgment from the United States District Court for the District of Columbia preclearing Chapter 601. Stip.Ex. 21. On this difficult issue, powerful conflicting views were brought to bear both from within the legislature and from without. From outside, several of the incumbent Democratic Congressmen who feared any revisions of their present districts encouraged the State to litigate, Stip.Ex. 20, while the Republican congressional delegation, which welcomed the prospect of such revisions, actively discouraged it. Stip. 73; Stip.Ex. 200, pp. 594–596. Within legislative ranks, there were comparable conflicting views, from a variety of motives. The Democratic leadership was not as one on the matter. While its members had come together,.despite some private misgivings, to support preclearance of the Chapter 601 single majority-minority district plan, those misgivings now led them to be of different minds about the proper course of ac-

tion now that preclearance had been denied. Some, believing that the Justice Department itself was simply trying to further partisan Republican interests by requiring two remedial districts, favored litigating the issue. Cohen testimony, Tr. pp. 321–322. Others, who had favored two districts all along as simply the right thing to do, but had been willing to compromise on one to achieve party consensus, now urged yielding to the Attorney General's objection. Fitch testimony, Tr. pp. 674–675.

In the end, the decision was made not to challenge by litigation the Attorney General's refusal to preclear. Various factors, reflecting various viewpoints shared by different groups of legislators, dictated the decision. A principal one was the sheer expense and uncertainty of seeking preclearance by litigation, carrying as it would the unavoidable twin risks that the State's declaratory judgment action might fail, and that even if it succeeded, it might only result in the State's then being faced with further litigation in the form of an action by minority voters challenging the now-precleared Plan under § 2 of the Voting Rights Act. Stip.Ex. 200, pp. 596–98 (Ballinger, Hunter statements). Another factor strongly urged by both Democratic and Republican legislators and Congressmen (though undoubtedly from different motives) was the need to have a Plan in place in time for the regularly scheduled 1992 electoral process. Fitch testimony, Tr. p. 675; Stip.Ex. 200, pp. 596–97 (Ballinger, Hunter statements). Finally, there was a substantial body of opinion that the Attorney General's objection should be yielded to simply because it was legally right or so probably right that it should in prudence and right be accepted as dispositive. Fitch testimony, Tr. p. 674; Stip.Ex. 200, pp. 907 (remarks of Sen. D. Winner), 1242 (remarks of Rep. Balmer).

Inevitably, a variety of individual and group views and motives lay behind the General Assembly's decision to forego declaratory judgment litigation and proceed to enact a congressional redistricting plan that deliberately would include two majority-minority districts. There was some patently honest sentiment, among both white and African-

American legislators, that in view of the State's long history of race discrimination in voting matters persisting down to the present time, simple racial justice warranted it. Stip.Ex. 200, p. 921 (remarks of Sen. Hunt in floor debate); pp. 923–24 (remarks of Sen. Ballance in floor debate); p. 932 (remarks of Sen. Walker in floor debate). This was, indeed, the sentiment expressed in debate by those Republican legislators who then favored that course of action, whatever their true motivation, as later revealed in this litigation, may have been. Stip.Ex. 200, p. 1268 (remarks of Rep. Flaherty in floor debate); *id.* p. 919 (remarks of Sen. Shaw in floor debate).

Beyond any question, however, the dominant concern driving the decision not to challenge the denial of preclearance in court was a perception that—contrary to the position taken by the Democratic leadership at the time the Chapter 601 plan was enacted (and the position advanced by the state in its efforts to obtain preclearance for it)—the Chapter 601 plan, and any other congressional redistricting plan which did not contain at least two majority-minority districts, would in fact violate the Voting Rights Act (or be so likely to violate the Act that in prudence it must be assumed to do so). The General Assembly that decided to abandon Chapter 601 and enact Chapter 7 in its stead was without doubt aware of the circumstances under which a congressional redistricting plan could be found to violate the Voting Rights Act. This was, after all, a General Assembly with powerful, recent institutional and individual memories of the Act's rigor in redistricting matters. Well over half the members of the 1991 General Assembly had been members of the 1986 General Assembly, which had been required by a federal court in the *Gingles* litigation to create 8 State House and Senate majority-minority districts in order to remedy violations of amended § 2. N.C.Manual, 1991–92. In addition, 58 had been members of the 1981

General Assembly, *id.,* whose original congressional redistricting plan had been denied § 5 preclearance on the ground that its exclusion of Durham County, with its politically-active black community, from then-Congressional District 2 appeared to have both the purpose and the effect of diluting minority voting strength. D.I.Ex. 501, pp. 34–53 (Kousser Rpt.); Stip.Ex. 195 (letter denying preclearance).[55] Finally, all were aware that the Republican Party, the ACLU, and other groups had contended that the Chapter 601 plan did not comply with the Act because it failed to include two majority-minority districts, and that the Justice Department, the agency assigned by Congress to enforce the Act, had declared, after reviewing these objections, that the plan actually did fail to pass muster under § 5. Stip.Ex. 27. Because of these recent experiences with Voting Rights challenges to earlier redistricting plans, the General Assembly that enacted Chapter 7 was necessarily aware of the general nature of the showing required to make out a *prima facie* § 2 challenge to a congressional redistricting plan, as well as the general nature of the showing that a state must make to establish that such a plan satisfies the § 5 standard.

The General Assembly that enacted Chapter 7 was also specifically aware—from evidence presented to it by the Republican Party, the ACLU, and others; from advice received from the Justice Department and its own redistricting experts; and from its members' own personal knowledge of North Carolina politics—that conditions in North Carolina were such that the African–American minority could very likely make out a *prima facie* § 2 challenge to the Chapter 601 plan or, for that matter, to any other plan that did not contain two majority-minority districts. Numerous plans presented to the General Assembly had demonstrated that the state's African–American population was sufficiently large and geographically compact to constitute a majority in two congressional districts.

---

**55.** As the denial letter by then-Assistant Attorney General William Bradford Reynolds explained, during a period when black population was increasing statewide, that in Congressional District 2—"the only district where black voters could have the potential for electing a candidate of their choice"—had been decreasing over the past several redistrictings—from 43% before the 1971 redistricting to 40.2% after it, and down to 36.7% under the 1981 plan as submitted. Stip.Ex. 195 (Reynolds ltr. to Brock, p. 3).

**464**

*See* Stip.Ex. 10, pp. 50–54 ("Balmer Congress 7.8"); pp. 55–59 ("Balmer Congress 8.1"); pp. 60–65 ("Optimum Congressional II–Zero"); pp. 66–72 ("92 Congress 1–"Peeler Plan"); pp. 81–94 ("1992 Congressional Base Plans ## 7 and 8"); pp. 95–106 ("Representative Flaherty's Congress Plan"); pp. 107–120 ("1992 Congressional Base Plans ## 9 and 10"). Members of the legislative leadership stated in floor debate that they believed the state's African–American population was large enough to constitute a majority in two congressional districts, that it was politically cohesive, and that pervasive bloc voting by the white majority allowed it usually to defeat candidates supported by the African–American minority in districts that were not majority-minority. *See* Stip.Ex. 200, pp. 921, 923–24, 932 (Senate floor debate statements of Senators Hunt, Ballance, Simpson, and Walker). Special counsel to the Republican Party, experienced in redistricting litigation, specifically warned the General Assembly at a public hearing that conditions in the state were such that failure to create two majority-minority congressional districts might well result in "turning over the drawing of districts to a federal court." Stip.Ex. 200, pp. 597–98 (statement of Robert Hunter). The Justice Department's letter denying preclearance to the Chapter 601 plan stated that it believed that two majority-minority congressional districts meeting the *Gingles* criteria could be drawn in North Carolina, and that the Chapter 601 plan's failure to do so constituted an impermissible dilution of minority voting strength. Stip.Ex. 27. In addition, the General Assembly was necessarily aware, from its members' own personal experiences in North Carolina politics, that conditions in North Carolina were such that the African–American minority could likely prove many of the other factors that are relevant to

establishing a § 2 violation under the statute's "totality of the circumstances" approach: the state had a long history of official voting-related discrimination; its African–American minority continued to bear the socio-economic effects of past discrimination, which hindered its ability to participate effectively in the electoral process; racial appeals continued to be used in its electoral campaigns; African–Americans were still not being elected to political office in the state in numbers even remotely approaching their representation in the general population, despite the fact that capable and experienced African–American candidates were running for election; and the Chapter 601 plan (or any other plan that created only one district in which African–Americans were a majority) would not give African–Americans a majority in a number of congressional districts that was anywhere close to proportional to their share of the state's population as a whole. *See* Stip.Ex. 200, pp. 921, 923–24, 932 (excerpts of Senate floor debates); Daughtry Dep. pp. 54–60, 63; Fitch Dep. pp. 65–69.

The validity of this general perception by the legislature (or at least its leadership) that the African–American minority could make out a *prima facie* § 2 case with respect to any congressional redistricting plan that did not include two majority-minority districts was confirmed by objective evidence adduced at trial.[56] The overwhelming evidence established that the state's African–American population was sufficiently large and geographically compact to constitute a majority in two congressional districts; numerous examples of plans drawing two majority-minority districts were presented to the court, *see* Stip. Ex. 10, including several prepared by the Plaintiff–Intervenors in which the majority-minority districts themselves were "geo-

---

**56.** Plaintiffs and Plaintiff–Intervenors objected to the admission of any evidence of continued racial bloc-voting, racial appeals in political campaigns, or other factors relevant to the establishment of a § 2 violation that was not specifically before the General Assembly, on the basis that it was irrelevant to any issue of legislative purpose or intent at the time the challenged Plan was enacted. We disagree. The evidence is relevant for the purpose of validating as non-pretextual the contemporaneously expressed belief of the legislative leadership that the Voting Rights Act

compelled its action. Surely, had there been contrary evidence—that there was no objective basis for believing the action compelled by § 2 or § 5 of the Voting Rights Act—it would have been highly relevant—and surely proffered—to demonstrate that there was no basis in fact for such an assumption. We have therefore considered the evidence as relevant for this purpose, though we do not believe it critical to proof of the material fact at issue—whether the legislature had a firm basis for believing its action legally compelled.

graphically compact" under any reading of *Gingles*. P.I.Ex. 301, Tabs 2 and 3 ("Shaw II" and "Shaw III"). There was undisputed evidence that the state's African–American population was politically cohesive. D.Ex. 404 (Engstrom Rpt.). Finally, there was considerable evidence that, although African–American electoral candidates' success, or near success, in both state-wide and local elections had continued the gradual improvement noted by the *Gingles* district court in 1984, *see* 590 F.Supp. 345, 364–65 (E.D.N.C. 1984) (three-judge court), *aff'd in part, rev'd in part on unrelated grounds sub nom., Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), racial bloc voting still persisted to a significant degree across the state in both local and statewide elections, including those for United States Congress. D.Ex. 404 (Engstrom Rpt.); Watson Dep.; Weber Dep. pp. 668–71. So also did racial appeals and tactics in political campaigning.[57]

In addition, the General Assembly that enacted Chapter 7 was obviously specifically aware that the Justice Department had denied preclearance to its predecessor, the Chapter 601 plan, on the express ground that it failed to satisfy the "purpose" prong of § 5. Stip.Ex. 27. And it was aware—from evidence presented to it by the Republican Party, the ACLU, and others; from advice received from the Justice Department and its own redistricting experts; and from its members' own personal knowledge of the factors that went into the creation of the Chapter 601 plan—that the Justice Department's conclusion was legally and factually supportable. *See* Stip.Ex. 200, pp. 921, 923–24, 932 (excerpts of Senate floor debates).

A final factor may well have tipped the decision of the Democratic leadership to accept the Attorney General's refusal to preclear the Chapter 601 plan and enact an alternative plan that would address the Attorney General's concerns by creating two majority-minority districts. It concerned the location of the additional remedial district that would have to be provided in such a plan. All the Republican-sponsored two majority-minority district plans that had been formally proposed during the 1991 Session and were again being proposed located that second district in areas decidedly unfavorable to Democratic interests. Particularly unfavorable was the one specifically suggested by the Attorney General, the Charlotte-to-Wilmington district of the "Balmer Congressional 6.2" plan. Such a district would take critical areas of the then Seventh District of Democratic Congressman Rose and the Eighth District of Democratic Congressman Hefner and threaten their seats. Stip.Ex. 10, pp. 27–37. Furthermore, it was disfavored by African–American legislators who believed—with good reason—that the African–American and Native–American voting populations whose aggregation was required to yield an effective voting majority in the proposed district were not in fact politically cohesive. Cohen testimony, Tr. pp. 380–81, 385–86. Concern about the location of the additional district therefore was a significant factor in the Democratic leadership's debate over whether to yield to the Attorney General's refusal to preclear their single remedial district plan.

During the critical period of this debate, an alternative location that favored rather than disfavored partisan Democratic interests surfaced. Ironically, it had been first suggested in a plan proposed by Republican Representative Balmer to the House Redistricting Committee co-chairmen back during the 1991 regular session. Never formally considered at that time, but made a part of the legislative record by Balmer as "Balmer Congress 8.1," it located a second remedial district in a narrow band running through the Piedmont

---

**57.** Though there are other examples in the record, two suffice to demonstrate this regrettable fact. In the closing stages of the 1990 general election campaign for the United States Senate between the white incumbent, Jesse Helms, and his African–American opponent, Harvey Gantt, the Helms campaign made extensive use of a television ad which directly appealed to white voter resentment of affirmative action programs in employment. D.I.Ex. 549; Watt testimony, Tr. p. 920. During that same campaign, African–American voters were targeted with a massive mailing of post-cards which identified the sender as the Republican Party and contained misinformation about state voting law residence requirements that was deliberately designed to chill African–American voting. D.I.Ex. 522–24.

Crescent, linking the historic "black neighborhoods" of the Piedmont cities along its course. Stip.Ex. 10, pp. 55–59. As described by Balmer in a letter to the Attorney General urging denial of preclearance to the Chapter 601 plan with its single remedial district, it "stretched from the black neighborhoods of Charlotte to the black neighborhoods of Durham." And, according to Balmer's letter, its configuration demonstrated how the Chapter 601 plan, by failing to include such a district, "submerged black voting potential" in this area. Stip.Ex. 23 (Balmer–Dunne ltr., pp. 7–8).

This idea of locating the second remedial district entirely within the Piedmont Crescent was picked up at some point during the interval by Democratic Representative Hardaway. He included a slight variant of the Balmer 8.1 districts along with a variant of the Chapter 601 First District in a plan, "Optimum Congressional II–Zero," which he submitted for committee consideration in its ongoing debate. Stip.Ex. 10, p. 60–65. Once revealed, the basic design of the Hardaway plan attracted immediate support among the Democratic leadership group, incumbent Democratic congressmen threatened by the Charlotte-to-Wilmington district, and civil rights organizations. A modified version containing variants of both districts in the plan quickly emerged as the result of consultations among aides to incumbent congressmen and members of the redistricting committees. Endorsed by the National Committee for an Effective Congress and the North Carolina NAACP, this modified plan, now popularly referred to as the "Merritt Plan" (for John Merritt, a political ally of Congressman Rose who had worked extensively on it) or the "Peeler Plan" (for Mary Peeler, Executive Director of the North Carolina NAACP), it was formally proposed by Ms. Peeler at a public hearing conducted by the redistricting committee on January 8, 1992. Stip. 85, Cohen testimony, Tr. pp. 324–29; Stip.Ex. 10, pp. 60–65.

For the Democratic leadership, this Merritt/Peeler Plan had two great virtues which figured significantly in the decision to enact a plan with two remedial districts rather than challenge the denial of preclearance in court.

First, this plan perfectly trumped the Republican-favored plan with its Charlotte-to-Wilmington district which would effectively have packed the bulk of the state's heavily Democratic African–American vote into two Congressional districts located in already Democratic-leaning areas. In direct contrast, locating one of the remedial districts in the Republican-leaning Piedmont Crescent would insure that its traditionally African–American vote, now a potential majority, would no longer be diffused (or "submerged," in Representative Balmer's characterization) in a Republican (hence, under present circumstances, white) majority voting population. Fitch testimony, Tr. pp. 675–78; Cohen testimony, Tr. pp. 330, 396.

Second, it would permit the creation of two remedial districts having the distinctive and different urban and rural characteristics and communities of interest which historical forces had shaped for the state's African–American population. This would accommodate suggestions of citizens at public hearings, and of legislators in floor debate, that the observance of distinctive urban and rural communities of interest should be a prime consideration in the general redistricting process. Stip.Ex. 200, pp. 2, 3 (public notice inviting comments), 198 (Walker statement), 212 (Mills statement), 245 (Tillman statement), 600 (Hunter statement), 603 (Kimbrough statement), 820 (Sen. D. Winner), 1003 (Rep. Hasty). And it would accommodate an expressed desire of African–American legislators and citizens from the rural Coastal Plain area that the remedial district centered in that area should not include urban African–American populations in the easternmost Piedmont Crescent cities of Durham and Raleigh. These were thought not to share the predominantly rural, agricultural interests of the region, but likely to dominate such a district politically because of their much stronger political traditions. Fitch testimony, Tr. pp. 670–75.

For all these reasons, the Democratic leadership adopted the Merritt/Peeler Plan as its first base plan, "92 Congress I," for implementing its decision to enact a congressional redistricting plan with two majority-minority districts. Stip.Ex. 10, pp. 66–72. It was that

plan which then evolved, preserving its basic design for the location of the two districts, into the enacted Plan now challenged. The process of its evolution involved different, but necessarily interrelated, sets of problems respecting the two districts. The working out of those problems determined the final shapes and locations of both. Because of the claimed centrality of their shapes and locations to the issues in this case, the process is best traced out separately as to each. Though vastly complicated in detail, its basic outlines are essentially undisputed and can be summarized.

To implement the basic decision to create a distinctively rural majority-minority district in the Coastal Plain region, the redistricting committees adopted the convention that at least 80% of its population must be located outside cities having populations greater than 20,000. This convention was observed by Cohen, using "places reports" detailing the exact location of persons within particular areas, to verify adherence. Cohen testimony, Tr. pp. 333, 356–58. It had been assumed from the outset, starting with Representative Hardaway's plan, that the rural district should be centered, as was the single remedial district in the Chapter 601 plan, on the large, proportionately dense African–American population in the northern part of the Coastal Plain. Stip.Ex. 10, p. 62. But if the other, urban district was to include the African–American population of inner-city Durham, and the rural-urban distinction between the two districts was to be observed, the First District must be extended still further southward in the Coastal Plain to compensate for loss of the urban Durham population. Cohen testimony, Tr. pp. 355–56; Fitch testimony, Tr. pp. 676–78.

Extending it southward presented both difficulties and advantages for the overall design. Its difficulties lay in the need to avoid extensive destruction of the cores of the districts of incumbent Democratic Congressmen Valentine (Second), Lancaster (Third), and Rose (Seventh), all of which lay to the south. This difficulty already had been encountered in constructing Chapter 601's single remedial district. Even with that district's inclusion of the African–Ameri-

can population in Durham, southward extensions from its core into portions of the existing Second and Third Districts had required substantial realignment of those districts. Stip.Ex. 10, p. 45 (Chapter 601 plan); Stip. Ex. 61 (1982 Congressional Districts). The need for still further extensions in that general direction posed the threat of still further realignments of those two districts and, depending upon its exact configuration, even of Congressman Rose's Seventh District in the southeastern corner of the Coastal Plain. *Id.* It was in part at least because of that threat of even further realignments of their districts if Chapter 601's plan were not precleared that these three Congressmen had urged the state to seeks its preclearance by litigation. Stip.Ex. 20. With that possibility now gone, these same Congressmen now sought by renewed consultations with the redistricting committee members and staff to protect their interests against unfavorable realignments in the drawing of the new Coastal Plain remedial district. Cohen testimony, Tr. pp. 358, 360, 388–92; D.Ex. 425, 426, 429, 430.

A compensating advantage of extending the First District even further southward was that by this means the Attorney General's objection that the African–American population in the south-central and southeastern portions of the state were not sufficiently taken into account in the Chapter 601 plan might be met. Cohen testimony, Tr. pp. 365–66; D.Ex. 441.

It was the interaction of these problems of protecting incumbents while meeting the equal population requirements, achieving effective African–American voting majorities, attending to the Attorney General's objections to the rejected plan, and observing the committees' contiguity criterion that produced the sprawling, peculiarly-shaped First District in the challenged Plan. Its overall sprawl—its sheer volume—resulted mainly from the need to include in it 552,386 persons out of a generally sparsely-populated rural region of the state, coupled with the decision to find at least 80% of them outside cities with populations in excess of 20,000. Its sprawls in detail—and it has many—resulted from a variety of reasons: to include historic "black sections" in various of the towns and

small cities—including Fayetteville and Wilmington—scattered across the essentially rural, agricultural Coastal Plain; to preserve politically-critical core areas in the districts of three politically-affected incumbent Congressmen and to avoid pairing any of them in realigned districts; and in the process to maintain the territorial contiguity required by the committee criteria. Cohen testimony, Tr. pp. 329–400, *passim.*

Many oddities of shape resulted. A great number can be laid most directly to incumbent protection. Several examples suffice to illustrate.

Though the home precincts of both Congressman Valentine in Nash County in the existing Second District and of Congressman Lancaster in Goldsboro in the Third were heavily (45%) African–American and were geographically situated for ready inclusion in the First District, they were retained, as were their entire counties, in their existing districts. To compensate, the First District had to be extended much further southward to include rural portions of Columbus and Bladen Counties with comparable African–American populations. Cohen testimony, Tr. p. 364.

The highly irregular shape of the southeast portion of the district, with its two narrow extensions into historic "black sections" of Fayetteville and Wilmington, resulted directly from the effort to preserve the core of Congressman Rose's Seventh District. These extensions represent the minimum possible territorial intrusions into two key counties, Cumberland and New Hanover, which formerly had been entirely in his district, that were thought needed to achieve the requisite African–American population for the district.

Perhaps the most striking illustration of the effects of incumbent protection upon the final irregularity of the First District's shape was the use of a "double cross-over"—a point of contiguity that allows two districts essentially to cross over each other—to allow in this case the southern extension of the First District to cut across Congressman Lancaster's existing Third District in Duplin County without destroying the technical contiguity of either district. Stip.Ex. 42; P–I Ex. Map 1;

D.Ex. 419. Its purpose, as explained by Cohen, was to retain critical portions of Sampson County lying to the west of this cross-over in Lancaster's Third District, as part of a larger purpose to avoid pairing in the same district any of the incumbent Democratic Congressmen who could be affected by the First District's final configuration: Valentine (Second), Lancaster (Third), Rose (Seventh), and Hefner (Eighth). Cohen testimony, Tr. pp. 348–49. Other examples of irregularities of shape driven largely by concerns for incumbent protection abound in the record.

The evolution of the Twelfth District, from its earliest precursor in Representative Balmer's 1991 "Congress 8.1" plan, through Representative Hardaway's "Optimum Congressional II–Zero" plan and the "92 Congress I/Peeler" plan, into its final form in the challenged Plan, followed the same general pattern as did the First District's. The same combination of factors—though with varying degrees of influence—determined this district's eventual location and shape. Again, though the process was complicated, its essentials for purposes of this case are largely undisputed and can be summarized.

Carrying through the idea of a predominantly urban district counterpart to the predominantly rural First District, the redistricting committees adopted a mirror-image convention to guide the Twelfth District's urban design: at least 80% of its total population must be drawn from cities with populations of 20,000 or more. Cohen testimony, Tr. pp. 333–35, 430–33, 536; D.Exs. 405, 406, 407. In the course of the district's evolution, this convention dictated the removal from the "92 Congress I/Peeler" base plan of large portions of four basically rural counties— Caswell, Person, Granville, and Vance—along the Virginia border, and the addition of historic "black neighborhoods" in the inner cities of Gastonia and Winston–Salem, the only Piedmont Crescent cities meeting the 20,000 criterion that were not included in the district in the original base plan. Cohen testimony, Tr. pp. 334, 341–42, 350–51. In the end, the design that resulted carried through a simple notion: to link the significant concentrations of African–Americans in the his-

toric "black neighborhoods" of the various towns and cities closely strung along the Piedmont Crescent, achieving the required effective minority-race voting majorities by connecting these inner-city concentrations with narrow corridors designed to achieve the purpose of the predominantly urban convention. This produced a district which included portions of all the cities of this subregion having populations in excess of 20,000, including four of the state's five largest. In its final form, the basic design therefore was that of a narrow, jagged band that stretched from inner-city Gastonia to inner-city Durham. Cohen testimony, Tr. pp. 331–35, 343, 350–52, 356–58. And within this basic design there were further detailed oddities and irregularities of shape that have, of course, been extensively emphasized in descriptions of this district in various contexts. Most of these, just as those in the First District, can be traced in whole or part to concerns for incumbent protection, achieving required minority-race voting majorities, and maintaining technical contiguity both within the district and within other districts intersected by the Twelfth District's basically ordered long, narrow course through the Piedmont Crescent. Chief among these, and sufficient for our purposes to illustrate the point, are the several "point contiguities" and "double cross-overs" that exist in the district's design. The "point contiguities" occur in the narrow corridors used to link the "black neighborhoods" which provide the principal African–American population concentrations of the district. They occur when the political or census block boundaries that are being used to define the boundaries of such a corridor happen to touch only at a single "point." They serve no independent redistricting purpose and could be avoided by the simple but meaningless cosmetic device of "splitting" the connecting political or census block units just enough to continue the corridor on a front of any measurable width. Stip.Ex. 42; Cohen testimony Tr. pp. 482–86. "Double cross-overs," however, are point contiguities with a purpose. Those in the Twelfth District serve the same general purpose as the one in the First District. Stip.Ex. 42, pp. 1–3; Cohen testimony, Tr. pp. 482–86. They permit the narrow remedial district to run completely across the existing district of an incumbent Congressman (here, Republican Congressman Coble's Sixth District) in a way that preserves the existing district's core portions while maintaining the technical contiguity of both.

The General Assembly enacted the challenged Plan, with its majority-minority districts in their final forms, as Chapter 7 of the 1991 Extra Session Laws, on January 24, 1992. The vote was along partisan political lines. The overwhelming majority of Democratic legislators, including all the African–Americans, voted in favor of the Plan. Stips. 94–95; Stip.Ex. 36. Chapter 7 was precleared under § 5 of the Voting Rights Act on February 6, 1992. Stip. 98; Stip.Ex. 39.

The two remedial districts that resulted from this legislative process have several significant characteristics. First off, there is the obvious fact—in many ways the central fact of this litigation—that the shapes of both are highly irregular and geographically non-compact. Laying aside the litigation-spawned pejoratives—"bizarre," "grotesque," "ugly," etc.—they are highly irregular and geographically non-compact by any objective standard that can be conceived, including the shapes of all earlier North Carolina congressional districts running back to 1790, Stip.Ex. 53; the shapes of all other districts in the challenged Plan (even including those most directly affected by shared irregularities of boundary), D.Ex. 419; and virtually all mathematical measures of geographical compactness devised by social scientists, which reveal them to be among the least geographically compact of all recent congressional districts in the country. Hofeller testimony, Tr. pp. 122. And, they are not the two most geographically compact remedial districts that could have been drawn—if no other interests were considered. Hofeller Testimony, Tr. pp. 123–125; P–I Ex. 301 Tabs 1–3 ("Shaw II" and "Shaw III" plans).

But the districts also plainly possess the distinctively rural (First) and urban (Twelfth) characteristics intended, as contemporaneously asserted, by the legislature. Stip.Ex. 38 (§ 5 submission of Chapter 7). This resulted primarily of course from their general locations, in the "rural" Coastal Plain and the

"urban" Piedmont Crescent respectively, but it undoubtedly was heightened in degree by the planners' adherence to the 20,000 population convention, one of the very factors that indisputably contributed to their irregular shapes.

That they are distinctively "rural" and distinctively "urban" in character is a fact so much within the common knowledge of intelligent inhabitants of the state that it probably is subject to judicial notice. *McCormick on Evidence,* (4th ed. 1992), at § 329. But if it be needed, there is ample evidence to demonstrate the fact. We summarize its core.

The First District is wholly within a predominantly agricultural region. Of the state's four counties that have agriculture as their principal source of income, all are in the First District. The counties included in whole or in part within the District had 64% of the state's harvested cropland in 1992. Stuart Rpt. p. 23. Five of the top ten tobacco-producing counties in the state, seven of the top ten sweet potato-producing counties, all of the top ten peanut-producing counties, seven of the top ten in hog production, eight of the top ten in cotton production, eight of the top ten in farm cash receipts, and seven of the top ten in corn for grain production are partly or wholly within the First District. Stip. 123. The district is without question predominantly rural in character.

Correspondingly, the Twelfth District is wholly within a predominantly urban, industrialized area of the state—the most heavily industrialized of its regions. Of its citizens, 86.3% reside in urban areas as defined by the Census Bureau. D.Ex. 401, p. 35, table 19. This measure of urbanness applies to African–American and white residents alike: at least two-thirds of the district's white residents and three-fourths of its African–American residents live in urban areas as so defined. Lichtman testimony, Tr. pp. 791–93;

D.Ex. 440. The Twelfth District is without question predominantly urban in character.

Reflecting their distinctive rural and urban natures, the more important fact for our purposes is that the two districts, as intended by the legislature, have correspondingly different and distinctive communities of interest. And, even more important, there are within each of the districts substantial, relatively high degrees of homogeneity of shared socio-economic—hence political—interests and needs among its citizens. Belying any intuitive assumption that the very bi-racial make-up and the irregularity of shape and geographical non-compactness of these districts would reflect great diversity and conflicts of interest among their citizens, both anecdotal and expert opinion evidence demonstrates the contrary. Inhabitants of both districts, drawing on their specific life experiences in the areas, are able to bear witness to the homogeneity of the material conditions and interests of the citizens of each; respected scholars of the regions concur. Stuart Rpt. pp. 23, 25, 29 (First District); Goldfield Rpt. p. 2 (Twelfth District); Institute for Research in Social Science, Univ. of No, Car., Stip.Ex. 49, pp. 1, 2 (Twelfth District); D–I Wit.Sts. Nos. 2 (Alvarez), at pp. 2–5; 3 (Albright); 4 (Rash) at pp. 4–8; 9 (Davis), at pp. 4–5; 12 (Burts) at pp. 4–5; 25 (Emerson) at pp. 2–5; 26 (Lambeth); 27 (McGovern).

These individual observations are validated on a larger scale by expert opinion concerning the homogeneity of basic interests in each of the districts. Based upon reliable analyses using accepted political-social science methodology, the two districts are among the most, rather than the least, homogeneous of the current twelve, in terms of the material conditions and political opinions of their citizens, whether only its white citizens, or only its African–American, or both together are considered. D.Ex. 401, pp. 11–25, Tables 3, 4, and 8.[58]

---

**58.** This analysis was performed and reported by Dr. Allan Lichtman, the state's expert witness who testified at trial. Plaintiffs and plaintiff-intervenors objected to large portions of his testimony and the exhibits used to illustrate it, on the ground that his analysis of the distinctive homogeneities of the two districts was largely based on 1990 census data that was not available to the

legislature during the redistricting process. For this reason, it was contended, this data, hence Lichtman's analysis in reliance upon it, was irrelevant to any issue of legislative intent in constructing these districts. We disagree. As with the objective evidence of the continued existence of the threshold *Gingles* conditions, *see supra* n. 56, this evidence was relevant to validate the

This distinctiveness of shared interests as between the two districts, and the homogeneity of those interests within each, are not accidental occurrences. They directly resulted from the legislature's contemporaneously-expressed purpose, in designing a plan to comply with the Voting Rights Act, to observe as a guiding districting principle the desirability of having districts with significant communities of interest as well as the necessary remedial racial compositions. Their deliberate location in different regions of the state having well and long-established historical integrities and distinctive cultures and economies insured that they would be such districts. Goldfield Rpt. pp. 10–11, 15.

There is no convincing evidence in the record that the irregularities and lack of geographical compactness of these two districts have had or are having any significant adverse effect upon their citizens' interests in fair and effective representation—in matters either of voting or access to their elected representatives. Indeed, such evidence as there is on the matter preponderates in the other direction.

Plaintiffs point to evidence of extremely low (6%) name recognition of Twelfth District Representative Watt in a post-election sample survey of his constituents. O'Rourke testimony, Tr. p. 232. One of the plaintiffs, a Duke University Law Professor testified that though he was not confused as to his residence within the Twelfth District by its odd shape, a Duke History Professor neighbor of his reported being so. Shimm testimony, Tr. pp. 1086–87. A High Point businessman reported being surprised to find when he went to vote, that he was in the Twelfth District. Froelich Aff. p. 2. Beyond this, there was only opinion evidence that as a general proposition geographical non-compactness tends

to make both campaigning, voting, and effective representation more difficult, O'Rourke testimony, Tr. pp. 209, 232, and some anecdotal evidence of instances of supposed inattentiveness of the two recently elected representatives to particular events or localities in their districts. *E.g.* Shimm testimony, Tr. pp. 1090–92.

On the other hand, voter participation in the 1992 congressional elections in North Carolina—with its quite recently created, peculiarly-shaped, non-compact districts—was higher than the national average that year. It was also higher than that in any neighboring state—all of which had relatively more compact congressional districts overall. And it was higher than that in the 1988 congressional elections in North Carolina, when the state's districts overall were more geographically compact. Lichtman testimony, Tr. pp. 819–22; D.Ex. 440, pp. 61, 62, 64, Tables 40, 41, 42. Nor did the irregularities resulting from the splitting of some counties between two or even three congressional districts have any demonstrable negative effect on voter participation in the 1992 congressional elections. In fact, according to data assembled by plaintiff-intervenors' own expert, Dr. O'Rourke, of the ten counties in the state where voter "roll-off" between the 1992 presidential and congressional elections was greatest, six were not divided, and of the ten where there was either no roll-off or even greater participation in the congressional elections, six were divided into two districts and one into three. O'Rourke testimony, Tr. pp. 263–66.

Though the parties offered some evidence, largely anecdotal, about the extent to which the districts' configurations might affect the degree of accessibility to and responsiveness of the two districts' representatives,[59] we

---

legislature's more intuitive and experiential perception—contemporaneously expressed—that the districts would indeed have just such high degrees of commonalities of interest—of homogeneity. Had there been contrary evidence—that they did not—its relevance to demonstrate the pretextual nature of the state's asserted purpose in constructing them so would have been obvious. There was none.

**59.** A completely separate matter, unrelated to the effect of the remedial districts' shapes upon the

accessibility and responsiveness of their representatives to *all* their constituents, is the question whether, without regard to their shapes, the very remedial purpose of the districts necessarily inhibits the ability of any African–American representatives elected from them to provide fair and effective representation to non-minority constituents. This obviously is an important political question for Congress concerning the remedial provisions of the Voting Rights Act, but it is irrelevant to any legal issue in this case turning on the peculiar shapes of these districts. We

think it too meager—given their short terms in office—to support any fair finding of fact on the subject. The few physical facts of the districts' configurations in relation to transportation facilities, media markets, commuting patterns and volumes certainly do not support any finding that their irregularities of shape necessarily will make their representatives less accessible and responsive than those of other districts.[60]

Aside from their irregularities of shape and lack of geographical compactness, their urban and rural natures, and the resulting homogeneity of interests within them, the districts have two other characteristics of relevance to the legal issues.

First, they are generally located in areas of the state where violations of the Voting Rights Act have occurred. All or portions of 22 of the First District's 27 counties are covered by § 5 of the Voting Rights Act. Stip. 109. In the *Gingles* litigation in the mid–1980s, § 2 violations were found in 11 of these counties. Since *Gingles*, 21 counties and cities within the District have been subject to § 2 actions which resulted in changes from at-large local election systems. Keech

Dep., Tables 8A and 8B. Two of the ten counties included in part in the Twelfth District, Gaston and Guilford, are covered by § 5. Stip. 110. In the *Gingles* litigation, § 2 violations were found in both of these counties. Since *Gingles*, a number of § 2 actions have resulted in changes to local election systems in four of the Twelfth District's counties: Guilford, Forsyth, Davidson, and Iredell. Keech Dep., Tables 8A and 8B.

Second, the two districts have but narrow African–American voting majorities: in the First District, 50.5% of the registered voters; in the Twelfth District, 53.5% of the registered voters. Though African–American candidates were elected to represent both districts in the first elections held under the Plan, it is demonstrably the case in North Carolina that such narrow voting majorities do not assure election of minority candidates. Of the eight majority-minority House and Senate districts created to comply with § 2 of the Voting Rights Act pursuant to the judgment in *Gingles*, three are presently represented by whites elected to office despite the minority-race voting majorities in those districts.

mention it only to indicate why we discount as legally irrelevant the opposing evidence on the subject offered by the parties: for the plaintiffs, Professor Shimm's opinion that the very remedial purpose of the districts necessarily prevented fair and effective representation by African-Americans of non-minority constituents such as he, Shimm testimony Tr. p. 1090; for the defendants, that in fact, the two current representatives had been called upon and had responded more frequently during their terms to requests for services and expressions of views by white than African-American constituents. Lichtman Report, p. 66, Table 43.

**60.** That objective evidence should reveal—perhaps counterintuitively—that the extreme "ugliness" of these districts has little if any effect of itself on fair and effective representation is unsurprising once a moment's honest reflection is put to it. Their perceived "ugliness"—their extreme irregularity of shape—is entirely a function of an artificial perspective unrelated to the common goings and comings of the citizen-voter. From the mapmaker's wholly imaginary vertical perspective at 1:25,000 or so range, a citizen may well find his district's one-dimensional, featureless shape aesthetically "bizarre," "grotesque," or "ugly." But back down at ground or eye-level, viewing things from his normal closely-bounded horizontal perspective, the irregularity of outline or exact volume of the district in which he resides surely is not a matter of any great

practical consequence to his conduct as citizen-voter. In the earth-bound, horizontal workaday world of his political and other lives, it surely never occurs to him—until aroused to dislike something else about his district or his representative—that the lines that include him with others in a particular electoral district wander irregularly rather than evenly to enclose them. What happens is that after every re-drawing of the lines of any of the various overlapping electoral districts in which he resides, he learns quickly enough (if interested enough), either by official notice or unofficially, that he is now in the same or a new district that is identified by a number. He has no idea where exactly on the earth's surface the lines of the district—mostly invisible from this live perspective—run throughout their course. Nor does he need to know in order to conduct his political affairs effectively as a citizen of the district. In due course he learns that candidates A and B are contending for his vote, learns what he wants to about them, re-learns where his present voting location is, casts his vote, and thereafter has whatever contact he wants with his representative, completely unaffected either by where exactly his district boundaries lie, his lack of exact knowledge of their location, or by any "ugliness" that may from the mapmaker's perspective result from their irregular shape.

## C. *Summary of Ultimate Facts Found*

1. In enacting the challenged congressional redistricting plan, the General Assembly of North Carolina deliberately created two districts, the First and the Twelfth, that would have narrow, but effective voting majorities of African–American citizens, specifically intending thereby to give the African–American citizens of those districts a reasonable opportunity to elect representatives of their choice.

2. The General Assembly did this in order to comply with §§ 2 and 5 of the Voting rights Act, on the basis of the well-founded belief of a sufficient majority of its membership that failure to do so would, or might well, violate one or both of those provisions.

3. Though there was some sentiment in the General Assembly that doing so was warranted simply as remedy for the state's long and continuing history of race-discrimination in matters of voting, that sentiment was not sufficient in voting power to have caused the legislative action independent of the perceived compulsion of the Voting Rights Act.

4. The two districts are highly irregular in their shapes and extreme in their lack of geographical compactness as compared to other districts in the plan or to other districts nationally. They are not the two most geographically compact majority-minority districts that could have been created were no factors other than equal population requirements and effective minority-race voting majorities taken into account.

5. The exact locations and highly irregular shapes of the two districts result from a combination of factors that influenced legislative choices: the equal-population requirements in relation to the population dispersions in the areas of their locations; the need for effective African–American voting majorities; the legislative intention to create one predominantly rural (First) and one predominantly urban (Twelfth) district, and, concomitantly, two districts with distinctive and internally homogeneous commonalities of interest; incumbent protection; and the maintenance of technical territorial contiguity. After the equal population and majority-minority imperatives, the most important factor for the legislature was the creation of districts with distinctive and internally homogeneous communities of interest. In according primacy to these redistricting principles, the legislature necessarily had to subordinate geographical compactness and respect for the integrity of political subdivisions, and did so.

6. The irregularities of shape and lack of geographical compactness of the two districts have not demonstrably affected adversely the fair and effective representation of their citizens. The present representatives, both African–Americans, are able effectively to maintain their accessibility to constituents by the standard devices of mailings, local offices, and personal visits to their districts.

## IV.

### *Conclusions of Law*

1. This three-judge district court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 2284.

2. The substantive nature of the Equal Protection claim remanded to this court by the Supreme Court is as defined and discussed in Part II–A of this Opinion. *See supra* at 421–423.

3. The plaintiffs and their supporting intervenors have standing to maintain the Equal Protection claim remanded to this court by the Supreme Court, because they have established that they are registered to vote in North Carolina's congressional elections and that the challenged redistricting plan assigns them to vote in particular electoral districts at least in part because of their race. *See supra* at 423–427.

4. The state defendants' concession that, in designing the challenged congressional redistricting plan, the General Assembly of North Carolina deliberately drew two districts—the First and the Twelfth—so that African–American citizens had a

voting majority in each, established *prima facie* that the Plan was a "racial gerrymander" that violated the Equal Protection Clause. *See supra* at 427–434. This had the effect of subjecting the Plan to judicial strict scrutiny to determine whether its use of race could yet be justified as a "narrowly tailored" means of furthering a "compelling state interest." *Id.*

5. In this strict scrutiny inquiry, the initial burden has been upon the state to come forward with evidence that the Plan's use of race was so justified. *See supra* at 435–437. But the burden of persuasion has remained throughout upon the plaintiffs to prove the Plan unconstitutional, and that burden extends to disproving any justification adequately advanced by the state. *Id.*

6. As explained more fully in Conclusions of Law 7 and 8 below, the state has produced sufficient evidence that the challenged Plan's use of race is narrowly tailored to further one or more compelling state interests to carry its burden of production under strict scrutiny analysis.

7. The state has adequately established that it had a "compelling interest" in enacting a race-based congressional redistricting plan, by demonstrating that it had a "strong basis in evidence" for concluding that such action was necessary to bring its existing congressional redistricting scheme into compliance with §§ 2 and 5 of the Voting Rights Act. *See supra* at 437–443.

The General Assembly had a "strong basis in evidence" for concluding that enactment of a race-based redistricting plan was necessary to avoid a violation of § 2 of the Act, because it was aware from a variety of sources—including earlier legislative experience with § 2 challenges to redistricting plans, legal advice, and general personal knowledge—that African–American voters could very likely make out a *prima facie* § 2 challenge to its original Chapter 601 plan, or any other plan that did not contain two majority-minority districts, *see supra* at 463–465, and that the state could not defend a § 2 challenge to

such a plan by arguing that it nonetheless provided African–Americans with equal political and electoral opportunity because it gave them a majority in a number of congressional districts that was roughly proportional to their share of the state's voting-age population as a whole. *See supra* at 464. *Compare De Grandy,* —— U.S. at ——, 114 S.Ct. at 2658–62.

The General Assembly also had a "strong basis in evidence" for concluding that enactment of a race-based congressional redistricting plan was necessary to comply with § 5 of the Act, because the Justice Department had denied preclearance to its original Chapter 601 plan on the ground that it failed to satisfy the "purpose" prong of § 5, and the state reasonably concluded, after conducting its own independent reassessment of the Chapter 601 plan in light of the concerns identified by the Justice Department, that the Justice Department's conclusion was legally and factually supportable. *See supra* at 465. *Compare Hays I,* 839 F.Supp. at 1196 & n. 21 (Justice Department had not denied § 5 preclearance to earlier version of same congressional redistricting plan).

That the General Assembly did not make specific legislative findings that the Chapter 601 plan would violate the Voting Rights Act is of no consequence, *see Wygant,* 476 U.S. at 277–78, 106 S.Ct. at 1848–49 (plurality); *id.* at 289–91, 106 S.Ct. at 1854–56 (O'Connor, J., concurring), for it is clear from the record as a whole that the General Assembly was in fact "attempting to remedy its own unlawful conduct," rather than "to alleviate the wrongs suffered through general societal discrimination," *id.* at 289, 106 S.Ct. at 1855, when it enacted Chapter 7, and that it "act[ed] on the basis of information which g[ave] [it] a sufficient basis for concluding that [such] remedial action [was] necessary." *Id.* at 291, 106 S.Ct. at 1856. *Compare Croson,* 488 U.S. at 498–506, 109 S.Ct. at 723–28 (majority) (state failed to demonstrate a compelling interest in engaging in race-based remedial action where it could not show that it was attempting to remedy identified instances of past or present discrimination within its own jurisdiction, but only general societal discrimination in the country as

a whole). That the state initially took the position, when enacting the Chapter 601 plan and seeking its preclearance, that the plan would not violate the Voting Rights Act, does not mean that it did not have a "substantial basis" for concluding that the plan would violate the Voting Rights Act when it later decided to abandon that plan and enact the Chapter 7 plan in its stead, and that its assertions to that effect must be dismissed as nothing but "weak post-hoc rationalizations." *Post,* at 486. The record as a whole firmly establishes that while the state may have believed in good faith that the Chapter 601 plan would not violate the Voting Rights Act when it first enacted and sought preclearance for that plan, it later reassessed that belief in light of the objections raised by the Justice Department in its denial of preclearance, and concluded—with considerable justification—that it may well have been erroneous.

8. The state has adequately established that the Plan creating the two remedial districts was "narrowly tailored" to serve the compelling interests discussed above. First, the state has demonstrated that the Plan does not create more majority-minority districts than is reasonably necessary to comply with the Voting Rights Act, and that the African–American voting majorities in each of those districts (50.5% and 53.5%, respectively) are no greater than is reasonably necessary to give African–Americans a reasonable opportunity to elect representatives of their choice in them. *See supra* at 445–446. *Compare Hays I,* 839 F.Supp. at 1207–08 (race-based redistricting plan not "narrowly tailored" where it "packed" minority voters into majority-minority districts in percentages much greater than reasonably necessary to give them a fair opportunity to elect representatives of their choice in those districts). Second, the state has demonstrated that the Plan does not impose a rigid quota for African–American representation in North Carolina's Congressional delegation, but only a flexible goal, *see supra* at 446–447, and that that goal (2 out of 12 seats, or 16.7%) bears a reasonable relation to the percentage of African–American voters

in the state's population as a whole (22%), *see supra* at 447–448. Third, the state has demonstrated that the Plan is a remedial measure of limited duration, which will automatically expire at the end of the ten-year redistricting cycle, and thus will last no longer than is reasonably necessary to eliminate the effects of the particular discrimination it is designed to redress. *See supra* at 447–448. Finally, the state has demonstrated that the Plan does not impose an undue burden on the rights of innocent third parties (such as plaintiffs in this case), because it complies with constitutional "one person, one vote" requirements, does not unconstitutionally dilute the voting strength of any identifiable group of voters, and creates districts which, though highly irregular in shape and relatively non-compact geographically, are nonetheless based on rational districting principles that ensure fair and effective representation to all citizens covered by them, since they are deliberately designed to be and are in fact highly homogeneous in terms of their citizens' material conditions and interests, and do not significantly inhibit access to and responsiveness of their elected representatives. *See supra* at 448–457.

9. The plaintiffs have not carried their burden of proving that the justification the state has advanced for the challenged Plan's use of race is untenable, either because the interest identified was not a "compelling" one or because the means used were not "narrowly tailored" to its achievement. Their only challenges to the two bases of justification advanced have been legal ones which are without merit, as is necessarily implied in our conclusions of law 7 and 8.

10. The challenged congressional redistricting plan does not violate any rights of the plaintiffs or their supporting intervenors under the Equal Protection Clause. Judgment accordingly will be entered for the state defendants dismissing this action on the merits.

## V.

### Conclusion

The question in the end is whether a deliberately race-based districting plan enacted by an overwhelmingly white legislature in one of the former Confederate states in order to comply with its understanding of the commands of national law enacted to enforce the guarantees of the Fourteenth and Fifteenth Amendments shall be declared unconstitutional at the behest of five white voters whose voting rights have been in no legally cognizable way harmed by the plan. We have concluded that under controlling law and the material facts of this case, the legislation passes strict scrutiny as a sufficiently narrowly tailored effort by the state legislature to serve the state's compelling interest in complying with that national remedial law.

Pointing essentially to the odd shapes of the two districts resulting in part—though by no means entirely—from the legislature's racial design, the plaintiffs, through counsel, have characterized the plan as a "constitutional crime." We have concluded instead that, under controlling law, it is a justifiable invocation of a concededly drastic, historically conditioned remedy in order to continue the laborious struggle to break free of a legacy of official discrimination and racial bloc voting in North Carolina's electoral processes that has played a significant part in the ability of any African–American citizen of North Carolina, despite repeated responsible efforts, to be elected to Congress in a century. We decline in this case to put a halt to the effort by declaring the plan unconstitutional.

RICHARD L. VOORHEES, Chief Judge, concurring in part, and dissenting in part:

I concur in the majority's findings here that the Plaintiffs have sufficient standing to bring suit under the Equal Protection Clause

of the Fourteenth Amendment, and further that Plaintiffs have successfully carried their burden of showing a racial gerrymander, for which the State of North Carolina must now offer compelling justification. I also concur in the majority's finding that Plaintiffs retain the ultimate burden of persuasion throughout these proceedings. However, I register my dissent as to the balance of the majority's opinion.

## I.

### Nature of the Constitutional Wrong

I agree that the evidence presented at trial wholly supports the finding here of a racial gerrymander, and that as such North Carolina's redistricting plan must survive strict scrutiny before it can be said to pass constitutional muster. Indeed, one glance at the map suffices to demonstrate to even the most casual observer the existence of at the very least a suspect intent on the part of the North Carolina General Assembly, a suspect intent that in itself demands explanation and justification.[1] But I would go one step further than the majority in assessing the significance of the shapes of the districts currently before us, consistent with my reading of the Supreme Court's opinion in *Shaw v. Reno.*

The majority's opinion explicitly limits the relevance of the districts' odd shapes to circumstantial evidence of the State's alleged discriminatory intent. *See ante* at 430–431, 449. Where the legislature has conceded such an unlawful intent, as its witnesses have explicitly done here, the majority would dismiss any evidence of district shape as essentially duplicative.[2] This approach, however, ignores the special breed of harms recently recognized by the Supreme Court in *Shaw*, a breed of harms "analytically distinct" from any associated with the mere intent to discriminate. *Shaw,* —— U.S. at ——, 113 S.Ct.

---

**1.** Justice Souter remarks in his dissent in *Shaw* that "[t]he shape of the district at issue in this case is indeed so bizarre that few other examples are ever likely to carry the unequivocal implication of impermissible use of race that the Court finds here." *Shaw v. Reno,* —— U.S. ——, ——, 113 S.Ct. 2816, 2848, 125 L.Ed.2d 511 (1993) (Souter, J., dissenting).

**2.** Likewise, Justice Stevens argues in dissent that "[e]vidence of the district's shape is therefore convincing, but it is also cumulative, and, for our purposes, irrelevant." *Shaw,* —— U.S. at ——, 113 S.Ct. at 2844, 125 L.Ed.2d 511 (Stevens, J., dissenting).

at 2830 ("Nothing in [*United Jewish Organizations v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) ] precludes white voters (or voters of any other race) from bringing the analytically distinct claim that a reapportionment plan rationally cannot be understood as anything other than an effort to segregate citizens into separate voting districts on the basis of race without sufficient justification"). The Court in *Shaw* characterized those harms explicitly as follows:

> Put differently, we believe that reapportionment is one area in which *appearances do matter.* A reapportionment plan that includes in one district individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries, and who may have little in common with one another but the color of their skin, bears an uncomfortable resemblance to political apartheid. It reinforces the *perception* that members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls. We have rejected such perceptions elsewhere as impermissible racial stereotypes. By perpetuating such notions, a racial gerrymander may exacerbate the very patterns of racial bloc voting that majority-minority districting is sometimes said to counteract.
>
> The message that such districting sends to elected representatives is equally pernicious. When a district obviously is created solely to effectuate the perceived common interests of one racial group, elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole. This is altogether antithetical to our system of representative democracy.

\* \* \* \* \* \*

Justice Souter apparently believes that racial gerrymandering is harmless unless it dilutes a racial group's voting strength. As we have explained, however, reapportionment legislation that cannot be understood as anything other than an effort to classify and separate voters by race *injures voters in other ways.* It reinforces racial stereotypes and threatens to undermine our system of representative democracy by signaling to elected officials that they represent a particular racial group rather than their constituency as a whole. Justice Souter does not adequately explain why these harms are not cognizable under the Fourteenth Amendment.

\* \* \* \* \* \*

> Racial classifications with respect to voting carry particular dangers. Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire.

*Id.* at ——, 113 S.Ct. at 2827–32 (citations omitted) (emphasis added). In short, race-based districting creates racially conscious districts and foments racial polarization within them.

As observed by Justice White in his dissent in *Shaw,* "[t]he logic of [the majority's] theory appears to be that race-conscious redistricting that 'segregates' by drawing odd-shaped lines is qualitatively different from race-conscious redistricting that affects groups in some other way." *Id.* at ——, 113 S.Ct. at 2838 (White, J., dissenting). Indeed, Justice White's observation is consistent with my reading of *Shaw v. Reno* as well. The majority here, however, fails even to acknowledge this significant distinction, instead implicitly subscribing to Justice White's argument that "[t]he consideration of race in 'segregation' cases is no different than in other race-conscious districting.... A plan that 'segregates' being functionally indistinguishable from any of the other varieties of gerrymandering, we should be consistent in what we require from a claimant: Proof of discriminatory purpose and effect." *Id.* at

——, 113 S.Ct. at 2840–41.[3] Of course, this assumes first that a plan that "segregates" is, *a priori*, functionally indistinguishable from a more compact redistricting plan, an assumption that ignores the special breed of harms recognized by the Supreme Court, and second that the only cognizable "effects" under the Equal Protection Clause therefore are vote dilution and obstruction of voter access. *See id.* at ——, 113 S.Ct. at 2836 (White, J., dissenting) (equal protection violation "only where the electoral system substantially disadvantages certain voters in their opportunity to influence the political process effectively"). That *Shaw* requires the State to justify not only its concededly discriminatory intent but also its scheme of implementation as a matter of constitutional relevance should not be surprising but expected in light of the divisive role that race has played in American society to date.[4]

Not long ago, in *Davis v. Bandemer*, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), a plurality of the Supreme Court observed that "the valid or invalid configuration of the [politically gerrymandered] districts was an issue we did not need to consider," *id.* at 142, 106 S.Ct. at 2815, since the Court expressly determined that "aside from election results, none of the facts found by the district court were relevant to the question of discriminatory effects." *Id.* at 142 n. 20, 106

S.Ct. at 2815 n. 20 (opinion by White, J.). Significantly, the Court in *Shaw* found that at least in the context of racial gerrymanders the configuration of districts is indeed relevant to the question of "discriminatory effects." In that regard, it seems clear from the cited language in *Shaw*, and from notions of logic and common sense, that a racially gerrymandered district of the tortuous nature presented here inflicts a harm qualitatively distinct from that imposed by an intentionally created majority-minority district whose contours are geographically compact and contiguous, a harm that the Supreme Court has found to be cognizable under the Fourteenth Amendment. The constitutional injury here, then, derives not only from the nature of the State's ultimate objective—namely, to classify citizens on the basis of their race—but also from the means employed to achieve that objective—namely, voting districts so grossly misshapen as necessarily to divide and stigmatize their citizenry along racial lines. As the legislature must go to greater and greater lengths of disfigurement to achieve a racially preconceived result because of the dispersion of minority voters among the population, the districts at last become so bizarre in shape that they can only be perceived as racially designated districts.[5] At this point, the harm has achieved a constitutional dimension and the shapes of the districts an unconstitutional one.[6]

---

**3.** Hence the majority's observation that the Equal Protection claim here "is, in effect, the same basic claim that the Court has recognized in other contexts in which race-based remedial measures, or 'affirmative action,' undertaken by state actors have been challenged, typically by members of the majority race claiming 'reverse discrimination.'" *See ante* at 423. However, the majority disregards the fact that it was the shapes of North Carolina's congressional districts that prompted the instant litigation in the first place, and that it was likewise district shape, as a manifestation of legislative intent, that gave the Supreme Court considerable cause for concern on appeal. Nonetheless, the majority's opinion inexplicably renders district shape irrelevant altogether under the facts of this case. For the reasons discussed here, I would find that the Equal Protection claim recognized by the Court in *Shaw* is substantively distinguishable from more familiar "reverse discrimination" claims.

**4.** The majority's reliance on discriminatory intent alone cannot be reconciled with the Supreme Court's express reservation of the question of whether the deliberate creation of majori-

ty-minority districts, without more, always triggers strict scrutiny. *See Shaw*, —— U.S. at ——, 113 S.Ct. at 2828 ("we express no view as to whether 'the intentional creation of majority-minority districts, without more,' always gives rise to an equal protection claim").

**5.** Indeed, the testimony of District 12's congressional representative, Mel Watt, speaks for itself. *See, e.g.,* Tr. pp. 999–1001 ("representing a district that you are consistent with in your philosophies allows you to be consistent in voting your conscience *without buckling under* or *catering*, as you said my statement said, to other interests that may not predominate in my district [such as the 'business or *white community* ']") (emphasis added).

**6.** The majority's opinion cites a host of legislative concerns, including incumbent protection, equal-population requirements, and district homogeneity, that affected the specific contours of the districts at issue here. *See ante* at 473. That such concerns played a role in the redistricting process is indisputable. Equally indisputable,

In order to prevail the State should therefore be required to offer a compelling justification for the means employed as well as the ends served. The evidence adduced simply does not support a finding of such justification. Put another way, I would find the districts created here to be inherently defective, by characterization not sufficiently "narrowly tailored" to survive strict scrutiny. To dismiss the relevance of district shape from our inquiry otherwise is to ignore the Supreme Court's mandate in this particular case.[7]

## II.

### Lack of Justification

The primary justification proffered by the State for its redistricting plan, on which the majority here entirely relies, is its statutory duty to comply with the Voting Rights Act.[8] The State argues that it had a duty to comply both with § 2 and with § 5 of the Act, thereby necessitating at least two majority-minority districts, if not these two majority-minority districts in particular. Keeping in mind the crucial distinction between compact and non-compact majority-minority districts and the implications thereof as recognized in *Shaw*, I will address each of the State's

arguments, and the majority's disposition thereof, in turn.

### A. Compliance With Section 2 of the Voting Rights Act

The State first asserts that it had a compelling interest in complying with § 2 of the Voting Rights Act, and that failure to create the districts at issue might very well have resulted in liability thereunder. Essentially the State argues that it had a duty to anticipate a potential violation of the Voting Rights Act and to remedy such a violation in a timely fashion. As the Supreme Court has recognized, "[t]he States certainly have a very strong interest in complying with federal antidiscrimination laws that are constitutionally valid as interpreted and as applied." *Shaw*, — U.S. at ——, 113 S.Ct. at 2830. In order to rely on such an interest, however, the State must at the very least demonstrate that "it has convincing evidence that remedial action is warranted. That is, it must have sufficient evidence to justify the conclusion that there has been [some violation of the Voting Rights Act]." *Wygant v. Jackson Bd. of Education*, 476 U.S. 267, 277, 106 S.Ct. 1842, 1848–49, 90 L.Ed.2d 260 (1986) (plurality opinion) (regarding remedial action for

---

however, is the fact that race, and race alone, was the *sine qua non* not only for the need for majority-minority districts generally, but also for the need to draw district lines of such peculiar shape, a fact of which the majority too easily loses sight.

7. Curiously enough, the majority's opinion seems to recognize the significance of "stigmatic" harm in its discussion on standing. *See ante* at 423–427 ("In other contexts, the Supreme Court has recognized that a state's use of racial classifications necessarily inflicts 'stigmatic' injury, which, though 'abstract' in the sense that it cannot easily be quantified, is sufficient 'injury in fact' to give any citizen who has been 'personally denied equal treatment' by such a classification standing *to challenge it under the Equal Protection Clause*") (citations omitted). Why the significance of such stigmatic harm is not recognized by the majority in the present context is puzzling, although not altogether surprising given the majority opinion's feverish concluding characterization of the case before us. *See ante* at 475 ("The question in the end is whether a deliberately race-based districting plan enacted by an overwhelmingly white legislature in one of the former Confederate states in order to comply with its

understanding of the commands of national law enacted to enforce the guarantees of the Fourteenth and Fifteenth Amendments shall be declared unconstitutional at the behest of five white voters whose voting rights have been in no legally cognizable way harmed by the plan").

8. The majority contends that the redistricting plan enacted by North Carolina here is most closely analogous to a "voluntarily" adopted affirmative action plan for purposes of analysis under the Equal Protection clause, and as such may require less scrutiny than a "judicially-imposed" plan. *See ante* at 434 n. 21. If, as the majority maintains, the State alternatively faced liability under § 2 of the Voting Rights Act or denial of preclearance by the Department of Justice, I fail to see how its actions were "voluntary." The majority's opinion elsewhere characterizes the Voting Rights Act as an exercise of Congress' "constitutional mandate" pursuant to the Fourteenth and Fifteenth Amendments. *Ante* at 100. Accordingly, a state's obligation to comply with the Act would hardly seem elective. The distinction here between "voluntary" and "judicially-imposed" remedial plans on the facts of this case should therefore play no role in the legal analysis.

prior discrimination). In other words, the trial court must make a factual determination that the State "had a strong basis in evidence for its conclusion that remedial action was necessary." *Id.*

The Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), set out the threshold requirements for a vote dilution claim under § 2 of the Voting Rights Act. First, a minority group must be able to demonstrate that it is "sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.* at 50, 106 S.Ct. at 2766 (footnote omitted). Second, the minority group must be able to show that it is "politically cohesive." *Id.* at 51, 106 S.Ct. at 2767. Third, the minority must be able to demonstrate that "the white majority votes sufficiently as a bloc to enable it ... to defeat the minority's preferred candidate." *Id.* (citation omitted). These being the threshold require-

ments for liability under § 2 for vote dilution, it follows that North Carolina must have had a "strong basis" in evidence for concluding that these three requirements had been met and that remedial action was therefore necessary.

It is significant to note as a preliminary matter that there is absolutely no evidence whatsoever in the legislative history of Chapter 7 regarding violations of the Voting Rights Act, or the necessity for any remedial action, other than as a response to the Attorney General's objections lodged against the State's initial redistricting proposal. Certainly no legislative findings were ever made during the redistricting process concerning the relevance of the factors set out in *Gingles;* on the contrary, in its submission to the Department of Justice in support of Chapter 601, its original redistricting plan, the State expressly disavowed the importance thereof altogether.[9] The majority here makes only

**9.** In support of the State's first redistricting proposal (Chapter 601), and in reply to certain comments filed by the American Civil Liberties Union (ACLU) arguing in favor of a second majority-minority district pursuant to *Gingles, supra,* Gerry Cohen, the Director of Legislative Drafting for the North Carolina General Assembly, submitted a memorandum dated October 14, 1991 (hereinafter the "Memorandum"), to the Department of Justice on behalf of House Redistricting Committee co-Chairman Toby Fitch, Senate Redistricting Committee Chairman Dennis Winner, and House Speaker Daniel T. Blue. In rejecting the ACLU's contentions regarding a second district, the State's Memorandum first noted that the findings in *Gingles* concerning North Carolina's racial disparities were ten years old and based on statistics dating back to 1978. Stip. Ex. 25 at 16. It asserted that "the gains [in black voter registration] that the three-judge court had said had not occurred by the time of the 1983 trial have now occurred." *Id.* At various points in the Memorandum, moreover, the State proclaimed "an end to any discrimination in voter registration" and "an end to the kind of discriminatory history recited both [sic] in the Congressional history of the 1982 Amendments to the Voting Rights Act." *Id.* at —— ——, ——.

As for racial appeals in political campaigns, another consideration under *Gingles,* the State asserted that "aside from the racial appeals attributed to Jesse Helms in 1990, the ACLU shows no evidence of them in the past decade since *Gingles.*" *Id.* at ——. The State further disputed the ACLU's allegations concerning continued polarized voting in North Carolina, pointing to recent black electoral successes in "Wake, Dur-

ham, Cumberland, Guilford, Forsyth, Orange, etc." counties, leading to a "dramatic" increase in the number of black elected officials between 1980 and 1990. *Id.* at ——, ——, ——, ——.

The State also rejected the contention that a second reasonably compact majority-minority district was feasible. In its Memorandum the State noted that "*Gingles* requires that a district be geographically compact in order to satisfy one of the prongs of the initial test." *Id.* at ——. Citing *Dillard v. Baldwin County Bd. of Educ.,* 686 F.Supp. 1459, 1466 (M.D.Ala.1988), the State argued that a district is not compact if it is so spread out or convoluted that there is no sense of community, or that its representatives and members could not efficiently stay in touch with each other or easily tell who lived in the district. *Id.* The State further asserted that a district is likewise not compact if it is "materially stranger in shape than some of the districts contained in the enacted plan." *Id.* at —— (quoting *Jeffers v. Clinton,* 730 F.Supp. 196, 207 (E.D.Ark. 1989), *aff'd,* 498 U.S. 1019, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991)).

The State therefore asserted that all of the ACLU's proposals for a second majority-minority district failed the "compactness tests" described in *Gingles, Dillard,* and *Jeffers. Id.* The State also claimed that the creation of an additional majority-minority district would require "stitch[ing] together dozens of disconnected black concentrations," and "snaking all over everywhere at the [census] block level." *Id.* at —— —— ——. The State specifically criticized a second majority-minority district proposed by Republican House Member David Balmer as "meander[ing] over 200 miles"; "so sprawling

conclusory observations about the General Assembly's "powerful, recent institutional and individual memories," *see ante* at 463, its "general perception" concerning potential liability under the Voting Rights Act, *ante* at 464, and the fact that it was "without doubt aware" or "necessarily aware" of the requisite circumstances thereunder. *See ante* at 463, 464. But the majority's opinion fails to cite where in the legislative record the General Assembly specifically considered its duties under the Voting Rights Act and the implications thereof for a proposed redistricting plan.[10] The State's contention that it was actually motivated by such concerns in light of the substantial evidence to the contrary has no support in the record whatsoever. Reversing its earlier contemporaneous position, the State now advances this argument as a matter of convenience to justify its unconstitutional behavior in enacting Chapter 7.

The majority holds that contemporaneous findings need not be made by a legislature prior to taking remedial action, *see ante* at 437–439, 474–475, a proposition with which I generally agree. But in holding contemporaneous legislative findings of past discrimination unnecessary, it is unlikely that the Supreme Court contemplated rendering them

irrelevant altogether. Such a result would necessarily prompt the same concerns, albeit to a lesser degree, expressed by Justice O'Connor regarding a state's voluntary efforts to eradicate the effects of past discrimination:

That Congress may identify and redress the effects of society-wide discrimination does not mean that, *a fortiori*, the States and their political subdivisions are free to decide that such remedies are appropriate. Section 1 of the Fourteenth Amendment is an explicit *constraint* on state power, and the States must undertake any remedial efforts in accordance with that provision. To hold otherwise would be to cede control over the content of the Equal Protection Clause to the 50 state legislatures and their myriad political subdivisions. The mere recitation of a benign or compensatory purpose for the use of a racial classification would essentially entitle the States to exercise the full power of Congress under § 5 of the Fourteenth Amendment and insulate any racial classification from judicial scrutiny under § 1. We believe that such a result would be contrary to the intentions of the Framers of the Fourteenth Amendment, who desired to place clear limits on the States' use of race as a

---

that it was most often described as 'ludicrous' or 'absurd' "; and "too sprawling and uncompact to allow for effective campaigning and representation." Stip. Ex. 26. Further, the State claimed that in order to create such districts, it would be required to divide several more voting precincts, resulting in a "nightmare" of voter confusion and electoral complications. Stip. Ex. 25 at 31–32. The State's own observations now serve to describe North Carolina's current Chapter 7.

Given the State's efforts to disavow the continued relevance of *Gingles* and the nearly total absence of support in the legislative record, I disagree with the majority's conclusions that the General Assembly was *"without doubt aware"* or *"necessarily aware"* that "conditions in North Carolina were such that the African–American minority could likely prove many of the other factors that are relevant to establishing a § 2 violation," *see ante* at 463–464, and that there was a *"general perception* by the legislature (or at least its leadership) that the African–American minority could make out a *prima facie* § 2 case with respect to any congressional redistricting plan that did not include two majority-minority districts...." *Ante* at 464 (emphasis added). One could safely conclude that legislators were

"without doubt aware" of the "need" for virtually *any* act of legislation.

10. Indeed, the portions of the legislative record cited in the majority's opinion support the conclusion that the Voting Rights Act was *not* the primary inspiration for Chapter 7:

I'm not going to try to speak as a lawyer versed in congressional or any other kind of redistricting. Because I haven't even read the *Gingles* case and I don't know much about it.

\* \* \* \* \* \*

And I'll say this, also, that I want the black people of this State of have [sic] two congressmen in the United States Congress. I think they *deserve* it.

Stip.Ex. 200 at 924 (excerpt of Senate floor debates) (emphasis added). Another Senator echoed this sentiment:

So, I just want to say I support this bill because I think so far as the blacks are concerned that yes, they *deserve* two black districts. After going through a 1990 race, they can see we still need to make some improvements in how our relationships are between our people. So I say to you, let's see how this works.

*Id.* at 932 (emphasis added).

criterion for legislative action, and to have the federal courts enforce those limitations.

*City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 490–91, 109 S.Ct. 706, 720, 102 L.Ed.2d 854 (1989) (opinion by O'Connor, J.) (citations omitted) (emphasis in original). *See also id.* at 510, 109 S.Ct. at 731 ("Absent such findings, there is a danger that a racial classification is merely the product of unthinking stereotypes or a form of racial politics"). While contemporaneous findings may not be required *per se,* certainly evidence to precisely the opposite effect would militate against a finding of compelling interest to justify the State's actions. At the very least such evidence raises serious concerns about the State's underlying motives here and the degree to which its interests can be genuinely characterized as "compelling," consequently casting doubt on the majority's conclusions in this regard.[11]

Of course, even assuming that the State's findings, such as they were, proved sufficient to warrant remedial action, and further as-

suming that the State has made sufficient showings of political cohesiveness and racial bloc voting under *Gingles* to support a finding of vote dilution under § 2 (showings not made here),[12] the evidence presented arguably supports the State's original contention that the creation of a second "geographically compact" majority-minority district simply was not possible, given the "relatively dispersed" nature of the black population in North Carolina. *See Shaw,* —— U.S. at ——, 113 S.Ct. at 2820 (noting that blacks constitute a majority of the general population in only five of the State's 100 counties). Indeed, the impracticality of creating a second geographically compact district is perhaps best demonstrated by the existence of District 12 itself.[13] Where there was no reasonable prospect of liability for vote dilution under § 2 given the dispersed nature of North Carolina's black population, therefore, and thus no "strong basis in evidence" supporting remedial action in connection therewith, the majority's finding in favor of a compelling interest in that regard is ill-taken.

---

**11.** The majority also notes the political sparring that took place between North Carolina Republicans and Democrats over the location of the majority-minority districts and the specific contours thereof. To the extent that such decisions were motivated by political expediency on either party's part, I would find the State's interest in creating these particular districts that much less compelling. The fight here was about power. The Democratic majority party in the legislature, as the State admits by its answer, sought to protect its incumbents; the evidence also showed that it drew district lines to enhance its members within the State congressional delegation. The Republican Party legislators had like motives. This is simply not the stuff of which solemn rectifications of past racial wrongs are wrought.

**12.** Regarding the *Gingles* requirement of political cohesion, I cite Justice Thomas' recent observations in *Holder v. Hall:*

According to the rule adopted in *Gingles,* plaintiffs must show simply that members of a racial group tend to prefer the same candidates. There is no set standard defining how strong the correlation must be, and an inquiry into the cause for the correlation (to determine, for example, whether it might be the product of similar socioeconomic interests rather than some other factor related to race) is unnecessary.... As a result, *Gingles'* requirement of proof of political cohesiveness, as practically applied, has proved little different from a working assumption that racial groups

can be conceived of largely as political interest groups.

—— U.S. ——, ——, 114 S.Ct. 2581, 2597–98, 129 L.Ed.2d 687 (1994) (Thomas, J., concurring in the judgment) (citations omitted).

**13.** In *Dillard, supra,* the District Court stated that "a district is sufficiently geographically compact if it allows for effective representation." 686 F.Supp. at 1466. Defendants cite this language in support of their contention that District 12 is in fact "geographically compact," common sense notwithstanding. But even *Dillard* recognized that "a district would not be sufficiently compact if it was so spread out ... or if it was so convoluted that there was no sense of community...." *Id.* The term "geographic" at least connotes physical location, and the word "community" implies some sense of physical proximity as well. Indeed, Webster's Dictionary defines "community" as most of us would, namely, "the people living in a particular place or region and usually linked by common interests." Webster's 3d New Int'l Dictionary. The Court in *Gingles* elsewhere summarized its holding as follows: "Stated succinctly, a bloc voting majority must usually be able to defeat candidates supported by a politically cohesive, *geographically insular* minority group." *Gingles,* 478 U.S. at 48–49, 106 S.Ct. at 2765–67 (emphasis added) (citations omitted). It is safe to say that the minority population extracted from virtually all over the State to comprise both District 1 and District 12 has never been characterized as "geographically insular."

Even if there were sufficient justification to create more than one majority-minority district generally in North Carolina, the very shape of District 12 demonstrates the absence of any compelling interest to create this particular gerrymandered district in order to avoid liability for vote dilution under *Gingles,* since the concept of geographical compactness was disregarded altogether. Put another way, had the district lines been drawn differently, would blacks living in various parts of what now constitutes District 12 have had a legitimate cause of action under § 2 because their votes had been fragmented or split, thereby diluting their potential voting strength? Clearly not. *See Gingles,* 478 U.S. at 50, 106 S.Ct. at 2766–67. If the purpose behind the creation of Districts 1 and 12 was to empower a geographically compact, politically cohesive minority population, as the State maintains, then clearly the State failed miserably to attain that purpose, since neither district can be said to incorporate a geographically compact population of any race. To find otherwise would render the Court's vote dilution test in *Gingles* a nullity.

In this respect, the Supreme Court's distinction between "what the law permits, and what it requires" is particularly relevant. *Shaw,* —— U.S. at ——, 113 S.Ct. at 2830. That the Voting Rights Act *permits* race-conscious districting in the form of majority-minority districts is clear from the plurality decision in *UJO. United Jewish Organizations,* 430 U.S. at 156–61, 97 S.Ct. at 1005–08 (opinion by White, J.). To find that the Voting Rights Act *requires* the creation of districts as tortured as those in question

here, such that compliance with the Act suffices as a compelling state interest under equal protection analysis, defies logic and reason. The necessary implication of the majority's holding in this regard, that majority-minority districts may and should be created wherever technologically possible regardless of the geographic consequences thereof, is to impose on states a *de facto* requirement of proportional representation,[14] a result expressly prohibited by case law, *see, e.g., Mobile v. Bolden,* 446 U.S. 55, 76, 100 S.Ct. 1490, 1504, 64 L.Ed.2d 47 (1980) ("The Equal Protection Clause of the Fourteenth Amendment does not require proportional representation as an imperative of political organization"); *Freeman v. Pitts,* —— U.S. ——, ——, 112 S.Ct. 1430, 1447, 118 L.Ed.2d 108 (1992) ("Racial balance is not to be achieved for its own sake. It is to be pursued when racial imbalance has been caused by a constitutional violation"), and by the statutory provisions of § 2 of the Voting Rights Act itself. *See* 42 U.S.C. § 1973b ("Provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population"); *see also Gingles,* 478 U.S. at 97, 106 S.Ct. at 2790–91 (O'Connor, J., concurring in the judgment) ("Requiring that every minority group that could possibly constitute a majority in a single-member district be assigned to such a district would approach a requirement of proportional representation as nearly as is possible within the framework of single-member districts.... This approach is inconsistent with the results test and with § 2's disclaim-

14. Indeed, the majority originally cited the recent Supreme Court case of *Johnson v. De Grandy,* —— U.S. ——, —— ——, 114 S.Ct. 2647, 2658–62, 129 L.Ed.2d 775 (June 30, 1994), specifically for the proposition that the State here had an obligation to create majority-minority districts "in substantial proportion" to African–Americans' share of the State's voting-age population. *See* Opinion filed August 1, 1994, at 144 (opinion by Phillips, J., joined by Britt, J.) ("The General Assembly had a 'strong basis in evidence' for concluding that enactment of a race-based congressional redistricting plan was necessary to avoid a violation of § 2 of the Act, because its members were aware from a variety of sources ... that the Chapter 601 plan did not create districts in which African–Americans were

a voting majority in substantial proportion to their share of the State's voting age population"). However, I read *De Grandy* only for the more limited proposition that if a state's existing plan already features majority-minority districts in substantial proportion to a given minority's share of the state's voting-age population, then the state generally has no further obligation to *maximize* the possible number of majority-minority districts located within its boundaries. *De Grandy,* —— U.S. at ——, 114 S.Ct. at 2659–60 ("reading § 2 to define dilution as any failure to maximize tends to obscure the very object of the statute and to run counter to its textually stated purpose.... Failure to maximize cannot be the measure of § 2"). The majority has since reconsidered its position. *See ante* at 474.

er of a right to proportional representation").[15]

Such a result is untenable and unconstitutional. Where a minority population is relatively dispersed geographically, as is the black population in most parts of North Carolina, and the only means therefore of achieving a majority-minority district is to disfigure the voting districts, the result amounts to a racial quota in pursuit of proportional representation.[16] Consequently, as in *Wygant, supra,* there is "no logical stopping point" to the majority's theory in this case. *Wygant,* 476 U.S. at 275, 106 S.Ct. at 1847–48 (plurality opinion) (finding that there was "no logical stopping point" to the District Court's role model theory, which allowed the Board of Education to engage in discriminatory hiring and layoff practices "long past the point required by any legitimate remedial purpose"); *see also Croson,* 488 U.S. at 498, 109 S.Ct. at 724 (" 'Relief' for such an ill-defined wrong could extend until the percentage of public contracts awarded to MBE's [minority business enterprises] in Richmond mirrored the percentage of minorities in the population as a whole"); *Davis,* 478 U.S. at 130–31, 106 S.Ct. at 2809–10 (plurality opinion) ("To draw district lines to maximize the representation of each major party would require creating as many safe seats for each party as the demographic and predicted political characteristics of the State would permit"). If North Carolina's District 12 were in fact *required* by the Voting Rights Act, as the majority seems to imply, then virtually any district, whatever shape or form, no matter how dispersed its population, would be upheld. Furthermore, under the majority's theory here, every minority group that could make out the proper showings under *Gingles* would consequently be entitled to its own single member district, ultimately resulting in systematic political apartheid. *See Shaw,* — U.S. at ——, 113 S.Ct. at 2827. To the extent that the Voting Rights Act by some stretch of the imagination does require such districts, therefore, I would find the Voting Rights Act to be unconstitutional, especially as applied in light of the distinct harms identified by the Court in *Shaw.*

In the alternative, even assuming that the State could have made a proper showing as to *all* of the relevant factors under *Gingles,* thereby supporting a finding of liability under § 2, and, further, that contemporaneous findings to that effect by the General Assembly are not required to support the State's burden herein (or, more precisely, that the State's actual beliefs to the contrary do not

**15.** The majority's contention that majority-minority districts that guarantee only the *opportunity* for minority electoral success do not violate § 2's rejection of proportional representation, *see ante* at 447, is wholly unpersuasive. As Justice Thomas notes in his concurrence in *Holder, supra,* "[i]t should be clear that a system that gives a minority group proportional control [accomplished even by a bare majority] effectively provides the 'right' to elect a proportionate number of minority candidates that the Act disclaims. Whether that right is utilized by minority voters to elect minority candidates is a matter of the voters' choice." — U.S. at ——, 114 S.Ct. at 2610 n. 26.

**16.** On December 17, 1991, House Speaker Daniel T. Blue, Jr., Representative Toby Fitch, Senator Dennis Winner, Leslie Winner, and Gerry Cohen travelled to Washington, D.C., to meet with John Dunne, the Assistant Attorney General of the United States for Civil Rights. The meeting had been called by Mr. Dunne in connection with the rejection of North Carolina's original redistricting plan (Chapter 601). Senator Winner recounted the events of the meeting in his deposition, waiving his legislative privilege:

That meeting—I could not figure out the purpose of that meeting once we got into it, because it was very obvious to me—that was the first time I met John Dunne, or whatever his name is. And it was very obvious to me that Mr. Dunne had already made his mind up, and why he dragged us to Washington I don't know.

They talked about the Senate and the House plan—you know, out of an hour or two hour meeting maybe we spent five minutes on the legislative plans. Most of it had to do with the congressional plan. And Mr. Dunne did most of the talking—there was a little talking from the other staff, but he did most of the talking, and most of it got down to sort of that we ought to have a quota system with respect to minority seats. You had 22 percent blacks in this state. Therefore, you ought to have as close to that as you could have of congressional districts. That is really all I remember about it.... I think his substance was really that you had—if you had 22 percent blacks in North Carolina, then you ought to have 22 percent minority congressional seats. Whatever shape didn't matter.

Deposition of Senator Dennis Winner at 17–19.

preclude a finding to that effect now), it only seems logical that whatever "remedy" the State imposes in anticipation thereof must be adequately tailored to the "wrong" to which it is addressed. *See also City of Rome v. United States,* 446 U.S. 156, 213, 100 S.Ct. 1548, 1580, 64 L.Ed.2d 119 (1980) (Rehnquist, J., dissenting) ("These precedents are carefully formulated around a historic tenet of the law that in order to invoke a remedy, there must be a wrong"). That is, even if compliance with § 2 constitutes a sufficient compelling interest for the creation of majority-minority districts generally, certainly the degree to which the State's proffered remedy—specifically the creation of Districts 1 and 12—in fact addresses the anticipated violation here is at least relevant to whether the plan is "narrowly tailored." To hold otherwise would effectively read the "geographical compactness" requirement out of the Court's § 2 jurisprudence altogether, since a gerrymandered district conceivably could *always* be drawn to incorporate enough black voters to constitute a majority in a single-member district, no matter how dispersed they were throughout the State. Surely this was not the Court's intention in *Gingles* when it made compact geography at least legally relevant in vote dilution cases, if not required.[17] The relevance of district shape to the issue of whether North Carolina's redistricting plan is narrowly tailored will be discussed more fully *infra.*

I would make one final general observation here before moving on with the analysis. By its plain language, the Voting Rights Act protects nothing more, and certainly nothing less, than the "opportunity" to participate in the political process and indeed specifically disavows any guarantee of proportional representation. Section 2(b) of the Act provides that:

A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less *opportunity* than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered....

42 U.S.C. § 1973(b) (emphasis added).

Since there are no allegations here that blacks in North Carolina are currently prevented from participating *per se* in the political process, from registering and exercising their right to vote, then the only salient evidence presented by the Defendants and Defendant–Intervenors here regarding a violation of § 2 would seem to be the extent to which members of the black population have been able to elect representatives of their choice or at least had the opportunity to do so. If we are to assume that the candidates of choice for blacks in North Carolina have always been black themselves, as Defendants imply, then we would have to find that the opportunity to elect such candidates has been denied them, given the congressional election results over the course of North Carolina's political history. *See also Gingles,* 478 U.S. at 93, 106 S.Ct. at 2788–89 (O'Connor, J., concurring in the judgment) ("electoral success has now emerged, under the Court's standard, as the linchpin of vote dilution claims").

But in assessing vote dilution, it is not at all clear why the Court should not take into account political *influence* as well—after all,

17. As a three-judge panel in Maryland recently noted, political scientists and voting law scholars have proved that *any* group of voters—regardless of where they live—can be fit into one contiguous district. *Marylanders for Fair Representation, Inc. v. Schaefer,* 849 F.Supp. 1022, 1052 n. 38 (1994) ("'If every name in the Manhattan phone book is randomly associated with one of ten districts, a map can be constructed that will place every voter in a literally contiguous district no matter which combination of names and districts are chosen. The resulting redistricting map would certainly look odd—in places, districts might be stretched thin as telephone wires—but it can be done, regardless of where the voters live'"). The panel went on to conclude, rightly so, that "[o]n this view, Justice Brennan's requirement in *Gingles* that a minority group be compact enough to be placed in a contiguous remedial district would actually be no requirement at all." *Id.*

"the power to influence the political process is not limited to winning elections." *Davis,* 478 U.S. at 132, 106 S.Ct. at 2810 (plurality opinion); *see also Gingles,* 478 U.S. at 94–100, 106 S.Ct. at 2789–92 (O'Connor, J., concurring in the judgment) (otherwise "the Court's test for measuring voting strength and its test for vote dilution, operating in tandem, come closer to an absolute requirement of proportional representation than Congress intended when it codified the results test in § 2"). Moreover, § 2 expressly states that electoral success is only *one* circumstance which may be considered in vote dilution claims, leaving the door open to other kinds of evidence.[18] Of course, there was no evidence presented to this Court regarding political influence *per se,* and the Court therefore has no basis on which to make a determination with respect thereto. But certainly such evidence, admitted for that limited purpose rather than as a testament to historical discrimination generally, would have been relevant to the question of the State's potential liability under § 2. For the courts to ignore such evidence, properly presented, is to limit unnecessarily the intended reach of the Voting Rights Act, thereby prompting legitimate concerns about proportional representation.

In sum, then, I dissent from the majority's finding here that, under the circumstances presented, North Carolina had a compelling interest in complying with § 2 of the Voting Rights Act. The State lacked a sufficient basis in evidence reasonably to anticipate liability under § 2, and the remedial legislation allegedly enacted in response thereto, Chapter 7, was consequently unwarranted. Plaintiffs have therefore met their ultimate burden of persuasion. Moreover, the fact that the General Assembly failed to make explicit findings as to its remedial intent, and now brings before the Court only weak post-hoc rationalizations, precludes finding in favor of the Defendants on this issue. Finally, even if remedial action had been warranted, the threshold requirement in *Gingles* of geographical compactness must at least have implications for whether North Carolina's redistricting plan can ultimately be described as "narrowly tailored," an issue which I discuss in more detail *infra.*

### B. *Compliance With Section 5 of the Voting Rights Act*

North Carolina's next argument in support of its redistricting plan derives from its statutory duty to comply with § 5 of the Voting Rights Act. More specifically, the majority here finds that the State had a compelling interest to comply with the Attorney General's preclearance requirements under § 5 by demonstrating that its revised plan (Chapter 7) had neither the "purpose ... [nor] the effect of denying or abridging the right to vote on account of race or color...." 42 U.S.C. § 1973c; *see also* 28 C.F.R. § 52.52.[19] As the majority observes, there are two separate prongs to the § 5 standard, but I, like the majority, find the "effect" prong inapplicable in the case presently before us. As to the "purpose" prong of the § 5 standard, I agree that an analysis thereunder essentially duplicates the analysis under the constitutional vote dilution standard, namely requiring a showing that the proposed redistricting plan was not designed to dilute minority voting strength. *See ante* at 441 n. 31. This is essentially the identical argument offered by the State in connection with its alleged duty to comply with § 2, discussed *supra;* the only material difference, of course, is that the State's interest here in complying with § 5 stems not from a desire to avoid future liability under the Voting Rights Act but from an administrative goal to secure pre-

---

**18.** The Supreme Court has expressly left open the question of whether influence-dilution claims are themselves cognizable under § 2. *Growe v. Emison,* —— U.S. ——, —— n. 5, 113 S.Ct. 1075, 1084 n. 5, 122 L.Ed.2d 388 (1993); *see also Gingles,* 478 U.S. at 46–47 n. 12, 106 S.Ct. at 2764 n. 12; *Voinovich v. Quilter,* —— U.S. ——,

——, 113 S.Ct. 1149, 1155, 122 L.Ed.2d 500 (1993).

**19.** In fact, North Carolina's original plan (Chapter 601) was explicitly rejected by the Attorney General for failure to demonstrate as much. *See ante* at 461–462, (quoting Stip. 72, Stip. Ex. 27).

clearance from the Attorney General.[20] Especially in light of the Attorney General's rejection of North Carolina's original plan, the State argues that it consequently had a compelling interest to comply with its obligations under § 5 as interpreted and enforced by the Attorney General in connection with its submission of Chapter 7.

Blind deference to the administrative findings of the United States Attorney General cannot render the State's conduct here immune from constitutional scrutiny, however. Since the General Assembly had the option of subsequently seeking preclearance in the United States District Court for the District of Columbia, see 42 U.S.C. § 1973c, and expressly considered such a course of action, its choice not to do so but instead to capitulate to the Attorney General's recommendations effectively negates the argument that the creation of Chapter 7 in its present form was required *per se* under § 5. In other words, reliance on the Attorney General's interpretation and application of the Voting Rights

Act, without regard to the accuracy or constitutionality thereof, is insufficient in itself to constitute a compelling state interest. Instead, there should be some independent basis for the State's apprehension of vote dilution sufficient to justify remedial action to correct it.[21] Otherwise the majority's holding in this respect would vest the Department of Justice with unbridled and unprecedented discretion, since under these circumstances at least the Department of Justice's findings would be deemed conclusive, and the Attorney General would further enjoy a *de facto* ability to determine the constitutional scope of federal legislation, heretofore a responsibility reserved for the courts.[22] For obvious reasons this is an altogether wholly unacceptable result.

In my opinion, then, the analysis here is subsumed within the analysis described above for vote dilution under § 2. Therefore, I would find that, at least in the case as it comes before us, the State should demon-

**20.** The majority observes in a footnote that coverage under § 5 "is tantamount to a congressional finding that the jurisdiction in question has committed identified violations of the Fifteenth Amendment in the relatively recent past," *see ante* at 442 n. 33, and that such a finding may be regarded as "sufficient, in and of itself, to give that jurisdiction a 'strong basis in evidence' for thinking that it must engage in race-based redistricting...." *Id.* Given the restrictive nature of the Voting Rights Act's bailout provisions, however, such a rule, taken to its logical conclusion, could conceivably require a jurisdiction to employ increasingly extreme race-based remedial devices over a prolonged period of time without any real justification. This could not have been Congress' intent when it enacted the Voting Rights Act. Moreover, evidence was adduced at trial that *some* members of the legislature believed that Justice Department officials were acting with partisan motives in requiring the State to create two majority-minority districts. This climate of opinion tends to contradict any contention that the legislature sincerely believed that "it must engage in race-based redistricting" in order to remedy voting rights violations.

**21.** I agree with the majority here that a state is not *required* to "challenge a Justice Department denial of preclearance in the United States District Court for the District of Columbia, and lose, before it may safely conclude that it has a compelling interest in adopting a new plan to address the concerns upon which the Department's denial of preclearance was based." *See ante* at 442. But to require a state to assert some *independent* basis for its apprehension of liability would nei-

ther manifest "disrespect for the judgment of the Attorney General" nor interfere with states' efforts "to comply voluntarily with their obligations under the federal civil rights laws." *Id.* at 442 (citations omitted). Indeed, such a requirement would only bolster a state's willingness to take remedial action, if warranted.

Here, of course, the State chose not to enact the particular district plan proposed by the Department of Justice, which included a majority-minority district in the south-central to southeastern part of the state. While the State obviously was not required to adopt the Department of Justice's proposal, its failure to do so or even to address the Department of Justice's concerns certainly casts some doubts on the merits of the Attorney General's objections and the compelling nature of the State's interest in complying therewith.

**22.** The majority notes that Congress expressly authorized the Department of Justice to act as a "surrogate" for the United States District Court for the District of Columbia in approving redistricting legislation. *See ante* at 442. Such approval of course does not render redistricting legislation immune from subsequent judicial scrutiny, including invalidation. Section 5 of the Voting Rights Act itself specifies that neither a declaratory judgment in the United States District Court for the District of Columbia nor a ruling by the Attorney General shall bar a subsequent action to enjoin enforcement of a proposed change in voting procedure. *See* 42 U.S.C. § 1973c.

strate that it had some independent basis for its apprehension that its initial redistricting plan was designed to dilute minority voting strength in an unconstitutional manner, thereby requiring it to take appropriate remedial measures in response thereto.[23] The State may indeed have had an independently compelling reason to create a second majority-minority district, if in fact the failure to do so would have amounted to vote dilution. Whether the failure to create any majority-minority districts or these districts in particular would have amounted to vote dilution again depends upon the State's potential liability under § 2 of the Voting Rights Act, as discussed *supra*. For the reasons stated above, again I would find either that the State could not have had a reasonable apprehension of liability under § 2, given the dispersed nature of the black population in North Carolina, or that, in the alternative, if the black population was in fact geographically compact enough to support liability under § 2, that such compactness must at least have implications for the shapes of the districts consequently created to remedy the § 2 violation in order to be "narrowly tailored."

Finally, it is interesting to note that of North Carolina's 100 counties, only 40 of those were subject to § 5's preclearance requirements at the time Chapter 7 was enacted. Any redistricting plan that affected all or a portion of these 40 counties would of course require preclearance, and such plans must by necessity be considered as a whole, not on a district-by-district basis. Obviously, if only one county in North Carolina were subject to the requirements of § 5, however, compliance therewith would not constitute a

compelling interest for the creation of a gerrymandered district located elsewhere in the State. Here, of the 40 counties covered by § 5, none is entirely included within the Twelfth District, and only two such counties—Gaston and Guilford—are even partially included in District 12. Stip.Paras. 108–11.[24] To argue that the State therefore had a compelling interest to create these particular gerrymandered districts in order to comply with § 5's preclearance requirements defies common sense and would seem to defeat the purposes served by the Voting Rights Act. Insofar as the majority finds to the contrary, I dissent.

### C. *Remedy Past Discrimination*

The final justification offered by the State for its racially gerrymandered districts is its interest in eradicating the effects of past racial discrimination. A state's voluntary efforts to remedy discrete and particular instances of discrimination is indeed a laudable endeavor and should not be discouraged. *See Wygant*, 476 U.S. at 289–91, 106 S.Ct. at 1855–56 (O'Connor, J., concurring in part and concurring in the judgment). Of course, a general showing of societal discrimination alone is not sufficient to justify a racial classification, *see id.* at 274–75, 106 S.Ct. at 1847–48 (opinion by Powell, J.), and the State must have had a "strong basis in evidence for its conclusion that remedial action was necessary." *Id.* at 277, 106 S.Ct. at 1848–49. I concur in the majority's finding here that the State has failed to demonstrate any basis in evidence for a conclusion that such remedial action was necessary, especially since the State has clearly demonstrated that it would not have enacted Chapter 7 *but for* the Attorney General's rejection of Chapter 601.[25]

---

**23.** Otherwise, the case before us presents the perfect example of how, in Abigail Thernstrom's view, § 5 has been improperly transformed from its original objective of "guarding against renewed disfranchisement, the use of the back door once the front was blocked," to an instrument to "promote the election of blacks to public office." *See* Abigail Thernstrom, *Whose Votes Count? Affirmative Action and Minority Voting Rights* 20, 38 (1987).

**24.** Of the remaining 60 counties which are not covered by § 5, eight of those are included in part in District 12. In addition, eight of North Carolina's § 5 covered counties are entirely in-

cluded within the First District, along with portions of 14 other counties. Six of the remaining uncovered counties are included, in whole or in part, in the First District. Sixteen of North Carolina's 40 covered counties are not included, in whole or in part, in either of Chapter 7's majority-minority districts. *Id.*

**25.** The majority's finding in this regard is of interest, however, in light of its prior conclusion that the General Assembly found sufficient reason to remedy a suspected § 2 violation, since contemporaneous evidence of legislative findings as to either justification is unquestionably scarce.

However, where Congress has sought to implement a legislative remedial scheme as decidedly broad and far-reaching as the Voting Rights Act, I question whether, as the majority here holds, a state can be found to maintain a compelling interest to exceed this federal mandate in efforts to achieve racial equality. *See ante* at 443–444. As the Court in *Shaw* clearly recognized, "only three Justices in *UJO* were prepared to say that States have a significant interest in minimizing the consequences of racial bloc voting apart from the requirements of the Voting Act." *Shaw*, —— U.S. at ——, 113 S.Ct. at 2832. Significantly, as the Court further observed, "those three Justices specifically concluded that race-based districting, as a response to racially polarized voting, is constitutionally permissible only when the State 'employ[s] sound districting principles [such as compactness and population equality],' and only when the affected racial group's 'residential patterns afford the opportunity of creating districts in which they will be in the majority.'" *Id.* at ——, 113 S.Ct. at 2832 (quoting *United Jewish Organizations*, 430 U.S. at 168, 97 S.Ct. at 1011 (opinion by White, J.)). Given North Carolina's total disregard for certain "sound districting principles," such as compactness and contiguity, I am compelled to find that the State's alleged efforts here to eradicate the effects of past discrimination transcend that which is expressly required by the Voting Rights Act.

The rationale behind the Court's apparent skepticism in *Shaw* in this regard should be obvious. It is by now a fundamental tenet in our equal protection jurisprudence that any effort by a state to remedy past discrimination must be carefully tailored, gauged to the specific past harm being alleviated. *Croson*, 488 U.S. at 507–08, 109 S.Ct. at 729 (majority opinion); *Wygant*, 476 U.S. at 274, 106 S.Ct. at 1847 (plurality opinion). Where the past harm is as undefined as it is here, described in relatively abstract terms of vote "dilution" rather than outright "denial," however, there is the very real danger that the remedy imposed may actually become part of the problem, especially in light of the distinctive harms associated with racially gerrymandered districts generally. *See Shaw*, —— U.S. at ——————, 113 S.Ct. at 2827–32; *see*

*also Croson*, 488 U.S. at 493, 109 S.Ct. at 721–22 (opinion by O'Connor, J.) ("Classifications based on race carry a danger of stigmatic harm"); *Regents of University of California v. Bakke*, 438 U.S. 265, 298, 98 S.Ct. 2733, 2752, 57 L.Ed.2d 750 (1978) (opinion by Powell, J.) ("preferential programs may only reinforce common stereotypes holding that certain groups are unable to achieve success without special protection based on a factor bearing no relationship to individual worth"). Accordingly, given the pitfalls necessarily inherent in any voluntary remedial undertaking concerning minority voting practices, I would find that the State has no compelling interest to address past discrimination in voting practices beyond that required by the Voting Rights Act, the federal remedy mandated by Congress.

## III.

### *Not Narrowly Tailored*

Assuming that the district lines employed by the State of North Carolina here are not *inherently* unconstitutional, and further assuming that the State had a compelling interest for its otherwise unconstitutional conduct, the next question is whether the redistricting plan at issue here is narrowly tailored to further that interest. I find that the districts here, while keenly tailored, are by no means "narrowly tailored" as that term is employed in Equal Protection law.

To what extent North Carolina's redistricting plan is narrowly tailored of course depends upon what compelling interest is advanced to justify the plan. After all, "[r]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Wygant*, 476 U.S. at 280, 106 S.Ct. at 1850 (plurality opinion) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 537, 100 S.Ct. 2758, 2805, 65 L.Ed.2d 902 (1980) (Stevens, J., dissenting)). The majority again inexplicably claims that district shape is irrelevant beyond its significance as an indication of discriminatory intent, thereby unwarrantedly delimiting the scope of the Court's opinion in *Shaw*. *See ante* at 449. But while such traditional districting principles as compact-

ness and contiguity may not be "constitutionally required" *per se, see Shaw,* —— U.S. at ——, 113 S.Ct. at 2827, they are plainly relevant at least in a relative sense in assessing whether there were less restrictive means available to the General Assembly during the redistricting process. *See Bridgeport Coalition for Fair Representation v. City of Bridgeport,* 26 F.3d 271, 278 (2d Cir.1994) ("A purported remedy for perceived violations of Section 2 of the Voting Rights Act must include consideration of both racial fairness and traditional districting principles"); *Marylanders for Fair Representation,* 849 F.Supp. at 1053 ("although a State can—and at times must—place great weight on race when redistricting, it may not do so to the exclusion of all traditional, nonracial districting principles, leaving a district that rationally can be understood only as 'an effort to classify and separate votes by race'") (citing *Shaw,* —— U.S. at ——, 113 S.Ct. at 2828).

North Carolina's alleged interests in complying with §§ 2 and 5 of the Voting Rights Act are essentially based on the assumption that, but for the creation of these gerrymandered districts, the State would have been subject to a § 2 vote dilution claim or would not have been able to secure preclearance from the Attorney General under § 5. The first question the Court must ask, then, is to what extent the State's proposed "remedy" here, namely the enactment of Chapter 7, successfully addresses the anticipated underlying "injury," namely minority vote dilution. *United States v. Paradise,* 480 U.S. 149, 171, 107 S.Ct. 1053, 1066, 94 L.Ed.2d 203 (1987) (opinion by Brennan, J.) (Court must consider "the necessity for the relief and the efficacy of alternative remedies"). The Court in *Paradise* undertook a similar endeavor in order to assess whether the remedy imposed in that case was narrowly tailored:

> To evaluate the District Court's determination that it was *necessary* to order the promotion of eight whites and eight blacks to the rank of corporal at the time of the motion to enforce, we must examine the purposes the order was intended to serve.

*Id.* (emphasis in original). Likewise, we must evaluate the State's asserted purposes here in order to determine whether the districts at issue are *necessary* in connection therewith.

As discussed *supra,* one of the threshold requirements of a § 2 vote dilution claim, and hence necessarily a factor in the Attorney General's § 5 preclearance considerations, is that the minority population at issue must be "geographically compact." *See Gingles,* 478 U.S. at 50, 106 S.Ct. at 2766. The logical implication of the Court's opinion in *Gingles,* and of the Congressional mandate expressed in § 2, is that if a politically cohesive and geographically compact minority population in fact exists, the State then has some obligation to incorporate said population in a majority-minority district in order to avoid liability under the Voting Rights Act. *Growe,* —— U.S. at ——, 113 S.Ct. at 1084. Assuming *arguendo* that there is a sufficiently "geographically compact" minority population in North Carolina to sustain a § 2 vote dilution claim, and thus a compelling reason for the State to take appropriate remedial measures in connection therewith in order to avoid liability and to secure preclearance under the Voting Rights Act, it would be difficult if not impossible to argue that the State here successfully incorporated compact minority populations within the boundaries of its two majority-minority districts. Indeed, one need only glance at the map to confirm that District 12 fails to accommodate a compact population of any race. In this context the precise shapes of the districts are relevant because they provide a gauge for the State's remedial success—and from the looks of Districts 1 and 12, the State failed miserably. When districts are as strung out as Districts 1 and 12, lacking all inherent integrity, they cease being districts at all, instead merely patching together islands of voters with only a legislative intent to group predetermined numbers of voters by race. Creation of such districts was by no means "necessary" in order to comply with the Voting Rights Act.[26]

---

26. In assessing proposed gerrymandered districts far less egregious than those presently before us, a three-judge panel in Arkansas likewise found that bizarre district shape could very well betray the absence of any compact minority population sufficient to warrant § 2 liability under

The State argues that Plaintiffs' submission at trial of an alternative district plan with more geographically compact districts in itself demonstrates the State's potential liability under § 2, since geographically compact majority-minority districts were clearly possible. In what can only be described as a legal leap of faith, however, the State, with the majority's blessing, *see ante* at 454–455 n. 50, asserts that whatever districts it actually created to preempt liability under the Voting Rights Act need not reflect or incorporate the specific compact minority populations which would allegedly trigger the § 2 violation. This line of contention is devoid of both logic and common sense and hardly merits this Court's attention, much less its endorsement. I must conclude that the State "went beyond what was reasonably necessary to avoid [vote dilution]" and that North Carolina's reapportionment plan consequently is not narrowly tailored to accomplish that goal. *See Shaw,* ——— U.S. at ———, 113 S.Ct. at 2831.

The majority here identifies five other factors relevant to determining whether the State's remedial scheme is sufficiently tailored to survive strict scrutiny. With respect to the first factor, I agree with the majority that a state that has a compelling interest in complying with the Voting Rights Act obviously has no completely race-neutral means of accomplishing that goal. Equally obvious, however, is the fact that the North Carolina General Assembly here failed to utilize more conventional district shapes that, if not inherently "race neutral," at least would have been more likely to have been perceived as such

by the voters. After all, "reapportionment is one area in which appearances do matter." *Id.* at ———, 113 S.Ct. at 2827. Again, where it is clear that a grossly disfigured majority-minority district poses dangers qualitatively distinct from those posed by a compact majority-minority district, the extent to which a redistricting plan *reflects* the use of race should have a significant bearing on our analysis. The very purpose of narrow tailoring, of course, is to promote the accomplishment of the remedy at *minimum* expense to other important interests, including contiguity and compactness. Where, as here, the State completely disregards less offensive alternatives in favor of a redistricting plan as contorted as the one presently before us, I find it difficult to characterize such a plan as "narrowly tailored." *See Croson,* 488 U.S. at 507, 109 S.Ct. at 729 ("there does not appear to have been any consideration of the use of race-neutral means to increase minority business participation in city contracting").

With respect to the second factor, the majority here finds North Carolina's redistricting plan more analogous to a "flexible goal" than a "strict quota." *See ante* at 446–447. While the "remedial" device employed by the State here is distinguishable from more traditional numerical quotas, Chapter 7 in many ways resembles the strict quota device struck down in *Croson, supra.* A redistricting plan that gerrymanders a given population in order to achieve a certain electoral result is closely analogous to hiring or promotion quotas designed to achieve a certain racial profile in the work force.[27] Given the absence of

Gingles. *Writing for the Court, Judge Arnold held that:*

> The peculiar shape of [plaintiff's proposed districts] ... is precisely due to the lack of the compact minority population required by *Gingles*.... The bottom line is that the black population in this area is simply too widely dispersed for us to hold that the Board [of Apportionment] has violated § 2 by refusing to draw the additional ... districts which the plaintiffs have requested.

*Jeffers,* 847 F.Supp. at 662.

27. The majority here makes much of the fact that, given the bare majority of blacks in North Carolina's two majority-minority districts, these districts in no way "guarantee" the election of an African–American to Congress in the same way that traditional quotas "guarantee" the hiring or

promotion of certain minorities. *See ante* at 446–447. Whether or not the election of blacks in these districts is certain, however, it is undisputed that these districts were intended by the General Assembly to achieve a certain result— guaranteeing blacks an *opportunity* to elect a representative of their own choice. This guaranty, of course, depends for its success on the legislative assumption that black voters will tend to vote in a bloc for black candidates. So while proportional representation may not always be the *actual* outcome of every election given the bare minority majorities in the districts at issue, it was nevertheless the *intended* outcome here, as the evidence strongly suggests.

In any event, the majority's argument that the Voting Rights Act requires even such "opportunity" districts arguably violates § 2's repudiation

any "logical stopping point" for the creation of majority-minority districts pursuant to the majority's reading of the Voting Rights Act here, these districts "cannot be said to be narrowly tailored to any goal, except perhaps outright racial balancing." *Croson,* 488 U.S. at 507, 109 S.Ct. at 729. As discussed *supra,* however, proportional representation is clearly not a legitimate objective, either for legislative pursuit or for judicial encouragement. *Cf. Paradise,* 480 U.S. at 178, 107 S.Ct. at 1070 (opinion by Brennan, J.) ("The one-for-one requirement evaporated at the ranks of corporal and sergeant upon implementation of promotion procedures without an adverse impact, demonstrating that it is *not* a disguised means to achieve racial balance") (emphasis added). And just as courts have struck down extreme quota devices that bear no rational relationship to any goal other than outright racial balancing, *see, e.g., Croson,* 488 U.S. at 507, 109 S.Ct. at 729, so too should we strike down extreme gerrymanders that promote nothing short of proportional representation.

The majority's analysis of the final factor, the impact of the enacted districts on the rights of third parties, likewise gives cause for concern. *See Paradise,* 480 U.S. at 171, 107 S.Ct. at 1066–67 (opinion by Brennan, J.); *Fullilove,* 448 U.S. at 514, 100 S.Ct. at 2793 (Powell, J., concurring). Given the unique breed of harms caused by these racially gerrymandered districts as identified so forcefully in the Supreme Court's opinion in *Shaw,* harms suffered by racially gerrymandered district residents and non-gerrymandered district residents alike, I simply cannot subscribe to the view that such districts are "narrowly tailored" where in fact more compact alternative districts were feasible.

Here, the burden is not placed on innocent non-minorities (in terms of any denial of privileges, benefits, etc.) so much as it is placed on the very minorities that these districts were presumably created to empower. *See Croson,* 488 U.S. at 516–17, 109 S.Ct. at 733–34 (Stevens, J., concurring in part and

concurring in the judgment); *cf. Wygant,* 476 U.S. at 283–84, 106 S.Ct. at 1851–52 (plurality opinion). The stigma associated with such districts is real and tangible and cognizable under the Fourteenth Amendment per the Court's opinion in *Shaw,* — U.S. at —, 113 S.Ct. at 2828, and even per the majority's opinion here. *See ante* at 423–427. *See also Fullilove,* 448 U.S. at 545 and n. 17, 100 S.Ct. at 2809 and n. 17 (Stevens, J., dissenting); *Croson,* 488 U.S. at 493, 109 S.Ct. at 721–22 ("Classifications based on race carry a danger of stigmatic harm"); *id.* at 516–17, 109 S.Ct. at 733–34 (Stevens, J., concurring in part and concurring in the judgment); *Bakke,* 438 U.S. at 298, 98 S.Ct. at 2752 (opinion by Powell, J.); *cf. Metro Broadcasting, Inc. v. F.C.C.,* 497 U.S. 547, 601, 110 S.Ct. 2997, 3028, 111 L.Ed.2d 445 (1990) (Stevens, J., concurring). Also, the stigmatic burden here is on *all* minorities, not just on certain nonminorities. *Cf. Metro Broadcasting,* 497 U.S. at 596–97, 110 S.Ct. at 3025–26. Given the Supreme Court's obvious concern for district shape as expressed in *Shaw,* the burden of these district shapes cannot be dismissed as "relatively light" or "diffuse," as the majority's opinion here so easily does. *Id.* at 600, 110 S.Ct. at 3027–28 (citing *Fullilove,* 448 U.S. at 484, 100 S.Ct. at 2777–78 (opinion by Burger, C.J.)). Rather, I would find that North Carolina's racially gerrymandered districts continue to "impose disproportionate harm on the interests, or unnecessarily trammel the rights, of innocent individuals directly and adversely affected by a plan's racial preference." *Wygant,* 476 U.S. at 287, 106 S.Ct. at 1854 (O'Connor, J., concurring in part and concurring in the judgment). As evidenced by the alternative redistricting plans submitted by Plaintiffs at trial, there were "less intrusive" means available to the General Assembly. *See id.* at 283, 106 S.Ct. at 1852. To characterize the burden to third parties here as "marginal unfairness," as the majority does, *see ante* at —, is to ignore the clear implications of the

---

of proportional representation where North Carolina's redistricting plan effectively provides the "right" to elect a proportionate number of minority candidates, even if such right is not actual-

ly exercised by minority voters. *See Holder,* 484 U.S. at —, 114 S.Ct. at 2610 n. 26 (Thomas, J., concurring in the judgment); *see also supra* at — n. 15.

Supreme Court's opinion in *Shaw*.[28] Accordingly, this Court's decision should recognize the significance to third-party voters and citizens of the Supreme Court's observations that "[b]y perpetuating such notions [of racial stereotypes], a racial gerrymander may exacerbate the very patterns of racial bloc voting that majority-minority districting is sometimes said to counteract," *Shaw*, —— U.S. at ——, 113 S.Ct. at 2827, and that "elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole. This is altogether antithetical to our system of representative democracy." *Id.* at ——, 113 S.Ct. at 2827.

Moreover, the majority's opinion, without justification, arbitrarily limits the criteria for evaluating North Carolina's redistricting plan to "constitutionally-mandated" redistricting principles, rendering all other considerations *de minimis*. *See ante* at 448–449. But it is not at all clear why redistricting principles which are not constitutionally-*mandated per se* should not be at least relevant and even significant in assessing a plan's constitutionality, especially where the constitutional relevance of such redistricting principles as compactness and contiguity has so recently been declared by the Supreme Court.[29] If we as a Court are to give any force at all to the mandate issued by the Supreme Court in this case, as I believe we must, then we must find in light of the cited language in *Shaw* that these districts are not "the most exact connection between justification and classification" as required in *Wygant, supra*. More compact variations were possible, and the State's redistricting plan is not sufficiently "narrowly tailored" to survive strict scrutiny.[30]

The majority also makes three arguments as to why, for practical reasons, courts should not consider notions of compactness and contiguity in assessing the constitutionality of voting districts. First, the majority asserts that such traditional districting principles have "little inherent value" in the districting process since they are no longer necessary to ensure fair and effective representation. *See ante* at 451. The majority's conclusion in this regard, however, is misplaced. The evidence at trial amply demonstrated that the combination of modern computer technology and voter-specific census data, readily available today and used by the legislature in creating Chapter 7, permits the creation of districts of unreasonable length and complexity. *See generally* testimony of Gerry Cohen, Tr. pp. 281–652. Indeed, notwithstanding the potentially self-serving testimonies of those congresspersons elected to

**28.** That characterization also betrays the majority's belief that a legislature may, at its leisure, subordinate the constitutionally protected third-party interests identified in *Shaw* in favor of such a relatively transitory interest as incumbency protection, one of the admittedly primary goals of Chapter 7. *See generally* testimony of Gerry Cohen, Tr. pp. 281–652.

**29.** Indeed, if consideration were reserved solely for constitutionally-mandated redistricting principles, there would be no need to engage in a strict scrutiny analysis in the first place. If a voting district violated the "one person, one vote" standard or unduly diluted minority voting strength, such a district would be defective in its own right, inherently unconstitutional regardless of any compelling justification.

**30.** The majority observes that "[n]either the *UJO* plurality nor the *Shaw* majority indicates that compactness, contiguity, and respect for political subdivisions are the *only* districting principles which can be considered 'sound'...." *See ante* at 450 n. 44 (emphasis in original) (citing *United*

*Jewish Organizations*, 430 U.S. at 167–68, 97 S.Ct. at 1010–11 (opinion by White, J.) ("we think it ... permissible for a State, employing sound districting principles *such as* compactness and population equality, to attempt to prevent racial minorities from being repeatedly outvoted by creating districts that will afford fair representation to the members of those racial groups who are sufficiently numerous and whose residential patterns afford the opportunity of creating districts in which they will be in the majority." (emphasis added))). But I fail to see how this authorizes a state to completely *disregard* traditional redistricting principles such as compactness and contiguity without consequence. I would therefore vigorously disagree with the majority's conclusion that "[i]n according primacy to these redistricting principles [including distinctive and internally homogenous communities of interest], the legislature *necessarily had* to subordinate geographical compactness and respect for the integrity of political subdivisions...." *See ante* at 473 (emphasis added). The legislature was not *required* to subordinate geographical compactness, and it should therefore be held accountable for its choice to do so.

represent Districts 1 and 12, it cannot be gainsaid that 160 miles is long for such a lanky district as District 12; indeed, it is sufficiently long to be served by no less than three national airports and three television markets. District 1 is equally ungainly, spread-eagled over a vast portion of Eastern North Carolina, from Virginia to South Carolina. These facts make fair representation virtually impossible in Districts 1 and 12, a conclusion shared at one time by North Carolina's legislative representatives in marshalling support for Chapter 601. No less extreme would be a district that ran the length of the California coastline, some 800 miles in length—indeed, the configurations of voting districts would be limited only by politicians' imaginations.[31] And while citizens of such districts would inevitably share certain concerns and interests, they would be denied the quality of representation inherent in a more geographically compact district, one that respected the established political, social, and economic communities already in existence.[32] So while it may be true, as the majority observes, that geography is no longer as important as it once was to the districting process because of improved transportation and communication, neither is it entirely irrelevant or insignificant.[33]

The majority's second and third arguments, regarding the absence of manageable judicial standards and the prospect of undue interference by the federal judiciary, respectively, are likewise unpersuasive.[34] Even under the majority opinion's narrow interpretation of *Shaw*, determining whether or not a given district successfully *incorporates* a "geographically compact" minority population, and therefore sufficiently addresses any potential § 2 violation, regardless of the aesthetics thereof, is a decision which is appropriately within the purview of the federal courts and which is subject to a "relatively simple and judicially manageable" standard. *See Davis*, 478 U.S. at 149, 106 S.Ct. at 2819 (O'Connor, J., concurring in the judgment). And while concepts like compactness and contiguity may not be scientifically ascertainable, even the majority here concedes that certain of the districts before us could never be characterized as "compact" by any definition of that word. Indeed, the obvious difficulty in distinguishing between permissible hiring or promotional goals and impermissi-

---

31. *See also supra* at 485 n. 17.

32. Of course, it is true that these values in isolation can be sacrificed by a legislature today with little fear of judicial intervention. But under *Shaw*, racial harmony is one value that may not be compromised free of strict (not scant) judicial scrutiny.

33. The majority in my opinion drastically underestimates the degree of voter confusion that can result from gerrymandered voting districts and the significance of such confusion to the political process, while overlooking the significance of citizens' *perceptions* of fair and effective representation as well. A citizenry's perceptions of its political process can be as critical in a democracy as the process itself, and factors that can adversely affect such perceptions should not be dismissed. Thus, the majority's conclusion that certain facts outside the normal, "earth-bound, horizontal workaday world" of the citizen-voter, such as the irregularity of the district in which he or she resides, are not a matter of any great practical consequence, *see ante* at 472 n. 60, seriously underestimates the intellectual grasp of those voters. These people serve on juries in intricate cases, and they know when race is energizing the affairs of state.

34. Regarding the political nature of the court's role in vote dilution cases generally, I find Justice Thomas' concurrence in *Holder, supra,* to have considerable merit. Justice Thomas, joined by Justice Scalia, notes that:

> by construing the [Voting Rights Act] to cover potentially dilutive electoral mechanisms, we have immersed the federal courts in a hopeless project of weighing questions of political theory.... [F]or it is only a resort to political theory that can enable a court to determine which electoral systems provide the "fairest" levels of representation or the most "effective" or "undiluted" votes to minorities.

—— U.S. at ——–——, 114 S.Ct. at 2591–92. Accordingly, "[t]he matters the Court has set out to resolve in vote dilution cases are questions of political philosophy, not questions of law. As such, they are not readily subjected to any judicially manageable standards that can guide courts in attempting to select between competing theories." *Id.* at ——, 114 S.Ct. at 2596 (footnote omitted). Determining issues of district compactness and shape no more involves courts in standardless policy-making than does each and every judicial endeavor under the Voting Rights Act. Indeed, the majority opinion's pejorative assessment of the inherent value of geographically-based voting districts generally, *see ante* at 451–452, demonstrates the political nature of our endeavor here.

ble quotas in other affirmative action contexts has never prevented courts from striking down remedies as irrational as the one presently before us. Where it is clear that the State has in fact crossed that line, it is unnecessary for us to decide, for the purposes of this case, at what point the State crossed it.

Although assessing the merits of future gerrymandering cases may prove to be difficult at times, that is not sufficient reason in itself to abdicate our responsibility to do so here. An assessment of "geographical compactness" can be no more problematic or standardless here than under the vote dilution test articulated by the Supreme Court in *Gingles, supra,* and in fact courts have already embarked on such endeavors since the Supreme Court's decision in *Shaw.* *See, e.g., Marylanders for Fair Representation,* 849 F.Supp. at 1052–56 (finding that district at issue "is not only compact in its shape and appearance, but moreover reflects the reasonable balancing of numerous legitimate redistricting principles"). Indeed, the majority's opinion here successfully accounts for the stigmatic harms associated with gerrymandered districts in its analysis of standing, but it inexplicably fails to address such harms in weighing the ultimate constitutionality of Chapter 7. Thus, the majority would find that while residents of a racially gerrymandered voting district would always enjoy standing to bring suit, such standing would be of no avail so long as said district complied with certain "constitutionally-mandated" districting principles, regardless of its shape and the stigmatic harms associated therewith. The plain language of the Voting Rights Act and the Supreme Court's opinion in *Shaw* does not support such a reading.

I therefore reiterate my earlier observation in this case, *Shaw v. Barr,* 808 F.Supp. 461 (E.D.N.C.1992), that it falls upon the courts to set forth constitutionally valid standards by which race-conscious redistricting may be implemented, and that it is not enough to leave these standards to the vicissitudes of "politics." *Id.* at 480–81 (Voorhees, C.J., dissenting). As the majority here recognizes, Congress has presumably balanced the need for "affirmative action" in the voting context against the potential harms thereof, resulting in the enactment and subsequent extension of the Voting Rights Act. But while it is true that every variety of "affirmative action" program necessarily relies on some offsetting form of the very discrimination such program is designed to combat, the remedial efforts undertaken here are particularly troublesome. *See Paradise,* 480 U.S. at 199, 107 S.Ct. at 1081 (O'Connor, J., dissenting) ("There is simply no justification for the use of racial preferences if the purpose of the [legislation] could be achieved without their use because '[r]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification'" (quoting *Fullilove,* 448 U.S. at 537, 100 S.Ct. at 2805 (Stevens, J., dissenting))). As the Court in *Shaw* recognized, the essential thrust of the State's various arguments here is that "the deliberate creation of majority-minority districts is the most precise way—indeed the only effective way—to .overcome the effects of racially polarized voting." *Shaw,* —— U.S. at ——, 113 S.Ct. at 2832. But I find it curious that the sole cure proposed for racially polarized voting and the effects thereof is a state-endorsed election system that is based on, and indeed whose success ultimately depends upon, racially polarized voting. *See ante* at 475 ("We have concluded instead that, under controlling law, [race-based districting] is a justifiable invocation of a concededly drastic, historically conditioned remedy in order to continue the laborious struggle to break free of a legacy of official discrimination and racial bloc voting").

It is often remarked that the vote is one of the most critical features of a representative democracy and therefore one of our most fundamental rights. *Reynolds v. Sims,* 377 U.S. 533, 562, 84 S.Ct. 1362, 1381–82, 12 L.Ed.2d 506 (1964) (describing the right to exercise the franchise in a free and unimpaired manner as "preservative of other basic civil and political rights"). It is also true that, by definition, a racially gerrymandered congressional district is a highly visible feature of the political landscape, visible to the American public in a way that many remedial programs are not. Indeed, it is just this kind

of visibility that concerned the Court in *Shaw* in the first place. It is crucial to remember also that racial classifications are by their very nature presumptively invalid. *City of Mobile v. Bolden,* 446 U.S. 55, 75–76 and n. 23, 100 S.Ct. 1490, 1504–05 and n. 23 (1980); *see also Fullilove,* 448 U.S. at 523, 100 S.Ct. at 2797–98 (Stewart, J., dissenting) ("Under our Constitution, any official action that treats a person differently on account of his race or ethnic origin is inherently suspect and presumptively invalid"); *Paradise,* 480 U.S. at 193, 107 S.Ct. at 1078 (Stevens, J., concurring in the judgment) ("In such cases [not involving any proven violations of law] the governmental decisionmaker who would make race-conscious decisions must overcome a strong presumption against them"). Therefore, I recount with emphasis the Supreme Court's observation in *Shaw* that three Justices in *United Jewish Organizations* "specifically concluded that race-based districting, as a response to racially polarized voting, is constitutionally permissible *only* when the State 'employ[s] sound districting principles,' and *only* when the affected racial group's 'residential patterns afford the opportunity of creating districts in which they will be in the majority.'" *Shaw,* —— U.S. at ——, 113 S.Ct. at 2832 (quoting *United Jewish Organizations,* 430 U.S. at 168, 97 S.Ct. at 1011 (opinion by White, J.)) (emphasis added). Therefore, where the vote is concerned, and where the State's remedial efforts are as visibly pernicious as they are here, I finally must conclude that such efforts simply go beyond that which is permitted by the Constitution.

## IV.

### Conclusion

[E]ven in the pursuit of remedial objectives, an explicit policy of assignment by race may serve to stimulate our society's latent race consciousness, suggesting the utility and propriety of basing decisions on a factor that ideally bears no relationship to an individual's worth or needs. . . .

*United Jewish Organizations,* 430 U.S. at 173, 97 S.Ct. at 1014 (Brennan, J., concurring in part). That our society's race consciousness persists, latent or otherwise, is indeed a regrettable phenomenon. The question of whether the achievement of a "color-blind" society is imminent or remote at this stage in our collective history has been the subject of considerable debate. The power of this Court, however, is more limited in that regard than some might hope, and our task consequently more mundane: to insure that the law as applied affords equal protection to every citizen.

The evidence presented in this case overwhelmingly supports the conclusion that the controlling officials in the General Assembly adopted the admitted racial gerrymander to create two minority-majority congressional districts in satisfaction of a numerical quota consistent with an intent to maximize the incumbency of all congresspersons affiliated with the controlling political party. The efforts of the Defendants to justify their actions in that respect since this litigation began, with talk of homogenous communities of interest and a perceived (but not hitherto expressed) need to correct past inequities, are lame attempts to reconstruct that truth. Why, then, does the majority lend credence to the sparse evidence supporting the State's position?

Aside from the misreading of *Shaw* embodied in its apparent adherence to Justice White's dissenting opinion, *see supra* at 477–478, at times the majority seems influenced by the notion that this case is merely a rehash of *Pope v. Blue,* where the instant gerrymander was held to reside in the political thicket, there to remain untouched by the judicial hand. That would explain the majority's indulgence towards the latest public position of a legislature which changes its assertions regarding the underlying facts as readily as it does its legal positions advanced in their support. But the *Shaw* decision requires that this Court address the underlying issues with greater seriousness of purpose than did the legislature. An admitted exercise in the nitty gritty of politics and power the majority opinion would elevate to heights of sensitivity and high purpose that the legislature simply never reached. The majority's findings of fact in these matters are decidedly contrary to the weight of the

evidence, and its conclusions of law are accordingly misplaced.

I conclude with an acute observation by Justice Kennedy in a recent case involving distinct but analogous issues: "I regret that after a century of judicial opinions we interpret the Constitution to do no more than move us from 'separate but equal' to 'unequal but benign.'" *Metro Broadcasting*, 497 U.S. at 637–38, 110 S.Ct. at 3047 (Kennedy, J., dissenting). Under the majority opinion, one fears, North Carolinians must live for an indefinite period of time with congressional districts in which the races are intentionally made "separate but equal" without sufficient justification. For all the foregoing reasons, I respectfully dissent.